ORAL ARGUMENT NOT YET SCHEDULED

No. 25-1215

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Jorge Rivera Lujan, et al.,
Petitioners-Appellants,
v.
Federal Motor Carrier Safety Administration, et al.,
Respondents-Appellees.

On Petition for Review of a Final Rule of the Federal Motor Carrier
Safety Administration

## EMERGENCY MOTION FOR A STAY PENDING REVIEW

Teague Paterson
Matthew Blumin
American Federation of
State, County & Municipal
Employees, AFL-CIO
1625 L Street, NW
Washington, DC 20036
(202) 775-5900
*Counsel for Petitioner AFSCME*

Daniel McNeil
Channing Cooper
American Federation of Teachers,
555 New Jersey Avenue NW
Washington, DC 20001
(202) 879-4400
*Counsel for Petitioner AFT*

Wendy Liu
Cormac Early
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
wliu@citizen.org

*Counsel for All Petitioners*

October 24, 2025

## CERTIFICATE OF COMPLIANCE WITH RULE 18

This motion complies with Circuit Rule 18. On October 21, 2025, petitioners requested that the Federal Motor Carrier Safety Administration (FMCSA) stay the effective date of the interim final rule at issue pending judicial review. FMCSA responded on October 24, stating that it was denying the request.

In accordance with Circuit Rule 18(a)(2), on October 23, 2025, counsel for petitioners notified counsel for respondents by telephone and by e-mail that they planned to file this motion.

/s/ *Wendy Liu*
Wendy Liu

# TABLE OF CONTENTS

CERTIFICATE OF COMPLIANCE WITH RULE 18 ...............................i

TABLE OF AUTHORITIES....................................................iv

GLOSSARY .............................................................viii

INTRODUCTION..............................................................1

BACKGROUND ...............................................................2

    A. Statutory and Regulatory Framework ............................2

    B. Interim Final Rule ...........................................5

    C. Procedural History ...........................................8

ARGUMENT .................................................................9

I.    Petitioners are likely to succeed on the merits. ...............9

    A.    Petitioners are likely to succeed on their claim
that the Rule is arbitrary and capricious. ...............9

    B.    Petitioners are likely to succeed in showing that FMCSA
failed to follow required procedures. ...................16

        1. FMCSA's factual evidence does not support the
existence of an emergency. ..............................18

        2. FMCSA's assertions of impracticability and public
interest lack merit. ....................................21

II.    The Rule is causing Petitioners imminent and irreparable harm. ........................................................... 24

III.   The balance of equities and the public interest support a stay. ... 26

CONCLUSION ........................................................... 28

CERTIFICATE OF COMPLIANCE ........................................ 30

CERTIFICATE OF SERVICE ............................................ 31

ADDENDA

      1     Certificate of Parties and Amici Curiae

      2     Interim Final Rule, 90 Fed. Reg. 46509

      3     Declaration of Jorge Rivera Lujan

      4     Declaration of Aleksei Semenovskii

      5     Declaration of Michelle Sforza

      6     Declaration of John Doe

      7     Declaration of Lauren Samet

      8     Declaration of Trasell Underwood

# TABLE OF AUTHORITIES*

**Cases**                                                                      **Pages**

*Alpine Securities Corp. v. Financial Industries Regulatory Authority*,
   121 F.4th 1314 (D.C. Cir. 2024) .....................................................24

*American Clinical Laboratories Ass'n v. Becerra*,
   40 F.4th 616 (D.C. Cir. 2022) ..........................................................9

*DHS v. Regents of the University of California*,
   591 U.S. 1 (2020) ............................................................................9

*East Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) ........................................................23

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .......................................................................15

*FDA v. Wages & White Lion Investors*,
   604 U.S. 542 (2025) .......................................................................15

*Jifry v. FAA*,
   370 F.3d 1174 (D.C. Cir. 2004)......................................................17

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...........................................................26

*Mack Trucks, Inc. v. EPA*,
   682 F.3d 87 (D.C. Cir. 2012) ...................................................16, 17

*Media Matters for America v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025).......................................................26

* *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual
   Automobile Insurance*,
   463 U.S. 29 (1983) ...........................................................10, 11, 14

iv

*National Council of Nonprofits v. OMB,*
    763 F. Supp. 3d 36 (D.D.C. 2025)....................................................25

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................9, 26

*Ohio v. EPA,*
    603 U.S. 279 (2024) ...........................................................................9

*Risteen v. Youth For Understanding, Inc.,*
    245 F. Supp. 2d 1 (D.D.C. 2002) .....................................................25

*Southern Education Foundation v. Department of Education,*
    784 F. Supp. 3d 50 (D.D.C. 2025)....................................................25

*Sierra Club v. EPA,*
    884 F.3d 1185 (D.C. Cir. 2018).........................................................10

*Singh v. Berger,*
    56 F.4th 88 (D.C. Cir. 2022) .............................................................26

* *Sorenson Communications Inc. v. FCC,*
    755 F.3d 702 (D.C. Cir. 2014)..................................... 16, 17, 20, 21

* *Tennessee Gas Pipeline Co. v. FERC,*
    969 F.2d 1141 (D.C. Cir. 1992).........................................17, 18, 24

*Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms,*
    *& Explosives,*
    437 F.3d 75 (D.C. Cir. 2006) ...........................................................10

**Statutes**

5 U.S.C. § 553(b)(B) ...............................................................................16

5 U.S.C. § 706(2)(A) .................................................................................9

---

* Authorities upon which we chiefly rely are marked with asterisks.

v

28 U.S.C. § 2112(a)(4)..............................................................9

49 U.S.C. § 31302.................................................................3

49 U.S.C. §§ 31301(4)...........................................................3

49 U.S.C. § 31305.................................................................3

49 U.S.C. § 31308..............................................................3, 20

49 U.S.C. § 31308(i).............................................................3

49 U.S.C. § 31311.................................................................3

49 U.S.C. § 31311(a)(1).........................................................3

Public Law No. 112-141, 126 Stat. 405 (July 6, 2012)...........................22

**Regulatory Materials**

49 C.F.R. § 383.23................................................................4

49 C.F.R. § 383.23(b)(1).......................................................4, 13

49 C.F.R. § 383.71(f)............................................................4

49 C.F.R. § 383.71(f)(2)(i).....................................................5

49 C.F.R. § 383.73................................................................6

49 C.F.R. § 383.110...........................................................4, 14

49 C.F.R. § 383.111...........................................................4, 14

49 C.F.R. § 383.113...........................................................4, 14

49 C.F.R. § 383.133...........................................................4, 14

81 Fed. Reg. 88790 (2016) ..........................................................22

84 Fed. Reg. 8464 (2019) ......................................................7, 15

86 Fed. Reg. 34631 (2021) .........................................................22

* 90 Fed. Reg. 46512 (2025)..............................................*passim*

90 Fed. Reg. 47627 (2025) ...........................................................6

**Other Authorities**

Executive Order 14286, 90 Fed. Reg. 18759 (Apr. 28, 2025)....................5

FMCSA, *President Trump's Transportation Secretary Sean P. Duffy*
    *Announces Nationwide Audit of States Issuing Non-Domiciled*
    *Commercial Driver's Licenses*, FMCSA (June, 27, 2025),
    https://www.fmcsa.dot.gov/newsroom/president-trumps-
    transportation-secretary-sean-p-duffy-announces-nationwide-
    audit-states...................................................................................5

FMCSA, *Large Truck and Bus Crash Facts 2022*,
    https://www.fmcsa.dot.gov/safety/data-and-statistics/large-truck-
    and-bus-crash-facts. ................................................................11

Jeremy Jones, *Court documents reveal what caused deadly Thomasville*
    *crash*, WKRG News (May 9, 2025),
    https://www.yahoo.com/news/thomasville-crash-kills-2-injures-
    195004913.html. .......................................................................11

Noël Fletcher, *States Targeted by DOT Respond to Non-Domiciled CDL*
    *Freeze*, Transport Topics, Oct. 16, 2025,
    https://www.ttnews.com/articles/states-respond-cdl-freeze. .........20

# GLOSSARY

APA        Administrative Procedure Act

CDL        Commercial Driver's License

CLP        Commercial Learner's Permit

CMV        Commercial Motor Vehicle

FMCSA    Federal Motor Carrier Safety Administration

# INTRODUCTION

Three weeks ago, on the slimmest of factual bases, and without complying with notice-and-comment rulemaking, the Federal Motor Carrier Safety Administration (FMCSA) issued an Interim Final Rule threatening the livelihoods of more than 200,000 working people and their families.

Under the Rule, which FMCSA made effective immediately, immigrants who are legally present and authorized to work in the United States are barred from holding commercial driver's licenses (CDLs)—licenses required to operate commercial motor vehicles such as trucks and school buses. In particular, the Rule prohibits asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients from holding CDLs, thereby threatening their jobs and livelihoods, with harmful impacts on the states, localities, school systems, businesses, and communities that rely on their essential work. FMCSA cited no evidence showing a connection between immigration status and public safety.

Petitioners are two truck drivers whose livelihoods are threatened by the Rule and two unions with numerous members who are likewise at

risk of losing their jobs (and with them, critical employee benefits such as health insurance). To prevent imminent harm, they ask this Court immediately to stay the Rule pending its review. The agency's restriction of CDL eligibility based on immigration status is not the product of reasoned decisionmaking, and it lacked good cause to skip the notice-and-comment requirement of the Administrative Procedure Act (APA). The harm caused by the Rule is devastating, imminent, and irreparable. It is causing immediate and widespread harm to workers, their families, and the communities that rely on their essential work, and the government will suffer no cognizable harm from a stay.

Accordingly, this Court should grant Petitioners' motion. In light of the widespread harm already being experienced by Petitioners, *see, e.g.*, Doe Decl. ¶¶5–6, and imminently facing others, *see, e.g.*, Rivera Lujan Decl. ¶2, 7, Petitioners respectfully request a ruling from this Court by October 31, 2025.

## BACKGROUND

### A. Statutory and Regulatory Framework

Drivers of commercial motor vehicles—such as certain trucks and buses—are required by statute to possess CDLs. 49 U.S.C.

§§ 31301(4), 31302. Although the licenses are issued by individual states, they are subject to federal standards. Thus, the Commercial Motor Vehicle Safety Act requires that the Department of Transportation, "[a]fter consultation with the States … prescribe regulations on minimum uniform standards for the issuance of [CDLs] and [commercial] learner's permits [(CLPs)] by the States." *Id.* § 31308. Those standards must require that persons with CDLs "pass written and driving tests for the operation of a commercial motor vehicle" and present certification that they had completed driver training. *Id.* § 31308(1)(A)–(B); *see id.* § 31311 (requiring states to test and ensure fitness of drivers). In addition, FMCSA must set "minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle" so that drivers have the knowledge, skills, and training necessary to operate commercial motor vehicles safely. *Id.* § 31305(a); *see id.* § 31305(a)(1)–(8). The states, in turn, must ensure that drivers with CDLs can safely operate commercial motor vehicles consistent with the federal standards. *Id.* § 31311(a)(1).

Accordingly, FMCSA has promulgated regulations requiring drivers with CDLs to "have the knowledge and skills necessary to operate

a [commercial motor vehicle] safely," 49 C.F.R. § 383.110; *see id.* § 383.111 (required knowledge of "20 general areas"), § 383.113 (required skills), and to be tested on that knowledge and those skills, *id.* § 383.133.

In 2011, FMCSA issued regulations specifying that only U.S. citizens and lawful permanent residents are eligible for CDLs. At the same time, it created a new category of license and permit—the "non-domiciled" CDL—for (i) persons domiciled in foreign countries without licensing standards comparable to those in the United States,[2] and (ii) persons domiciled in a state prohibited from issuing CDLs. 49 C.F.R. §§ 383.23(b), 383.71(f). Under those regulations, individuals applying for non-domiciled CDLs were required to present documentation to prove their legal presence in the United States:

> an unexpired employment authorization document (EAD) issued by USCIS or an unexpired foreign passport accompanied by an approved I-94 form documenting the applicant's most recent admittance into the United States.

---

[2] For example, because FMCSA determined that licenses issued by Canada and Mexico were "in accordance" with federal standards, drivers from those countries are not eligible for non-domiciled CDLs. *See* 49 C.F.R. § 383.23(b)(1) n.1.

*Id.* § 383.71(f)(2)(i). Thus, the agency made the "non-domiciled" category of CDLs available for people who are in the United States legally, although not U.S. citizens or lawful permanent residents.

## B.     The Interim Final Rule

In April 2025, President Trump issued an Executive Order directing the Secretary of Transportation and FMCSA to "review non-domiciled [CDLs] issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities with respect to non-domiciled CDL issuance"; and "evaluate and take appropriate actions to improve the effectiveness of current protocols for verifying the authenticity and validity of both domestic and international commercial driving credentials." Exec. Order 14286, § 4, 90 Fed. Reg. 18759, 18760 (2025). Two months later, the Department of Transportation launched a nationwide audit into state agencies' issuance of non-domiciled CDLs, "specifically reviewing the potential for unqualified individuals obtaining licenses and posing a hazard on our roads."[3]

---

[3]     FMCSA, *President Trump's Transportation Secretary Sean P. Duffy Announces Nationwide Audit of States Issuing Non-Domiciled Commercial Driver's Licenses* (June 27, 2025), https://www.fmcsa.dot.gov/newsroom/president-trumps-transportation-secretary-sean-p-duffy-announces-nationwide-audit-states.

On September 29, 2025, FMCSA issued the Interim Final Rule. *See* 90 Fed. Reg. 46509. Under the Rule, the only immigrants eligible for a non-domiciled CDL or CLP are those with H-2A, H-2B, or E-2 visas. "[I]ndividuals excluded from eligibility for a non-domiciled CLP or CDL … include asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients." *Id*. at 46515. The Rule also revises the regulations for state procedures on issuing CDLs and CLPs by requiring states to "compl[y] with the standards" for requiring "evidence of lawful immigration status." *Id*. at 46524 (amending 49 C.F.R. § 383.73).

In addition, the Rule rescinds guidance stating that non-domiciled CDLs are available to individuals who are citizens of Mexico present under the DACA immigration policy. *See id*. at 46517. The Rule also rescinds guidance stating that non-domiciled licenses are available to "foreign driver[s] holding an employment authorization document or an unexpired foreign passport accompanied by an approved Customs and

Border Protection (CBP) I-94 Arrival/Departure Record." FMCSA-CDL-383.23-Q1, 84 Fed. Reg. 8464, 8470–71; *see* 90 Fed. Reg. at 46517.[4]

FMCSA issued the Rule without undertaking notice-and-comment rulemaking and made it effective immediately upon its publication. According to FMCSA, there was a "two-front crisis that constitutes an imminent hazard to public safety and a direct threat to national security" because of (1) five examples of fatal crashes in 2025 and (2) administration problems with CDL licensing programs in six states, resulting in an unspecified number of erroneous licenses being issued, *id*. at 46514. FMCSA stated that providing notice was "impracticable and contrary to the public interest because it would actively subvert the rule's purpose by creating a foreseeable and concentrated surge in applications that would exacerbate the current safety crisis." *Id*. FMCSA is accepting comment on the Rule through November 28, 2025. *Id*. at 46515.

The Rule requires states "to pause issuance of … CDLs and CLPs until they can ensure compliance with" the Rule. *Id*. at 46519. FMCSA estimates that "roughly 194,000 current non-domiciled CDL holders will

---

[4] On October 2, 2025, FMCSA corrected an error in the amendatory instructions for the Rule. 90 Fed. Reg. 47627.

exit the freight market" because of this Rule. *Id.* CDL holders who drive busses and other commercial motor vehicles will also be affected.

### C.    Procedural History

On October 20, 2025, Petitioners Jorge Rivera Lujan, Aleksei Semenovskii, American Federation of State, County & Municipal Employees, AFL-CIO (AFSCME), and American Federation of Teachers (AFT) petitioned for review of the Rule.

Petitioners Rivera Lujan and Semenovskii are commercial truck drivers and owner-operators of trucking businesses. Mr. Rivera Lujan, a DACA recipient, has held a CDL and been driving trucks for eleven years. Mr. Semenovskii, an asylum seeker, has held a CDL and been driving for over five years. Under the Rule, each is ineligible for a CDL and therefore will lose his livelihood.

Petitioners AFSCME and AFT are unions with members who drive trucks, buses, snowplows, street sweepers, and other commercial motor vehicles and who hold non-domiciled CDLs to provide essential government services but are now ineligible for CDLs under the Rule. By eliminating their ability to hold CDLs, the Rule threatens their livelihoods, jeopardizing their ability to pay for housing, food, and other

necessities for themselves and their families; their employer-provided benefits including health insurance; and the essential public services they provide.

## ARGUMENT

This Court should stay the Rule, which is currently in effect, pending its review of the Rule. *See* 28 U.S.C. § 2112(a)(4). In ruling on a motion for a stay, the Court considers four factors: (1) likelihood of success on the merits; (2) the prospect of irreparable injury to the moving party; (3) the possibility of harm to other parties if relief is granted; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 443 (2009). Here, all four weigh heavily in favor of granting a stay.

## I. Petitioners are likely to succeed on the merits.

### A. Petitioners are likely to succeed on their claim that the Rule is arbitrary and capricious.

Courts must "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted); *see DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (requiring agencies to "engage in 'reasoned

decisionmaking'" (citation omitted)). "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Am. Clinical Lab. Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022) (cleaned up, quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

Here, FMCSA's position that immigration status impacts a driver's ability to safely operate commercial motor vehicles has no "reasonable connection to the facts in the record." *Sierra Club v. EPA*, 884 F.3d 1185, 1198 (D.C. Cir. 2018) (citation omitted); *see Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 81, 83 (D.C. Cir. 2006) (rejecting rule as arbitrary and capricious where the agency "action is founded on unsupported assertions or unstated inferences"). To begin with, FMCSA cited *no* evidence of a link between immigration status and a driver's ability to safely operate a commercial motor vehicle. And FMCSA cited *no* evidence showing that asylum seekers, refugees, DACA recipients, or others made ineligible by the Rule cannot and do not safely operate commercial motor vehicles. Indeed, conceding that it has "insufficient evidence" to "estimate … the potential

safety benefits resulting from" the Rule, the agency stated that "[t]here is not sufficient evidence … to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations." 90 Fed. Reg. at 46520.

Although FMCSA cited five examples of crashes involving drivers who, under the Rule, would not be eligible for non-domiciled CDLs, *see id*. at 46512–13, the examples do not have "a rational connection" to the decision to restrict licenses based on immigration status. *State Farm*, 463 U.S. at 43. According to a FMCSA report issued around the same time as the Rule, there were over 6,000 large trucks and buses involved in fatal crashes in 2022.[5] Assuming the number for 2025 is similar, FMCSA is disqualifying nearly 200,000 freight drivers and thousands of bus and other CDL drivers, based on data showing that they are involved in fewer

---

[5] FMCSA, *Large Truck and Bus Crash Facts 2022*, https://www.fmcsa.dot.gov/safety/data-and-statistics/large-truck-and-bus-crash-facts. FMCSA's most recent publicly available statistics are from 2022.

than one-tenth of one percent of crashes.[6] By FMCSA's logic, then, drivers who are *not* targeted by the Rule—that is, U.S. citizens, lawful permanent residents, and holders of certain types of visas—should be barred from holding CDLs, because they are involved in the overwhelming majority of crashes involving commercial motor vehicles.

FMCSA expresses concern that administration of CDLs in some states—"procedural and computer programming errors," staff training and quality assurance, and management controls—leads to the improper issuance of non-domiciled CDLs. 90 Fed. Reg. at 46512; *see id.* at 46514. But FMCSA fails to connect those administrative issues to safety concerns tied to non-domiciled CDLs. For instance, FMCSA says that some states improperly issued non-domiciled CDLs to drivers domiciled in Mexico. *Id.* at 46512 n.8. Mexican drivers, though, do not qualify for non-domiciled CDLs for reasons unrelated to safety: Mexican drivers, like Canadian drivers, can drive in the United States because those

_____

[6] Moreover, one of FMCSA's examples reportedly involved a driver with a work visa. *See* Jeremy Jones, *Court documents reveal what caused deadly Thomasville crash*, WKRG News (May 9, 2025), https://www.yahoo.com/news/thomasville-crash-kills-2-injures-195004913.html. FMCSA's reliance on an example of a crash by a visa-holder to justify its exclusion of categories of immigrants who do not hold work visas underscores the arbitrariness of its position.

12

countries have comparable licensing standards. *See* 49 C.F.R. § 383.23(b)(1) n.1. The other administrative lapses cited likewise do not suggest a safety concern.

Further, FMCSA's reason for allowing people with certain work visas to have CDLs would apply equally to the categories of people it is now excluding from eligibility. Specifically, FMCSA stated that people with H-2A, H-2B, and E-2 visas have "proof of work established through the [f]ederal visa process," and that the visa requirements "ensure that [they] are already approved to work specific jobs that may require acquisition of a non-domiciled CDL." 90 Fed. Reg. 46515. Asylees, refugees, DACA recipients, and other immigrant groups, however, likewise have proof of work authorization from a federal agency and likewise work jobs requiring non-domiciled CDLs. *See* Semenovskii Decl. ¶¶2–3; Rivera Lujan Decl. ¶¶4–5; Doe Decl. ¶¶3–4. Moreover, H-2A and H-2B visa holders are seasonal workers not permitted to remain and work in the United States year round. Those individuals would likely be less accustomed to United States driving than asylees, refugees, DACA recipients, and people with temporary protected status, who are lawfully present and authorized to work in the United States all year.

FMCSA also stated that employers seeking to hire truck drivers under the H-2B visa program are incentivized to screen for and hire drivers with safe driving records. *See* 90 Fed. Reg. at 46516. But the same is true for employers hiring drivers generally, and arguably even more true for the state and local governments who employ AFSCME and AFT members with non-domiciled CDLs, as those public employers are democratically accountable. And all individuals, regardless of whether they were born in the United States or immigrated, and regardless of their type of work authorization, must pass tests to show that they have "the knowledge and skills to operate a [commercial motor vehicle] safely" before they may obtain a CDL. 49 C.F.R. § 383.110; *see id.* § 383.111 (required knowledge in "20 general areas"), § 383.113 (required skills), § 383.133 (testing).

According to FMCSA, the Rule will increase safety by reducing "drivers with unknown driver safety records" because the "driving history [for non-domiciled CDL and CLP drivers] exists predominantly or solely within a foreign jurisdiction." 90 Fed. Reg. at 46514. But FMCSA's concern with driving history bears no "rational connection" to its decision to limit CDL eligibility according to immigration status. *State Farm*, 463

U.S. at 43. Indeed, people with work visas (eligible for CDLs under the Rule) also have driving histories from foreign jurisdictions, whereas DACA recipients like Petitioner Rivera Lujan (prohibited from CDLs under the Rule) have driving records that are domestic because they have been in the United States since they were children. *See* Rivera Lujan Decl. ¶3.

Moreover, an agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009); *see FDA v. Wages & White Lion Inv.*, 604 U.S. 542, 568 (2025). The Rule undermines the serious reliance interests of asylum seekers, asylees, refugees, and DACA recipients, who obtained but cannot renew their CDLs. Indeed, during the previous Trump Administration, FMCSA had assured people with these immigration statuses that they were eligible for non-domiciled CDLs, thereby enabling them to obtain jobs requiring such licenses. *See* 84 Fed. Reg. 8464, 8470–71 (2019).

Because FMCSA failed to provide a reasoned explanation and disregarded known reliance interests, Petitioners are likely to succeed in showing that the Rule is arbitrary and capricious.

## B. Petitioners are likely to succeed in showing that FMCSA failed to follow required procedures.

FMCSA made the Rule effective immediately, without providing notice or an opportunity for public comment. FMCSA failed to satisfy, however, the requirements for invoking the good-cause exception to the APA's notice-and-comment requirement.

An agency may bypass the APA's procedural requirements if it "for good cause finds … that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). "[T]he good-cause inquiry is "meticulous and demanding." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014) (citation omitted). This Court has "repeatedly made clear that the good cause exception 'is to be narrowly construed and only reluctantly countenanced.'" *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012). The exception is not an "'escape clause[]' that may be arbitrarily utilized at the agency's whim." *Id.* (citation omitted). Rather, it should be invoked only in "*emergency* situations … or where delay could result in

serious harm," *Sorenson*, 755 F.3d at 706 (quoting *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)), such as where "delay would imminently threaten life or physical property," *id.*

An agency's invocation of the exception is reviewed de novo. *Id.* Where the agency "[l]acks record support proving the emergency" it claims, *id.* at 707, or "provide[s] little factual basis for its belief" that regulated parties would seek to avoid the future rule, this Court has rejected the agency's assertion of the exception, *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1145 (D.C. Cir. 1992). The agency's improper invocation of the exception is grounds for vacatur of the rule. *See Sorenson*, 755 F.3d at 710; *Mack Trucks*, 682 F.3d at 95; *Tenn. Gas*, 969 F.2d at 1146.

Here, FMCSA's invocation of the exception proceeds in two steps. First, FMCSA asserts a "two-front crisis" jeopardizing public safety and national security. 90 Fed. Reg. at 46514. Second, based on this asserted "crisis," FMCSA contends that notice and comment are "contrary to the public interest and impracticable because it would delay the adoption and immediate implementation" of the Rule. *Id.* FMCSA's claim of good cause is without merit.

### 1. FMCSA's factual evidence does not support the existence of an emergency.

The lynchpin of FMCSA's argument for making the Rule effective immediately is its assertion of a need for "immediate action to protect the traveling public" stemming from "overly broad eligibility requirements" of the prior regulations, 90 Fed. Reg. at 46514, and "a systemic breakdown in State implementation of the rule," *id*. For much the same reason that the Rule is arbitrary and capricious, FMCSA's factual discussion does not justify its decision to skip notice-and-comment rulemaking.

To begin with, as discussed above, FMCSA's factual support for "overly broad eligibility requirements" references five fatal crashes in 2025. 90 Fed. Reg. at 46514. But, again, those crashes are a tiny fraction of a percentage of the total number of commercial motor vehicle crashes in a year. *See supra* p.11. That miniscule percentage does not justify emergency action. *See Tenn. Gas*, 969 F.2d at 1145 (stating that "evidence of a single violation ..., while not insubstantial, is a thin reed on which to base a waiver of the APA's important notice and comment requirements").

Further, the administrative issues that FMCSA claims reveal "a systemic breakdown" by the states, 90 Fed. Reg. at 46514, do not support an interim final rule with immediate effect. As noted above, *see supra* p.12, FMCSA does not explain how any of the issues it cites amounts to a safety emergency or leads to unsafe drivers on the road. For example, FMCSA relies on its preliminary findings that California had improperly issued CDLs. *See* 90 Fed. Reg. at 46514; *id.* at 46512. But nowhere in either the Rule or those preliminary findings does FMCSA connect the administrative issues it identified—for example, CDL expiration dates exceeding work-authorization expiration dates—to public safety, let alone explain why there is any imminent threat. *Id.* at 46512, 46514; *see generally* Letter from FMCSA to Hon. Gavin Newsom, et al. (Sept. 26, 2025).[7] In addition, although FMCSA asserts that five other states (Colorado, Pennsylvania, South Dakota, Texas, and Washington) have erroneously issued CDLs, it provides *no* information describing what those errors were or their extent. *See* 90 Fed. Reg. at 46512; *id.* at 46514.

---

[7] https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2025-09/Letter%20to%20California_2025%20Annual%20Program%20Review%20Findings.pdf.

And public reporting suggests that the errors in some of those states may have been de minimis.[8]

The absence of evidence is particularly telling because FMCSA failed "to consult with the states prior to promulgation of th[e] rulemaking," 90 Fed. Reg. at 46523, despite being required by statute to do so. *See* 49 U.S.C. § 31308. Moreover, that a few state agencies improperly issued some CDLs does not support FMCSA's invocation of the good-cause exception to restrict eligibility in every state.

In addition, FMCSA asserts an emergency based on the "unknown driver safety records" of non-domiciled CDL drivers. 90 Fed. Reg. at 46512. "Curiously … there [are] no factual findings supporting the reality of the threat." *Sorenson*, 755 F.3d at 706. And, as explained above, FMCSA's apparent concern with driving history is particularly inapt for DACA recipients, all of whom arrived in the U.S. as children and whose driving records would not be "unknown." *See supra* pp.14–15.

_____

[8] For example, South Dakota reportedly identified only six mistakenly issued CDLs. *See* Noël Fletcher, *States Targeted by DOT Respond to Non-Domiciled CDL Freeze*, Transport Topics (Oct. 16, 2025), https://www.ttnews.com/articles/states-respond-cdl-freeze.

Finally, FMCSA's assertion that issuing CDLs "to foreign individuals" has "national security implications" is supported only by an example of a person who "carried out a terrorist attack" using a "truck … [that] did *not* qualify as a *commercial motor vehicle*." 90 Fed. Reg. at 46514 n.20 (first emphasis added). An attack that does not involve a commercial vehicle cannot support the Rule, much less the decision to skip notice-and-comment rulemaking before issuing it.

Put simply, FMCSA falls well short of demonstrating an "*emergency situation[]*" where the APA's notice-and-comment requirements would result in "serious harm." *Sorenson*, 755 F.3d at 706.

## 2. FMCSA's assertions of impracticability and public interest lack merit.

FMCSA asserted that undertaking notice-and-comment rulemaking was "impracticable and contrary to the public interest" because it would "creat[e] a foreseeable and concentrated surge in applications that would exacerbate the current safety crisis." 90 Fed. Reg. at 46514. The assertion lacks merit.

According to FMCSA, public notice will result in "forum shopping" by applicants seeking CDLs from states with "systemic weaknesses and high error rates," which will "likely … funnel … applicants toward the

very State agencies least equipped to handle them, overwhelming their capacity for due diligence." *Id*. at 46515. The only data point that FMCSA provides, however, is an increase in CDL and CLP issuances between December 2020 and February 2022, "when the compliance date for FMCSA's [new rule on] entry-level driver training requirements was approaching." *Id*. at 46514. But FMCSA fails to show that the increase in that period was caused by notice of the new regulations. To the contrary, there was ample notice of the new regulations because the requirements were mandated by Congress in 2012;[9] FMCSA issued notice of the new regulations in 2016 with a compliance date of three years after the rule's effective date, 81 Fed. Reg. 88790 (2016), and then extended the compliance date until 2022, 86 Fed. Reg. 34631 (2021). Yet FMCSA points to no evidence showing a surge in applications before the compliance date was extended. And it does not even consider the possibility that confounding factors, such as the COVID-19 pandemic, might account for the cited increase. Moreover, FMCSA's interpretation

---

[9] Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141, § 32304, 126 Stat. 405, 791 (July 6, 2012).

of the data is belied by the fact that CDL issuances *increased* after the new requirements took effect. *See* 90 Fed. Reg. at 46515 n.22.

Even crediting FMCSA's prediction of an increase in CDLs applications before the effective date of a notice-and-comment rule, however, the point would not justify its decision. FMCSA claims that greater numbers of applicants would "overwhelm[]" state agencies' "capacity for due diligence," 90 Fed. Reg. at 46515, leading to improper issuance of CDLs. But it offers no evidence for that claim and no reason to believe that state agencies would skimp on their standards, rather than allowing for greater backlogs.

Furthermore, it is also "likely often, or even always true" that notice of a rule "allows parties to change their behavior in response." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676 (9th Cir. 2021). Thus, FMCSA's assertion that following the APA's requirements would increase the harm that the Rule is intended to address would eviscerate those very requirements, allowing an agency to assert the exception in nearly every circumstance. This Court should not countenance such a sweeping interpretation.

Because FMCSA "has failed to demonstrate sufficient cause for setting aside [the APA's] important safeguards of notice and comment," *Tenn. Gas*, 969 F.2d at 1146, Petitioners are likely to succeed on their claim that the Rule should be vacated.

## II. The Rule is causing Petitioners imminent and irreparable harm.

The harm to Petitioners from the Rule is devastating. Without a non-domiciled CDL, Petitioners Rivera Lujan and Semenovskii cannot continue their careers as truck drivers, and they will be forced to close their trucking businesses. Rivera Lujan Decl. ¶7; Semenovskii Decl. ¶6. These injuries cannot be remedied at the end of the litigation because the Rule threatens the very existence of Petitioners' businesses. *See Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) ("A business's 'destruction in its current form' commonly qualifies as irreparable harm." (collecting cases)). And the loss of their businesses threatens their ability to provide for their families and to pay for housing and basic necessities. Rivera Lujan Decl. ¶7; Semenovskii Decl. ¶¶6–8. This harm is both irreparable and imminent: Mr. Lujan Rivera's license expires in one month, and he cannot renew it because of the Rule. Rivera Lujan Decl. ¶¶2, 8.

AFSCME's members and AFT's members also will suffer irreparable harm absent a stay, as each union's membership includes drivers who are required to have CDLs for their jobs. Samet Decl. ¶¶11–14; Underwood Decl. ¶¶5, 9; Sforza Decl. ¶¶2–5; Doe Decl. ¶¶1–3. Absent non-domiciled CDLs, members employed in jobs requiring CDLs are threatened with potential loss of their jobs. Sforza Decl. ¶¶7–11; Samet Decl. ¶11; Doe Decl. ¶¶1–3, 6; Underwood Decl. ¶9. Their ability to pay rent, buy groceries, and support themselves and their families is at immediate risk, as is the employer-provided health insurance on which they rely. Sforza Decl. ¶¶7, 11; Doe Decl. ¶6. Because the harms from the Rule threaten the livelihoods of workers who depend on each paycheck to pay for food, housing, and bills, as well as their health insurance, they are irreparable. *See S. Educ. Found. v. Dep't of Educ.*, 784 F. Supp. 3d 50, 72 (D.D.C. 2025) (finding irreparable harm in part "because the defendants' actions threaten the livelihoods of [the plaintiff organization's] employees"); *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 57 (D.D.C. 2025) (finding irreparable harm where the plaintiffs' "members will suffer 'existential injuries'" and "[t]heir workers may be unable to pay for housing or food"); *Risteen v. Youth For*

*Understanding, Inc.*, 245 F. Supp. 2d 1, 16 & n.4 (D.D.C. 2002) ("The loss of health insurance benefits—particularly for those who are unemployed—constitutes irreparable harm for purposes of a preliminary injunction." (collecting cases)).

## III. The balance of equities and the public interest support a stay.

The final two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435; *see Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022). Here, the factors weigh decisively in favor of a stay.

To begin with, Petitioners' "extremely high likelihood of success on the merits is a strong indicator" that a stay is in the public interest. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) ("[T]he government may not 'act unlawfully even in pursuit of desirable ends.'").

The widespread harm from the Rule further tilts the equities in favor of a stay. Over three *thousand* comments have already been filed on the rulemaking docket,[10] primarily from individual drivers whose

---

[10] *See* https://www.regulations.gov/docket/FMCSA-2025-0622.

livelihoods are threatened. Hundreds of CDL drivers—including over 125 Ukrainian refugees—explained that they will default on loans and be unable to cover basic expenses without CDLs.[11] Owner-operators similarly have explained that "th[e] rule places [their] livelihood and business at immediate risk."[12] And hundreds have explained that the Rule will exacerbate "a critical shortage of truck drivers," "disrupt supply chains," and "negatively impact the U.S. economy."[13]

Across the country, states, localities, and school districts rely on CDL drivers to ensure that essential public services are provided. The Rule threatens state and local government services, ranging from the transportation of inmates, critical repairs to highways and other public roads, clearing of roadways during inclement weather, operation of public transit systems, and more. Sforza Decl. ¶¶4, 8, 12. School districts, which

---

[11] *See, e.g.*, Comment of Singh, FMCSA-2025-0622-2028 (Oct. 6, 2025); Comment of Drozdek, FMCSA-2025-0622-1037 (Oct. 2, 2025); Comment of Ponyrko, FMCSA-2025-0622-0532 (Sept. 30, 2025); Comment of Andreiev, FMCSA-2025-0622-0231 (Sept. 29, 2025).

[12] Comment of Anonymous, FMCSA-2025-0622-0743 (Oct. 1, 2025); *see also* Comment of Cervantes, FMCSA-2025-0622-1215 (Oct. 7, 2025).

[13] Comment of Sukharska, FMCSA-2025-0622-0603 (Oct. 1, 2025); *see also* Comment of Shakhan Inc., FMCSA-2025-0622-2468 (Oct. 10, 2025).

already "fac[e] a severe shortage of school bus drivers" will also suffer, Samet Decl. ¶14, harming students, parents, teachers, and staff. *See id.* ¶15 ("Because of reduced or unreliable transportation services, students are losing access to critical school resources—such as extracurricular programs and meals—and are experiencing higher rates of tardiness and absenteeism."). In short, absent a stay, the Rule will threaten the basic functioning of essential public services.

## CONCLUSION

Petitioners' motion for a stay should be granted.

Respectfully submitted,

/s/ *Wendy Liu*
Wendy Liu
Cormac Early
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
wliu@citizen.org

*Counsel for All Petitioners*

Teague Paterson
Matthew Blumin
American Federation of
State, County & Municipal
Employees, AFL-CIO
(AFSCME)
1625 L Street, NW
Washington, DC 20036
(202) 775-5900

*Counsel for Petitioner AFSCME*

Daniel McNeil
Channing Cooper
American Federation of Teachers,
AFL-CIO (AFT)
555 New Jersey Avenue NW
Washington, DC 20001
(202) 879-4400

*Counsel for Petitioner AFT*

October 24, 2025

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by the Federal Rules of Appellate Procedure and this Court's rules, this document contains 5,191 words, as calculated by my word processing software.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word 365.

/s/ *Wendy Liu*
Wendy Liu

## CERTIFICATE OF SERVICE

I hereby certify that, on October 24, 2025, the foregoing document was served through the Court's ECF system on counsel for all parties.

/s/ *Wendy Liu*
Wendy Liu

# ADDENDA

# INDEX

1          Certificate of Parties and Amici Curiae

2          Interim Final Rule, 90 Fed. Reg. 46509

3          Declaration of Jorge Rivera Lujan

4          Declaration of Aleksei Semenovskii

5          Declaration of Michelle Sforza

6          Declaration of John Doe

7          Declaration of Lauren Samet

8          Declaration of Trasell Underwood

# ADDENDUM 1

# CERTIFICATE OF PARTIES AND AMICI CURIAE

Pursuant to D.C. Circuit Rule 18(a)(4) and 28(a)(1)(A), the undersigned counsel certifies as follows:

There were no district court proceedings in this case, and so no parties or amici curiae in the district court.

Petitioners-Appellants are Jorge Rivera Lujan, Aleksei Semenovskii, American Federation of State, County & Municipal Employees, AFL-CIO (AFSCME), and American Federation of Teachers (AFT). Respondents-Appellees are Federal Motor Carrier Safety Administration, the United States Department of Transportation, and the United States.

As of this filing, there are no amici in this Court.

/s/ *Wendy Liu*
Wendy Liu

# ADDENDUM 2

**§ 131.48 Water quality standards to protect aquatic life in the Delaware River.**

(a) *Scope.* (1) The designated use in paragraph (b) of this section applies to river miles 108.4 to 70.0 of the mainstem Delaware River for the States of New Jersey and Pennsylvania.

(2) The aquatic life criteria in paragraph (c) of this section apply to river miles 108.4 to 70.0 of the mainstem Delaware River for the States of Delaware, New Jersey, and Pennsylvania.

(b) *Aquatic life designated use.* The aquatic life designated use is protection and propagation of resident and migratory aquatic life.

(c) *Dissolved oxygen criteria.* The applicable dissolved oxygen criteria are shown in table 1 to this paragraph (c).

TABLE 1 TO PARAGRAPH (c)—DISSOLVED OXYGEN CRITERIA

| Season | Magnitude (percent oxygen saturation) | Duration | Exceedance frequency |
|---|---|---|---|
| Spawning and Larval Development *(March 1–June 30)*. | 66 | Daily Average | 12 Days Cumulative *(10% of the 123-day season)*. |
| Juvenile Development *(July 1–October 31)* | 66 | Daily Average | 12 Days Cumulative *(10% of the 123-day season)*. |
| | 74 | Daily Average | 61 Days Cumulative *(50% of the 123-day season)*. |
| Overwintering *(November 1–February 28/29)* | 66 | Daily Average | 12 Days Cumulative *(10% of the 123-day season)*. |

(d) *Applicability.* (1) The aquatic life designated use in paragraph (b) of this section applies concurrently with other applicable designated uses in New Jersey and Pennsylvania for river miles 108.4 to 70.0 of the mainstem Delaware River.

(2) The dissolved oxygen aquatic life water quality criteria in paragraph (c) of this section are the applicable dissolved oxygen criteria in Delaware, New Jersey, and Pennsylvania for river miles 108.4 to 70.0 of the mainstem Delaware River and apply concurrently with other applicable water quality criteria.

(3) The designated use and criteria established are subject to Delaware's, New Jersey's, and Pennsylvania's general rules of applicability in the same way and to the same extent as are other federally promulgated and State-adopted water quality standards in those States.

[FR Doc. 2025–18816 Filed 9–26–25; 8:45 am]

**BILLING CODE 6560–50–P**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Motor Carrier Safety Administration

### 49 CFR Parts 383 and 384

**[Docket No. FMCSA–2025–0622]**

**RIN 2126–AC98**

### Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), Department of Transportation (DOT).

**ACTION:** Interim final rule; request for comments.

**SUMMARY:** FMCSA amends the Federal regulations for State Driver's Licensing Agencies (SDLAs) issuing commercial driving credentials to foreign-domiciled individuals. Through this interim final rule (IFR), FMCSA restores the integrity of the commercial driver's license (CDL) issuance processes by significantly limiting the authority for SDLAs to issue and renew non-domiciled commercial learner's permits (CLPs) and CDLs to individuals domiciled in a foreign jurisdiction. This change strengthens the security of the CDL issuance process and enhances the safety of commercial motor vehicle (CMV) operations.

**DATES:** This IFR is effective September 29, 2025. Comments must be received on or before November 28, 2025.

**ADDRESSES:** You may submit comments identified by Docket Number FMCSA–2025–0622 using any of the following methods:

- *Federal eRulemaking Portal:* Go to *https://www.regulations.gov/docket/FMCSA-2025-0622/document.* Follow the online instructions for submitting comments.
- *Mail:* Dockets Operations, U.S. Department of Transportation, 1200 New Jersey Avenue SE, West Building, Ground Floor, Washington, DC 20590–0001.
- *Hand Delivery or Courier:* Dockets Operations, U.S. Department of Transportation, 1200 New Jersey Avenue SE, West Building, Ground Floor, Washington, DC 20590–0001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. To be sure someone is there to help you, please call (202) 366–9317 or (202) 366–9826 before visiting Dockets Operations.
- *Fax:* (202) 493–2251.

To avoid duplication, please use only one of these four methods. See the "Public Participation and Request for Comments" portion of the **SUPPLEMENTARY INFORMATION** section for instructions on submitting comments, including information collection comments for the Office of Information and Regulatory Affairs (OIRA), Office of Management and Budget (OMB).

**FOR FURTHER INFORMATION CONTACT:** Philip Thomas, Deputy Associate Administrator, Office of Safety, FMCSA, 1200 New Jersey Avenue SE, Washington, DC 20590–0001; (202) 366–9554; *Philip.Thomas@dot.gov.* If you have questions on viewing or submitting material to the docket, call Dockets Operations at (202) 366–9826.

**SUPPLEMENTARY INFORMATION:** FMCSA organizes this IFR as follows:

I. Public Participation and Request for Comments
A. Submitting Comments
B. Viewing Comments and Documents
C. Privacy
D. Comments on the Information Collection
II. Executive Summary
III. Abbreviations
IV. Legal Basis
V. Background
A. Existing Requirements for Issuance of Non-Domiciled CLPs and CDLs
B. The Need for Secure Identification
C. Annual Program Reviews (APRs) of SDLAs
D. Recent, Fatal Crashes Involving Drivers With Non-Domiciled CDLs
VI. Discussion of the Interim Final Rule
A. Justification for the IFR
B. Overview of the IFR
VII. International Impacts
VIII. Section-by-Section Analysis
A. Regulatory Provisions
B. Guidance Statements and Interpretations
IX. Regulatory Analyses
A. E.O. 12866 (Regulatory Planning and Review), E.O. 13563 (Improving

Regulation and Regulatory Review), and DOT Regulatory Policies and Procedures
B. E.O. 14192 (Unleashing Prosperity Through Deregulation)
C. Congressional Review Act
D. Advance Notice of Proposed Rulemaking
E. Regulatory Flexibility Act (Small Entities)
F. Assistance for Small Entities
G. Unfunded Mandates Reform Act of 1995
H. Paperwork Reduction Act
I. E.O. 13132 (Federalism)
J. Privacy
K. E.O. 13175 (Indian Tribal Governments)
L. National Environmental Policy Act of 1969

## I. Public Participation and Request for Comments

### A. Submitting Comments

If you submit a comment, please include the docket number for this IFR (FMCSA–2025–0622), indicate the specific section of this document to which your comment applies, and provide a reason for each suggestion or recommendation. You may submit your comments and material online or by fax, mail, or hand delivery, but please use only one of these means. FMCSA recommends that you include your name and a mailing address, an email address, or a phone number in the body of your document so FMCSA can contact you if there are questions regarding your submission.

To submit your comment online, go to *https://www.regulations.gov/docket/FMCSA-2025-0622/document,* click on this IFR, click "Comment," and type your comment into the text box on the following screen.

If you submit your comments by mail or hand delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing.

FMCSA will consider all comments and material received during the comment period.

### Confidential Business Information (CBI)

CBI is commercial or financial information that is both customarily and actually treated as private by its owner. Under the Freedom of Information Act (5 U.S.C. 552), CBI is exempt from public disclosure. If your comments responsive to the IFR contain commercial or financial information that is customarily treated as private, that you actually treat as private, and that is relevant or responsive to the IFR, it is important that you clearly designate the submitted comments as CBI. Please mark each page of your submission that constitutes CBI as "PROPIN" to indicate it contains proprietary information. FMCSA will treat such marked

submissions as confidential under the Freedom of Information Act, and they will not be placed in the public docket of the IFR. Submissions containing CBI should be sent to Brian Dahlin, Chief, Regulatory Evaluation Division, Office of Policy, FMCSA, 1200 New Jersey Avenue SE, Washington, DC 20590–0001 or via email at *brian.g.dahlin@dot.gov.* At this time, you need not send a duplicate hardcopy of your electronic CBI submissions to FMCSA headquarters. Any comments FMCSA receives not specifically designated as CBI will be placed in the public docket for this rulemaking.

### B. Viewing Comments and Documents

To view any documents mentioned as being available in the docket, go to *https://www.regulations.gov/docket/FMCSA-2025-0622/document* and choose the document to review. To view comments, click this IFR, then click "Browse Comments." If you do not have access to the internet, you may view the docket online by visiting Dockets Operations on the ground floor of the DOT West Building, 1200 New Jersey Avenue SE, Washington, DC 20590–0001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. To be sure someone is there to help you, please call (202) 366–9317 or (202) 366–9826 before visiting Dockets Operations.

### C. Privacy

In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its regulatory process. DOT posts these comments, including any personal information the commenter provides, to *www.regulations.gov* as described in the system of records notice DOT/ALL 14 (Federal Docket Management System (FDMS)), which can be reviewed at *https://www.transportation.gov/individuals/privacy/privacy-act-system-records-notices.* The comments are posted without edits and are searchable by the name of the submitter.

### D. Comments on the Information Collection

Written comments and recommendations for the information collection discussed in this IFR should be sent within 60 days of publication to *www.reginfo.gov/public/do/PRAMain.* Find this information collection by clicking the link that reads "Currently under Review—Open for Public Comments" or by entering OMB control number 2126–0087 in the search bar and clicking on the last entry to reach the "comment" button.

## II. Executive Summary

This IFR revises the regulations that allow SDLAs to issue and renew non-domiciled CLPs and CDLs to individuals domiciled in a foreign jurisdiction. The changes strengthen the security of the CDL issuance process and enhance the safety of CMV operations by revising to whom an SDLA may issue a non-domiciled CLP or CDL, what the requirements are for issuance, and when a non-domiciled CLP or CDL must be canceled or revoked. Non-domiciled CDL holders have been involved in several recent fatal crashes. In addition, FMCSA recently uncovered evidence of systemic, nationwide regulatory non-compliance by SDLAs in the issuance of non-domiciled CLPs and CDLs at SDLAs. This IFR revises the regulations to restrict issuance of non-domiciled CLPs and CDLs to individuals maintaining lawful immigration status in the United States in certain employment-based nonimmigrant categories, to certain individuals domiciled in a U.S. territory, and to individuals domiciled in a State that is prohibited from the issuance of CLPs or CDLs as a result of the decertification of the State's CDL program. The revisions will help ensure that individuals who do not have lawful immigration status in the United States, and those who do have immigration status but whose status is not directly connected to a legitimate, employment-based reason to hold a CDL, will no longer be eligible to obtain non-domiciled CLPs or CDLs.

This rule: (1) limits individuals eligible for non-domiciled CLPs and CDLs to those maintaining lawful immigration status in certain employment-based nonimmigrant categories, certain individuals domiciled in a U.S. territory, and individuals domiciled in a State that is prohibited from issuing CLPs or CDLs because the State's CDL program is decertified; (2) requires non-citizen applicants (except for lawful permanent residents) to provide an unexpired foreign passport and an unexpired Form I–94/I–94A (Arrival/Departure Record) indicating a specified type of employment-based nonimmigrant status at every issuance, transfer, renewal, and upgrade action defined in the regulation; (3) requires SDLAs to query Systematic Alien Verification for Entitlements (SAVE),[1] administered by U.S. Citizenship and Immigration Services (USCIS), to confirm the applicant's claim to be in lawful

---

[1] Available at *https://www.uscis.gov/save.*

immigration status in a specified category; (4) requires that SDLAs retain copies of the application documents for no less than 2 years; (5) requires the expiration date for any non-domiciled CLP or CDL to match the expiration date of the Form I–94/I–94A or 1 year, whichever is sooner; (6) requires the applicant to be present in-person at each renewal; and (7) requires an SDLA to downgrade the non-domiciled CLP or CDL if the State becomes aware that the holder is no longer eligible to hold a non-domiciled CLP or CDL.

## III. Abbreviations

APA   Administrative Procedure Act
APR   Annual Program Review
BLS   Bureau of Labor Statistics
CDL   Commercial Driver's License
CDLIS   Commercial Driver's License Information System
CFR   Code of Federal Regulations
CLP   Commercial Learner's Permit
CMV   Commercial Motor Vehicle
DACA   Deferred Action for Childhood Arrivals
DOL   Department of Labor
DOT   Department of Transportation
EAD   Employment Authorization Document
E.O.   Executive Order
FARS   Fatality Analysis Reporting System
FR   Federal Register
ICR   Information Collection Request
IFR   Interim Final Rule
MCMIS   Motor Carrier Management Information System
NAICS   North American Industry Classification System
OES   Occupational Employment Statistics
OIG   Office of the Inspector General
OIRA   Office of Information and Regulatory Affairs
OMB   Office of Management and Budget
RFA   Regulatory Flexibility Act
SAS   Service Annual Survey
SAVE   Systematic Alien Verification for Entitlements
Secretary   The Secretary of Transportation
SDLA   State Driver's Licensing Agency
SSN   Social Security Number
U.S.C.   United States Code
USCIS   U.S. Citizenship and Immigration Services

## IV. Legal Basis

This IFR is based on the broad authority of the Commercial Motor Vehicle Safety Act of 1986 (CMVSA, 49 U.S.C. 31301, et seq.), as amended, which was also the basis on which FMCSA relied in establishing the CDL program and the performance standards with which State CDL programs must comply. The statute requires the Secretary of Transportation (Secretary), after consultation with the States, to prescribe uniform minimum standards "for testing and ensuring the fitness of an individual operating a commercial motor vehicle" (49 U.S.C. 31305(a)). In addition, the statute requires States that issue non-domiciled CDLs to do so in

accordance with regulations established by the Secretary (49 U.S.C. 31311(a)(12)(B)(ii)). The Administrator of FMCSA is delegated authority under 49 U.S.C. 113(f) and 49 CFR 1.87 to carry out the functions vested in the Secretary by 49 U.S.C. chapters 311, 313, and 315 as they relate to CMV operators, programs, and safety.

This IFR is also consistent with the concurrent authorities of the Motor Carrier Safety Act of 1984 (49 U.S.C. 31131, et seq.), as amended, and the Motor Carrier Act of 1935 (49 U.S.C. 31502), as amended. The 1984 Act granted the Secretary broad authority to issue regulations "on commercial motor vehicle safety," including regulations to ensure that "commercial motor vehicles are . . . operated safely" (49 U.S.C. 31136(a)(1)). This IFR is consistent with the safe operation of CMVs. In accordance with 49 U.S.C. 31136(a)(2), the amendments contained in this rule will not impose any "responsibilities . . . on operators of commercial motor vehicles [that would] impair their ability to operate the vehicles safely." This IFR does not directly address medical standards for drivers (49 U.S.C. 31136(a)(3)) or possible physical effects caused by driving CMVs (49 U.S.C. 31136(a)(4)). FMCSA does not anticipate that this rule will result in the coercion of CMV drivers by motor carriers, shippers, receivers, or transportation intermediaries to operate a CMV in violation of the Federal Motor Carrier Safety Regulations (FMCSRs, 49 U.S.C. 31136(a)(5)).

Pursuant to 49 U.S.C. 31502(b), "[t]he Secretary of Transportation may prescribe requirements for—(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation." This IFR, which addresses the ability of individuals who are domiciled in foreign jurisdictions to operate CMVs in the United States, is related to the safe operation of motor carrier equipment because the CDL program is designed to ensure that only individuals who have been determined by relevant State licensing agencies—in accordance with Federal standards—to be qualified to operate large commercial vehicles are allowed to drive such vehicles on the Nation's roadways. Both identity verification and skills testing are integral to the determination of a driver's qualifications and are implicated in this rule.

## V. Background

### A. Existing Requirements for Issuance of Non-Domiciled CLPs and CDLs

The implementing regulations relating to CDL standards and State compliance with the CDL program are codified under 49 CFR part 383, Commercial Driver's License Standards; Requirements and Penalties, and 49 CFR part 384, State Compliance with Commercial Driver's License Program. Under 49 U.S.C. 31311(a)(12)(B)(ii), States are authorized to issue CDLs to individuals who are "not domiciled in a State that issues [CDLs]," but if they choose to issue non-domiciled CDLs, they must do so in accordance with regulations prescribed by FMCSA (49 U.S.C. 31311(a)(12)(B)). The regulations setting forth the standards States must apply when issuing non-domiciled CLPs and CDLs are found at 49 CFR 383.23, 383.71(f), 383.73(f), 384.201, and 384.212(a). To obtain a non-domiciled CLP or CDL under existing § 383.71(f), the applicant must be domiciled either in a foreign jurisdiction (defined in § 383.5 to mean "outside the fifty United States and the District of Columbia") other than a jurisdiction the Administrator has determined to have comparable testing and licensing standards (i.e., Canada and Mexico, see § 383.23, note 1), or in a State that is prohibited from issuing CLPs and CDLs in accordance with § 384.405. A person in these jurisdictions is eligible to apply for a non-domiciled CLP or CDL from any State that elects to issue a non-domiciled CLP or CDL and that complies with the testing and licensing standards contained in subparts F, G, and H of part 383.

State procedures for issuing non-domiciled CLPs and CDLs under § 383.71(f)(2)(i) must require that an applicant domiciled in a foreign jurisdiction show that he or she is registered by providing an unexpired employment authorization document (EAD) issued by USCIS or an unexpired foreign passport accompanied by an approved I–94 form documenting the applicant's most recent admittance into the United States.

### B. The Need for Secure Identification

The events of September 11, 2001, highlighted the need for secure identification, as all but one of the 9/11 hijackers acquired some form of U.S. identification document. Acquisition of these forms of identification assisted them in boarding commercial flights, renting cars, and other activities. The report from the 9/11 Commission recommended that the Federal government set standards for the

issuance of sources of identification, such as driver's licenses, emphasizing that fraud in identification documents goes beyond theft, and that "[a]t many entry points to vulnerable facilities, including gates for boarding aircraft, sources of identification are the last opportunity to ensure that people are who they say they are and to check whether they are terrorists." [2]

In 2006, section 703(a) of the Security and Accountability for Every Port Act of 2006 [3] required FMCSA to issue regulations implementing the recommendations in a management advisory issued by DOT's Office of the Inspector General (OIG) concerning verification of the legal status of commercial drivers. [4] In its advisory to DOT's Deputy Secretary, OIG noted vulnerabilities in the CDL program that allowed applicants to obtain a CDL without being legally present in the United States. OIG also noted that the requirement in FMCSR at that time to provide a Social Security number (SSN), without additional verified documentation, did not ensure the applicant's U.S. citizenship or legal presence. OIG recommended that all CDL applicants be required to demonstrate that they are either a U.S. citizen, a permanent legal resident, or otherwise legally present in the United States. OIG further recommended having a requirement for verification of SSNs or for fingerprinting when issuing a CDL to help prevent fraud in the program and further enhance security by verifying applicants' identification.

On May 9, 2011, FMCSA published a final rule implementing section 703 and addressing OIG recommendations. [5] The rulemaking strengthened the legal presence requirements and increased the documentation required for CLP and CDL applicants to demonstrate their legal presence in the United States. The final rule revised the CDL regulations to specify that a State may issue a CLP or CDL only to an applicant who is a U.S. citizen or lawful permanent resident of the United States, and may issue a non-domiciled CLP or CDL to foreign applicants (other than applicants from Canada or Mexico) who have temporary or indefinite legal presence in the United States. [6]

## C. Annual Program Reviews (APRs) of SDLAs

Each year, FMCSA conducts Annual Program Reviews (APRs) of SDLAs in accordance with 49 U.S.C. 31311 and 49 CFR 384.307 to gauge the States' compliance with the CDL program. This year's APRs (2025 APRs) included a heightened focus on the issuance of non-domiciled CDLs, consistent with Executive Order (E.O.) 14286. [7] The 2025 APRs uncovered systemic procedural and computer programming errors, significant problems with staff training and quality assurance, and policies that lack sufficient management controls in the issuance of non-domiciled CLPs and CDLs by multiple SDLAs. As a result, SDLAs have issued non-domiciled CDLs to drivers who do not qualify, [8] issued non-domiciled CDLs that extend beyond a driver's expiration of lawful presence known at the time of issuance, issued non-domiciled CDLs without first validating the drivers' eligibility under § 383.71(f)(2)(i), and engaged in other noncompliant practices. For example, as part of California's APR, FMCSA reviewed a sample of records of drivers issued non-domiciled CDLs and recently found that approximately one in four non-domiciled CDLs were not compliant with requirements in 49 CFR parts 383 and 384. In that same APR, FMCSA uncovered instances where the SDLA issued non-domiciled CDLs with expiration dates as long as 4 years after the EAD's expiration date—well beyond the driver's authorized employment period. Even more troubling was that some of these non-domiciled CDLs included a passenger and school bus endorsement. Furthermore, the 2025 APRs have shown at least five other States including Colorado, Pennsylvania, South Dakota, Texas, and Washington that have issued non-domiciled CDLs in violation of the regulatory requirements. The 2025 APRs have revealed inconsistencies or failures that demonstrate acute systemic problems across the country in the non-domiciled CDL issuance processes. FMCSA expects the number of States discovered to have improperly issued non-domiciled CDLs to grow as FMCSA's APRs continue.

## D. Recent, Fatal Crashes Involving Drivers With Non-Domiciled CDLs

Since the beginning of the 2025 calendar year, FMCSA has identified at least five fatal crashes involving non-domiciled CDL holders. At least two of these drivers were improperly issued a CDL, while others held CDLs that complied with the regulations in place at the time of issuance but would not be eligible for a non-domiciled CDL under the revised regulations. These crashes show the tangible impact of States failing to follow the proper procedures when issuing non-domiciled CDLs, as well as the need for stronger regulations to ensure that non-domiciled drivers present in the United States without lawful immigration status are not able to obtain CLPs and CDLs.

Most recently, on August 12, 2025, the driver of a tractor-trailer, who did not have lawful immigration status [9] and held a non-domiciled CDL based on a valid USCIS-issued EAD, caused a crash in Florida that killed three people. The Florida Department of Highway Safety and Motor Vehicles stated that its initial, but ongoing, investigation showed that the driver attempted to execute a U-turn in an unauthorized area on the Florida Turnpike in St. Lucie County. [10] A dashcam video widely broadcast across various forms of media shows the CMV crossing in front of a minivan, which crashed into the truck and became lodged under its trailer. [11] The driver was later arrested in California on three counts of vehicular

[2] Thomas H. Kean, Lee H. Hamilton, and the National Commission on Terrorist Attacks, *The 9/11 Commission report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (9/11 Report), Washington, DC, U.S. Government Printing Office, Official Government Edition, July 22, 2004, p. 390. Available at *https://www.gpo.gov/fdsys/pkg/GPO-911REPORT/content-detail.html*.

[3] Public Law 109–347, 120 Stat 1884 at 1944 (2006); See 49 U.S.C. 31100 note.

[4] DOT, OIG, Management Advisory to the Deputy Secretary of Transportation, *Need to Establish a Legal Presence Requirement for Obtaining a Commercial Driver's License*, June 4, 2004, *https://www.oig.dot.gov/sites/default/files/cc2004054.pdf*. See also DOT, OIG, *Improving Testing and Licensing of Commercial Drivers*, Report No. MH–2002–093, May 8, 2002, *https://www.oig.dot.gov/sites/default/files/mh2002093e.pdf*.

[5] 76 FR 26854 (May 9, 2011). The final rule was effective July 8, 2011, and States were required to be in compliance with subpart B of Part 384 by July 8, 2014. On March 25, 2013, in response to various petitions for reconsideration, FMCSA made minor clarifications to the final rule and extended the date for State compliance to July 8, 2015. See 78 FR 17875 (Mar. 25, 2013); 49 CFR 384.301(f).

[6] See 76 FR 26854, 26858. The final rule changed the term "Nonresident" to "Non-domiciled" for both CLPs and CDLs to provide greater consistency with FMCSA's authorizing statute (which bases jurisdictional authority to issue CDLs on domicile, not residency), to avoid confusion, and to eliminate any actual or perceived conflicts with DHS immigration programs. Other than the change to "Non-domiciled," the rule remained as proposed in the NPRM. See 73 FR 19282, 19285 (Apr. 9, 2008).

[7] Enforcing Commonsense Rules of the Road for America's Truck Drivers, 90 FR 18759, May 2, 2025. See also, *https://www.fmcsa.dot.gov/newsroom/president-trumps-transportation-secretary-sean-p-duffy-announces-nationwide-audit-states*.

[8] For example, FMCSA is aware that numerous States have issued non-domiciled CDLs to drivers who are domiciled in Mexico, despite the fact that Mexican and Canadian drivers are not eligible for non-domiciled CDLs under 49 CFR 383.71(f).

[9] The driver was present in the United States without being inspected and admitted or paroled and was in removal proceedings before the Executive Office for Immigration Review.

[10] *https://www.flhsmv.gov/2025/08/16/illegal-u-turn-truck-driver-arrested-for-vehicular-homicide/* (accessed Sep. 19, 2025).

[11] *https://www.youtube.com/watch?v=HDgHr8KHOzw* (accessed Sep. 19, 2025).

homicide and three counts of manslaughter and returned to Florida for prosecution. The Department of Homeland Security announced that a U.S. Immigration and Customs Enforcement investigation revealed that the driver had been living in the U.S. without lawful immigration status since 2018 after unlawfully crossing the border from Mexico.[12] Preliminary findings from FMCSA's post-crash investigation showed that the driver was not proficient in the English language and also revealed that he had previously been cited for speeding in New Mexico.

This driver had an unexpired EAD and was therefore eligible for a non-domiciled CDL under the existing regulations but was improperly issued a standard (full-term) CDL in Washington in 2023. He was subsequently issued a proper non-domiciled CDL in California, but would not have been eligible for a non-domiciled CDL under the revised regulations requiring a driver to provide an I–94 or I–94A indicating a specified employment-based nonimmigrant status.

In another crash, which occurred on July 11, 2025, a truck tractor traveling on the Delaware Memorial Bridge from New Jersey into Delaware crossed three lanes of traffic and crashed into a concrete wall. The Delaware River and Bay Authority stated that the impact collapsed the concrete wall, and the truck tractor careened into the Delaware River.[13] The driver of the vehicle, who was killed in the crash, held a non-domiciled CDL. The emergency response for this incident involved significant recovery resources and personnel including a crane and barge repositioned from the active construction site of the Bridge Ship Collision Protection project, the Delaware State Police Marine dive unit, and a fire company. This driver similarly had entered the United States unlawfully, was in removal proceedings, and had a valid USCIS-issued EAD. Because a standalone EAD will no longer suffice as proof of employment eligibility for issuance of non-domiciled CDLs and this driver did not provide an I–94 or I–94A indicating a specified employment-based nonimmigrant status, he would not have been able to obtain his CDL under the revised regulations.

Another crash took place on May 6, 2025, in Thomasville, AL, in which a tractor-trailer hit four vehicles from behind as they were stopped at a red light.[14] Two people were killed and four people were injured. The driver of the CMV held a valid USCIS-issued EAD, which allowed him to obtain a non-domiciled CDL, but did not provide an I–94 or I–94A indicating a specified employment-based nonimmigrant status. FMCSA's ongoing post-crash investigation has revealed that the driver held the CDL for less than six weeks and initially failed his CDL skills test for speeding and failing to obey a traffic control device before passing the test a few days later. The crash occurred on the driver's third day of employment with the carrier. Because a standalone EAD will no longer suffice as proof of employment eligibility for issuance of non-domiciled CDLs, this driver would not have been able to obtain his CDL under the revised regulations.

On March 14, 2025, a CMV driver caused a multi-vehicle collision in Austin, TX. Witnesses stated that the driver of the 18-wheeler failed to brake and crashed into a long line of stopped and slow-moving traffic ahead of him.[15] The incident involved 17 vehicles, killed five people including two children, and caused 11 more people to be hospitalized. The post-crash scene extended for approximately one-tenth of a mile.[16] The driver was improperly issued a standard (full-term) CDL in Texas despite being eligible for only a non-domiciled CDL, a fact that demonstrates the difficulty SDLAs are currently having in correctly applying the existing regulations. Moreover, since this driver did not provide an I–94 or I–94A indicating a specified employment-based nonimmigrant status, he would not be eligible for a CDL under the revised regulations. A post-crash investigation revealed that this driver's driving record showed two prior citations, for failure to obey a sign/traffic control device and erratic (unsafe) lane changes. The investigation also found that the driver was not in possession of a current medical certificate and had violated the hours of service rules multiple times in the 11 days preceding the crash.

A crash in West Virginia on January 19, 2025, involved a driver of a tractor-trailer who held a non-domiciled CDL and had two prior citations for speeding. The driver entered the United States unlawfully, is in removal proceedings, and had a valid USCIS-issued EAD. According to news reports, the driver caused a collision on a bridge over Cheat Lake on Interstate 68 resulting in a vehicle falling from the bridge into the lake, killing the person inside.[17] Those reports also state that investigators determined that the driver, who had also struck another vehicle prior to the crash on the bridge, was traveling at an unsafe speed.[18] After being arrested in California and extradited to West Virginia, he was charged with negligent homicide.[19] As with other crashes described above, the driver's lack of an I–94 or I–94A indicating a specified employment-based nonimmigrant status and specifically allowing him to work as a truck driver would have prevented him from receiving a CDL under the revised regulations.

## VI. Discussion of the Interim Final Rule

### A. Justification for the IFR

Under the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.,* an agency must typically provide prior notice and an opportunity for public comment before a rule becomes effective. However, the APA provides an exception "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest" (5 U.S.C. 553(b)(B)). With good cause, an agency may also make a rule effective immediately upon publication (5 U.S.C. 553(d)(3)).

FMCSA finds good cause to issue this IFR without prior notice and comment and to make it effective immediately. This finding is based on the determination that notice and public procedure are both contrary to the public interest and impracticable because it would delay the adoption and immediate implementation of strict standards concerning the issuance and renewal of non-domiciled CLPs and CDLs necessary to address a recently

[12] *https://www.dhs.gov/news/2025/08/18/ criminal-illegal-alien-recklessly-driving-18-wheeler-kills-three-florida* (accessed Sep. 19, 2025).

[13] *https://www.drba.net/drba-police-investigating-bobtail-tractor-accident* (accessed Sep. 19, 2025).

[14] *https://www.waka.com/2025/05/07/2-dead-4-injured-in-thomasville-multi-wreck-crash-suspect-in-custody/; https://www.southalabamian.com/ articles/tuesday-wreck-claims-two/* (accessed Sep. 19, 2025).

[15] *https://apnews.com/article/austin-texas-crash-pileup-five-killed-509a46da52ec4552158d5b1d33f645af; https:// www.fox7austin.com/news/austin-i-35-crash-lawsuit* (accessed Sep. 19, 2025).

[16] *https://abcnews.go.com/US/5-people-dead-massive-car-crash-involving-17/story?id=119786467* (accessed Sep. 19, 2025).

[17] *https://www.wvnews.com/news/wvnews/tragic-fatal-accident-on-cheat-lake-bridge-leads-to-pending-criminal-charges/article_fed01d9c-f846-11ef-9e84-5bcd6ca70bef.html* (accessed Sep. 19, 2025).

[18] *https://www.wtae.com/article/fayette-county-cheat-lake-missing-man-charges/64017724* (accessed Sep. 19, 2025).

[19] *https://www.wdtv.com/2025/05/24/sukhjinder-singh-booked-north-central-regional-jail/* (accessed Sep. 19, 2025).

discovered, two-front crisis that constitutes an imminent hazard to public safety and a direct threat to national security.

FMCSA has recently become aware of a critical safety failure that is occurring in two distinct and dangerous ways: the eligibility requirements for obtaining a non-domiciled CLP and CDL are not narrowly tailored to provide a sufficient margin of safety to protect the traveling public, and the existing regulatory framework is unworkable in practice due to systemic deficiencies in State implementation. FMCSA cannot, in good faith, permit a demonstrably failed non-domiciled credential issuance regulatory framework and implementation to continue while conducting a notice and comment rulemaking process.

The first front of this crisis—the overly broad eligibility requirements of the current regulations—has been tragically demonstrated by multiple fatal crashes in 2025 involving drivers who held non-domiciled CDLs (or who were mistakenly issued a standard CDL instead of a non-domiciled CDL), most of which were properly issued in accordance with existing regulations. As discussed in Section V.D. of this preamble, non-domiciled CDL holders have been involved in several recent, fatal crashes that claimed the lives of 12 people (including two children) and caused injuries to 15 people (at least 11 of which were hospitalized). One driver had been in the U.S. illegally since 2018 and would not have been eligible for a non-domiciled CDL under the revised regulation. Two of the drivers had prior citations on their driving records, with one of those drivers also having inconsistencies in his hours-of-service record leading up to the day of the crash. These crashes demonstrate that the existing non-domiciliary credentialing framework is dangerously permissive, creating an untenable risk to the public even when the CDLs were properly issued under the existing standards.

The second front of the crisis is a systemic breakdown in State implementation of the rule, which can have disastrous consequences, as evidenced by the March 14, 2025, fatal crash in Texas caused by a driver with a license improperly issued by Texas and another crash in Florida on August 12, 2025, where the driver had previously been issued an improper license by Washington. As discussed in Section V.C. of this preamble, the scale of this implementation failure was recently uncovered by FMCSA's 2025 APRs, which revealed that States are fundamentally failing to administer the

issuance of non-domiciled credentials to foreign-domiciled applicants properly. FMCSA's APR has demonstrated that approximately one in four non-domiciled CDLs California issued were not compliant with the requirements in 49 CFR parts 383 and 384. Moreover, FMCSA has already confirmed improperly issued non-domiciled CDLs across six States, including California, Colorado, Washington, Texas, Pennsylvania, and South Dakota. FMCSA expects the number of States discovered to have improperly issued non-domiciled CDLs to grow as FMCSA's APRs continue.

When the integrity of the non-domiciled CDL process is in question, the credential itself is compromised and can no longer be trusted to verify an individual's eligibility and qualifications. Although FMCSA's primary focus in this rulemaking is on highway safety, the Agency notes that issuance of CLPs and CDLs to foreign individuals does have national security implications that should not be overlooked. Failure to properly vet such individuals raises the risk that individuals with malicious intent could gain authorized control of CMVs, which can be used to transport hazardous materials and target critical infrastructure or to otherwise carry out a terrorist attack.[20] Therefore the non-domiciled CLP and CDL issuance process must be protected to prevent exploitation by bad actors.

In addition, the current regulations for issuing non-domiciled CLPs and CDLs require States to obtain an applicant's complete 10-year driving history from all States where the individual was previously licensed. See § 383.73(b)(3)(iv). However, States are unable to carry out this requirement for individuals whose driving history exists predominantly or solely within a foreign jurisdiction. Without a verified driving record, there is a serious risk that unsafe or high-risk drivers—who may have prior violations, suspensions, or a history of crashes in foreign jurisdictions—could be granted non-domiciled CLPs and CDLs and operate large trucks and buses on U.S.

roadways. This undermines the integrity and safety of the CLP and CDL issuance process. Though there is a need to handle the issuance processes differently (due to the lack of authority to compel foreign jurisdictions to provide driving records), FMCSA believes that limiting eligibility for non-domiciled CLPs and CDLs (particularly when limited to employees holding an I–94 or I–94A indicating a specified employment-based nonimmigrant status that ensure additional screening of drivers) will increase safety by appreciably reducing the number of non-domiciled CLP and CDL drivers with unknown driver safety records on the Nation's roadways.

The confluence of these recent events and recently uncovered factors creates an imminent concern that the current regulatory framework does not provide a sufficient margin of safety to protect the traveling public. The recent fatal crashes demonstrate that the current regulations related to non-domiciled credentials fail even when properly followed, while the systemic issuance errors and fatal crashes caused by drivers who were improperly issued a license confirm the current regulatory framework has allowed for frequent points of failure—allowing ineligible persons to obtain non-domiciled CLPs and CDLs. This combination constitutes an imminent hazard that warrants immediate action to protect the traveling public.

Furthermore, providing advance notice through a proposed rule is impracticable and contrary to the public interest because it would actively subvert the rule's purpose by creating a foreseeable and concentrated surge in applications that would exacerbate the current safety crisis. A non-domiciled CDL is a high-value economic credential, and historical precedent shows that announcing a closing window for such an opportunity invariably triggers a rush of applicants. For example, when the compliance date for FMCSA's entry-level driver training requirements was approaching, SDLAs saw a large spike in CLP and CDL issuances immediately before applicants would have been subject to the new training requirements. The compliance date for the requirements was February 7, 2022. Data from the Commercial Driver's License Information System (CDLIS) [21] shows that CLP and CDL issuances steadily increased during 2021 culminating in numbers for December 2021 through February 2022

---

[20] On October 31, 2017, Sayfullo Saipov, who possessed a CDL, carried out a terrorist attack when he used a 6,000-lb. truck to murder eight victims and injure many more, including a 14-year old child, on the Hudson River Bike Path in lower Manhattan. See *https://www.justice.gov/usao-sdny/pr/sayfullo-saipov-be-sentenced-life-prison-2017-truck-attack-isis.* Though the truck used in this attack did not qualify as a *commercial motor vehicle* under the definition in 49 U.S.C. 31132 (because it did not have a gross vehicle weight rating or gross vehicle weight of at least 10,0001 pounds), it shows the lethal damage that can be inflicted by a single vehicle in the wrong hands.

[21] See *https://www.aamva.org/technology/systems/driver-licensing-systems/cdlis.*

that were around twice as high as the same time period in the previous year.[22]

The incentive and willingness to seek a CDL during a pendency period between a proposed rule and its potential finalization is amplified by the unique nature of the non-domiciled foreign applicant pool. Unlike U.S. citizens, non-citizen nationals residing in a U.S. territory, or lawful permanent residents who must apply for a CDL or CLP in their State of domicile, non-domiciled CDL or CLP applicants are not bound by such requirements. They are uniquely mobile and can strategically apply in any State that issues non-domiciled CDLs or CLPs.

The public notice itself would effectively serve as a guide for this forum shopping. The justification for the rulemaking would identify States with systemic weaknesses and high error rates, inadvertently advertising the path of least resistance. This is likely to funnel a national, and even international, pool of applicants toward the very State agencies least equipped to handle them, overwhelming their capacity for due diligence. Knowing that their window of opportunity was closing, those seeking to obtain a CDL improperly would rush to secure a license before the final rule takes effect. This would dramatically exacerbate the very danger the rulemaking is designed to eliminate, flooding the Nation's roadways with a new cohort of ineligible drivers.

The harm from such a concentrated surge is not speculative—it is foreseeable. Based on FMCSA's own 2025 APRs, California was found to have an error rate in excess of 25 percent and issued approximately 3,820 non-domiciled CDLs and CLPs in June 2025 alone. FMCSA expects a notice-and-comment period would result in this State being inundated with applicants, and extrapolating from the 2025 APR finding in June, could lead to the issuance of potentially over 1,000 improperly issued credentials every month. Even if fewer drivers than expected seek to secure licenses before the regulatory changes take effect, the current processes in noncompliant States indicate that as many as one in four drivers who would normally apply during that timeframe could be issued non-domiciled CLPs and CDLs improperly. Dangerous drivers who would be eligible to obtain a non-domiciled CLP or CDL under the current framework but are at risk of causing

fatal crashes such as those involved in the fatal crashes cited above in West Virginia, Alabama, Delaware, and Florida would equally be incentivized to obtain a non-domiciled CLP or CDL before the enhanced standards became effective, resulting in a higher number of dangerous drivers on America's roadways and threatening public safety.

Therefore, advance notice would create a perverse incentive, turning the period between the publication of the notice and the publication of the final rule into a window of heightened danger and making the standard rulemaking process unworkable and self-defeating. For the same reasons described above, FMCSA finds good cause to make the rule effective on publication, rather than making it effective at least 30 days after publication. States that choose to issue non-domiciled CDLs and CLPs will be required to pause issuance of those CDLs and CLPs until they can ensure compliance with the updated regulations.

Though this IFR is effective immediately, FMCSA invites comments from interested members of the public. These comments must be submitted on or before November 28, 2025. FMCSA will consider these comments and determine whether to make any revisions to the rule as a result of these comments.

## B. Overview of the IFR

The current regulations focus on an individual's possession of a valid USCIS-issued EAD or an unexpired foreign passport accompanied by evidence that the individual was inspected and admitted or paroled into the United States. As some of the recent incidents highlighted in Section V demonstrate, this allows individuals without lawful immigration status, including those who entered the United States illegally, to receive non-domiciled CLPs or CDLs as long as they obtain an EAD. This IFR revises the regulations to focus on lawful immigration status in the United States in certain employment-based nonimmigrant categories. An EAD will no longer be sufficient to obtain a non-domiciled CLP or CDL. An EAD only serves as proof that an individual is authorized to work in the United States for a specific time period, not that the individual entered the United States legally by presenting themselves at a port of entry.[23] This standard of

documentation is no longer sufficient to ensure that the non-domiciled CLP and CDL issuance process is narrowly tailored to those individuals who have lawfully entered the United States and should be allowed to drive a CMV. Individuals who do not possess evidence of lawful immigration status as defined in this IFR in certain employment-based nonimmigrant categories, will no longer be eligible to receive non-domiciled CLPs or CDLs. These individuals excluded from eligibility for a non-domiciled CLP or CDL would include asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients. Although these individuals may be eligible for employment in the United States, they would not be eligible to apply for a non-domiciled CLP or CDL. The rule will continue to allow U.S. citizens and lawful permanent residents, and non-citizen nationals domiciled in a U.S. territory (other than the 50 States and the District of Columbia) to obtain a non-domiciled CLP or CDL in a U.S. State. This rule also does not impact the ability of an individual domiciled in a State that is prohibited from issuing CDLs to obtain a non-domiciled CLP or CDL in another State.

Only those in lawful status in the United States in one of the following employment-based nonimmigrant categories will be permitted to obtain a non-domiciled CLP or CDL: H–2A (Temporary Agricultural Workers), H–2B (Temporary Non-Agricultural Workers), or E–2 (Treaty Investors). No other immigration categories will be eligible for a non-domiciled CLP or CDL under the IFR. These nonimmigrant categories require either a labor certification through the Department of Labor (DOL), current employment, or other specified proof of work established through the Federal visa process.[24] These requirements ensure that individuals in the United States under these nonimmigrant categories are already approved to work specific jobs that may require acquisition of a non-domiciled CDL. In addition, being issued the visa by the Department of State, presenting themselves at a valid port of entry to be screened by U.S. Customs and Border Protection, and being issued a Form I–94/94A ensures that these visa holders have entered the United States lawfully and have lawful immigration status. This list of specified nonimmigrant categories does not include every employment-based

---

[22] According to CDLIS CLPs and CDLs issued by month and year: 32,970 in December 2020; 37,571 in January 2021; 43,366 in February 2021; 63,462 in December 2021; 84,291 in January 2022; and 87,672 in February 2022.

[23] An EAD may be issued to certain groups of individuals who may not have presented themselves at a valid port of entry to be screened. See 8 CFR 274a.12.

[24] For more information on the requirements and processes required for the listed visas see *https://www.uscis.gov/working-in-the-united-states.*

nonimmigrant category, but encompasses the vast majority of individuals working in such categories that cover jobs that would require the acquisition of a non-domiciled CDL. Keeping the list targeted to CDL-specific employment-based nonimmigrant categories will eliminate confusion regarding who may be eligible for a non-domiciled CLP or CDL and ensure that those credentials are being issued only to those who need them for specific employment purposes. In addition, as discussed in Section VI.A of this preamble, limiting eligibility for non-domiciled CLPs and CDLs (particularly when limited to employees working under one of the specified employment-based nonimmigrant categories that ensure additional screening of drivers) will also increase safety by appreciably reducing the number of non-domiciled CLP and CDL drivers with unknown driver safety records on the Nation's roadways. In consulting with DOL's Office of Foreign Labor Certification, FMCSA understands that employer applications related to commercial trucking typically include some combination of the following job requirements: possess U.S. CDL or foreign CDL equivalent, related work experience (12 months to 2 years), clean driving record, pass drug or medical testing, and knowledge or proficiency in English. This employer screening, in addition to the incentive to avoid unnecessarily repeating the lengthy job order process,[25] helps ensure that the population of drivers being hired under one of the specified employment-based nonimmigrant categories are more likely to be drivers with safe driving records.

Individuals in approved employment-based nonimmigrant categories will be required to provide an unexpired Form I–94/94A and unexpired foreign passport at every issuance, transfer, renewal, and upgrade action defined in the regulation. Applicants who are U.S. citizens, lawful permanent residents, or non-citizen nationals domiciled in a U.S. territory will be required to provide any of the documents specified in Table

1 of § 383.71 as proof that they are eligible to receive a non-domiciled CLP or CDL. The expiration date for any non-domiciled CLP or CDL will be the expiration of the alien's period of admission documented on the Form I–94/94A or 1 year, whichever is sooner. This ensures that the SDLA will verify U.S. citizens and non-citizen nationals domiciled in a U.S. territory will be issued a non-domiciled CLP or CDL with an expiration date one year from the date of issuance to ensure consistency in the licensing process, which will reduce confusion for SDLAs issuing these non-domiciled credentials.

Once an applicant has presented the proper documentation, SDLAs will be required to utilize SAVE,[26] administered by USCIS, to verify the immigration status and employment-based nonimmigrant category information provided by the applicant. If the information received from SAVE does not confirm the applicant's claim to be in lawful immigration status (*i.e.,* if the applicant's Form I–94/94A "admit until date" has expired) or the applicant's nonimmigrant category as reflected by SAVE is no longer one of those specified in this rule (*i.e.,* no longer denotes H–2A (Temporary Agricultural Workers), H–2B (Temporary Non-Agricultural Workers), or E–2 (Treaty Investors), the SDLA would be prohibited from issuing the non-domiciled CLP or CDL. However, the SDLA may not rely solely on the SAVE response; it must confirm the applicant's claim to be in lawful immigration status in a specified category, it must retain copies of the required documents in its records, and it must provide copies of these documents and proof of SAVE verification to FMCSA upon request. The SDLA will also be required to retain these documents for no less than 2 years. The new requirements for verification through SAVE and records retention ensures that FMCSA has access to relevant information during APRs moving forward to verify the integrity of a State's non-domiciled CLP and CDL issuance process. This will address many of the challenges the Agency encountered in assessing a State's compliance during the current round of APRs caused by the lack of documentation showing the number of non-domiciled CLPs and CDLs issued or that such CLPs and CDLs were properly issued.

SDLAs will be prohibited from renewing non-domiciled CLPs or CDLs by mail and must require the applicant to be present in-person at each renewal.

The rule also contains a mandatory downgrade provision. If a State receives notification from FMCSA, the Department of Homeland Security, the Department of State, or other Federal agency with jurisdiction that a non-domiciled CLP or CDL holder licensed in that State no longer holds lawful nonimmigrant status in a category established in this rule, or if the non-domiciled CLP or CDL holder violates any terms of their immigration status, the SDLA will be required to initiate a process to remove the commercial privilege from the license within 30 days. Each time an SDLA renews, transfers upgrades, amends, corrects, reprints, or otherwise duplicates a previously issued CLP or CDL, the SDLA (in addition to confirming that the applicant's foreign passport is unexpired) must verify through SAVE that the applicant's I–94/94A "admit until date" has not expired and that the applicant's immigration category as noted on the I–94/94A or as confirmed by SAVE, remains listed as H–2A (Temporary Agricultural Workers), H–2B (Temporary Non-Agricultural Workers), or E–2 (Treaty Investors).

## VII. International Impacts

Motor carriers and drivers are subject to the laws and regulations of the countries where they operate, unless an international agreement states otherwise. Drivers and carriers should be aware of the regulatory differences between nations in which they operate.

This rule will not impact drivers domiciled in Canada or Mexico. FMCSA has previously determined that CDLs issued by Canadian Provinces and Territories in conformity with the Canadian National Safety Code and "Licencias Federales de Conductor" issued by the United Mexican States are in accordance with the standards of part 383. Under these reciprocity determinations, drivers that live in Canada and Mexico would operate in the United States with the license issued by their country of domicile. Therefore, under the single license provision of § 383.21, a driver holding a CDL issued under the Canadian National Safety Code or a "Licencia Federal de Conductor" issued by Mexico is prohibited from obtaining a non-domiciled CDL, or any other type of driver's license, from a State or other jurisdiction in the United States.

## VIII. Section-By-Section Analysis

This section-by-section analysis describes the changes to the regulatory text in numerical order.

---

[25] For example, employers that would like to hire H–2B workers are required by DOL to submit a job order ("Application for Temporary Employment Certification") no more than 90 days and no less than 75 days before the work start date. See 20 CFR 655.15(b). Each job qualification and requirement must be listed in the job order and must be bona fide and consistent with the normal and accepted qualifications and requirements imposed by non-H–2B employers in the same occupation and area of intended employment. 20 CFR 655.18(a)(2). An employer therefore has an incentive to thoroughly screen a prospective employee's driver safety record and apply similar qualifications and requirements to avoid having to go through the application process again, as this would delay the hiring of another driver for more than 75 days.

[26] Available at *https://www.uscis.gov/save.*

*A. Regulatory Provisions*

Section 383.5    Definitions

FMCSA adds a definition of *evidence of lawful immigration status* to § 383.5.

Section 383.71    Driver Application and Certification Procedures

FMCSA revises paragraph (f) of § 383.71.

Section 383.73 State Procedures

FMCSA amends § 383.73 by revising paragraphs (a)(6), (b)(6), (c)(7), (d)(7), and (e)(5); revising the introductory text of paragraph (f)(2); adding a new paragraph (f)(2)(iv), revising paragraph (f)(3), adding new paragraphs (f)(5) and (6), and revising paragraph (m).

Section 384.212    Domicile Requirement

FMCSA adds new paragraphs (a)(1) and (2) to § 384.212.

Section 384.301    Substantial Compliance—General Requirements

FMCSA adds new paragraphs (q) to § 384.301.

*B. Guidance Statements and Interpretations*

This IFR amends a regulation that has associated guidance statements. Such guidance statements do not have the force and effect of law, are strictly advisory, and are not meant to bind the public in any way. Conformity with guidance statements is voluntary. Guidance is intended only to provide information to the public regarding existing requirements under the law or FMCSA policies. A guidance statement does not alter the substance of a regulation.

FMCSA rescinds the following guidance:

1. FMCSA–CDL–383.23–FAQ001(2023–05–08):[27]

This guidance document, which refers to individuals present under the DACA immigration policy as a citizen of Mexico, is rescinded. It is no longer applicable under the new requirements to provide evidence of legal status.

2. FMCSA–CDL–383.23–Q1[28]

This guidance document, which refers to foreign drivers with employment authorization documents, is rescinded. Foreign drivers must meet the new requirements in this rule to obtain non-domiciled CLPs and CDLs and the rest

of the guidance is unnecessary as it is simply a restatement of what is already explained in footnote 1 to § 383.23.

Nomenclature for Non-Domiciled CLPs and CDLs

In addition, some SDLAs were operating under informal guidance previously issued by FMCSA that permitted States to refer to their non-domiciled credentials under different nomenclature. FMCSA notes that during the 2025 APRs, SDLA use of these disparate terms generated confusion for some SDLAs because it made it difficult to determine whether the State did in fact issue non-domiciled credentials in the first place. This IFR supersedes any past guidance on this issue and clarifies that §§ 383.73(f)(2)(ii) and 383.153(c) require that the word "non-domiciled" appear across a CLP or CDL and must "be conspicuously and unmistakably displayed" on the face of the CLP or CDL when a State issues a non-domiciled CLP or CDL. States may not use other nomenclature (such as "limited term" or "temporary") as a substitute for "non-domiciled," use restriction codes that require the examination of fine print on the back of the license as a substitute for "non-domiciled" on the face of the credential, or use any other alternatives to conspicuously and unmistakably displaying "non-domiciled" on the face of the CDL or CLP.

## IX. Regulatory Analyses

*A. E.O. 12866 (Regulatory Planning and Review), E.O. 13563 (Improving Regulation and Regulatory Review), and DOT Regulatory Policies and Procedures*

OMB has determined that this rulemaking is a significant regulatory action under E.O. 12866 (58 FR 51735, Oct. 4, 1993), Regulatory Planning and Review, as supplemented by E.O. 13563 (76 FR 3821, Jan. 21, 2011), Improving Regulation and Regulatory Review, because of the substantial Congressional and public interest concerning issuance of non-domiciled CLPs and CDLs. The rulemaking is also significant under DOT Regulatory Policies and Procedures.

This IFR amends the Federal regulations for SDLAs issuing commercial driving credentials to foreign-domiciled individuals. Through this rulemaking, FMCSA restores the integrity of the CDL issuance processes by significantly limiting the authority for SDLAs to issue and renew non-domiciled CLPs and CDLs to individuals domiciled in a foreign jurisdiction.

The analysis below discusses the affected entities, the need for the regulation, and the costs, benefits, and transfers that may result from this IFR.

Analysis Inputs

Wage Rates

FMCSA computes its estimates of labor costs using data gathered from several sources. Labor costs are comprised of wages, fringe benefits, and overhead. Fringe benefits include paid leave, bonuses and overtime pay, health and other types of insurance, retirement plans, and legally required benefits (Social Security, Medicare, unemployment insurance, and workers compensation insurance). Overhead includes any expenses to a firm associated with labor that are not part of employees' compensation; this typically includes many types of fixed costs of managing a body of employees, such as management and human resource staff salaries or payroll services. The economic costs of labor to a firm should include the costs of all forms of compensation and labor related expenses.

FMCSA used the driver wage rate to represent the value of the drivers' time that, in the absence of the rule, would have been spent being gainfully employed and performing duties as a CMV driver. The source for driver wages is the median hourly wage data (May 2024) from DOL, Bureau of Labor Statistics (BLS), Occupational Employment Statistics (OES).[29] The CMV driver wage is a weighted average of three occupational codes that require a CDL: 53–3032 Heavy and Tractor-Trailer Truck Drivers, 53–3051 Bus Drivers, School, and 53–3052, Bus Drivers, Transit and Intercity. BLS does not publish data on fringe benefits for specific occupations, but it does for the broad industry groups in its Employer Costs for Employee Compensation release. To calculate the fringe benefits rate, this analysis uses an average hourly wage of $32.71 and average hourly benefits of $14.99 for private industry workers in "transportation and warehousing"[30] to estimate that fringe benefits are equal to 45.83 percent ($14.99 ÷ $32.71) of wages.[31]

[27] Available at *https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled*.

[28] Available at *https://www.fmcsa.dot.gov//registration/commercial-drivers-license/may-foreign-driver-employment-authorization-document-obtain*.

[29] DOL, BLS. *Occupational Employment Statistics (OES). National. May 2024.* Available at: *https://www.bls.gov/oes/tables.htm* (accessed Aug. 27, 2025).

[30] DOL, BLS. *Table 4: Employer Costs for Employee Compensation for private industry workers by occupational and industry group, December 2024.* Available at: *https://www.bls.gov/news.release/archives/ecec_03142025.htm* (accessed Sept. 9, 2025).

[31] FMCSA's standard approach to accounting for the opportunity cost of drivers' time considers

Continued

FMCSA used the wage rate for employees in office and administrative support to represent the value of the SDLA employees' time that, in the absence of the rule, would have been spent performing other duties and responsibilities. The source for SDLA employees' wages is the median hourly wage data (May 2024) from the BLS' OES. To calculate the fringe benefits rate, this analysis uses an average hourly wage of $25.56 and average hourly benefits of $18.95 for State and local government workers in "office and administrative support" to estimate that fringe benefits are equal to 74.14 percent ($18.95 ÷ $25.56) of wages. FMCSA uses the Census Bureau's Service Annual Survey (SAS) Table 5 to calculate overhead expenses and their ratio to gross annual payroll expenses for the North American Industry Classification System (NAICS) 484 (Truck Transportation) and NAICS 485 (Transit and Ground Passenger) industries.[32]

FMCSA reviewed SAS data from 2013 through 2021, finding 2015 to be the most appropriate baseline from which to estimate industry overhead rates. While it is typically preferable to use the most recent information, data from 2020 was an anomalous year with especially high overhead rates, likely due to the coronavirus disease 2019 pandemic and subsequent business disruptions. For the 2018 and 2019 SAS tables, Census greatly reduced the number of expenses published in Table 5. Based on the assigned expense categories as overhead, FMCSA followed two steps to calculate the overhead rate. First, FMCSA added together the seven overhead expense categories (expensed purchases of software; data processing and other purchased computer services; purchased repairs and maintenance to buildings, structures, and offices; lease and rental payments for land, buildings, structures, store spaces, and offices; purchased advertising and promotional

services; purchased professional and technical services; and cost of insurance). FMCSA then divided the sum of the overhead expense categories by gross annual payroll. Following this approach including only the seven expense categories most focused on firm fixed expenses, the 2015 overhead expenses in truck transportation would be $13.0 billion.[33] Dividing the $13.0 billion overhead by $62 billion gross annual payroll gives a 21 percent overhead rate for NAICS 484. The 2015 overhead expenses in passenger and ground transportation would be $3.1 billion. Dividing the $3.1 billion overhead by the $13 million gross annual payroll gives a 23 percent overhead rate for NAICS 485. FMCSA then combined the expense and payroll categories for both industries to calculate an average transportation industry overhead rate of 21 percent for use in this analysis.

### TABLE 1—HOURLY MEDIAN WAGE RATE, FRINGE BENEFITS, AND OVERHEAD RATES

| BLS occupation code | Occupation | Hourly median wage | Fringe benefits rate (%) | Overhead rate (%) | Median hourly base wage + fringe benefits | Median hourly base wage + fringe benefits + overhead |
|---|---|---|---|---|---|---|
| 53–3032; 53–3051; 53–3052. | CDL Driver Composite ................ | NA | 45.83 | NA | $39.19 | NA |
| 43–1011 ..................... | First-Line Supervisors of Office and Administrative Support Workers. | $31.80 | 74.14 | 21 | 55.38 | $62.05 |

### Average SDLA Fee for License Renewal

FMCSA reviewed fees for CDL renewal across all 51 (50 States and the District of Columbia) jurisdictions and found that renewal fees range from $5 to $164.50. The average renewal fee is $55.28, and FMCSA uses an estimate of $55 to represent the renewal fee paid by non-domiciled CDL applicants.

### Crash Costs

FMCSA uses crash cost values to assess and estimate the safety benefits of various regulatory initiatives. FMCSA publishes its methodology for calculating crash costs for fatal, injury, and non-injury crashes on its website.[34] The values below incorporate the most

recent crash data from the National Highway Traffic Safety Administration, from calendar year 2023, inflated to 2024 values based on the Consumer Price Index for All Urban Consumers.

### TABLE 2—CMV CRASH COST, BY CRASH TYPE

[In 2024 dollars]

| Crash type | CMV crash costs |
|---|---|
| Cost per non injury crash ..... | $52,864 |
| Cost per injury crash ............ | 400,025 |
| Cost per fatal crash .............. | 15,739,682 |

### Affected Entities

#### SDLAs

This IFR will impact the SDLAs in 46 States that currently issue non-domiciled CDLs (AL, MS, NH, TN, and WV do not issue non-domiciled CDLs).

#### Drivers

This final rule will impact current and prospective non-domiciled CDL holders. Drivers will be required to provide additional documentation, and in some cases will no longer be eligible for a non-domiciled CDL. FMCSA gathered information on current CLP and CDL holders during the APRs discussed earlier in the preamble, and estimates that there are approximately

hourly base wage plus fringe benefits, but exclusive of overhead, representing the value to the driver of his or her forgone best alternative (*i.e.*, in the absence of this rule it is assumed these individuals would be working during that time and as such, the analysis values that time at the same amount that they accept in exchange for it, that is, their base wage plus fringe benefits). Including an overhead rate as a component element of the driver wage rate, over and above the base wage and fringe benefits, for the purposes of evaluating the opportunity cost to drivers does not accurately reflect the value as

incident upon the driver (because the value of the overhead component of wage rates is not incident upon, nor received as compensation by, the driver, as are base wages and fringe benefits).

[32] See SAS Table 5. Available at: *https://www.census.gov/programs-surveys/sas/data/tables.html* (accessed: Sept. 10, 2025).

[33] The seven expense categories included in this overhead estimate are: "Expensed purchases of software" ($321 million), "Data processing and other purchased computer services" ($320 million), "Purchased repairs and maintenance to buildings,

structures, and offices" ($541 million), "Lease and rental payments for land, buildings, structures, store spaces, and offices" ($3,067 million), "Purchased advertising and promotional services" ($507 million), "Purchased professional and technical services" ($1,782 million), and "Cost of insurance" ($6,535 million).

[34] Available at *https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2024-12/FMC-PRE-240812-001-Federal%20Motor%20Carrier%20Safety%20Administraction%20Crash%20Cost%20Methdology%20Report-2024_0.pdf.*

200,000 non-domiciled CDL holders, and approximately 20,000 non-domiciled CLP holders. Upon renewal, some number of these individuals will no longer be eligible for a non-domiciled CDL and will have their credential downgraded. In an effort to determine the number of drivers that will still be eligible for non-domiciled CDLs, FMCSA spoke with other Government agencies and reviewed data from SDLAs and other on-line resources. Approximately 500 to 600 individuals receive a H–2B status with the intent to operate a CMV each year. This nonimmigrant classification can be granted for up to the period of time authorized on the temporary labor certification and may be extended for qualifying employment in increments of up to one year.[35] FMCSA thus assumes that 500 to 600 individuals will seek a non-domiciled CDL, including renewals or extensions, each year. FMCSA does not have clear estimates of the number of H–2A workers that intend to operate a CMV because it is often incidental to the work they are doing. The Office of Homeland Security Statistics yearbook estimates that approximately 27,240 H–2A visas were issued to individuals from countries other than Canada and Mexico in 2023.[36] This represents an upper bound in that it is highly unlikely that all of these individuals would seek a CDL. The Bureau of Labor Statistics (BLS) reports employment based on industry and occupational code. In 2024, BLS estimates that there were approximately 15,000 heavy and tractor-trailer truck drivers in the agricultural industry.[37] Many of these drivers are U.S. citizens and would not seek a non-domiciled CDL. FMCSA makes the simplifying assumption that ⅓ of these individuals hold H–2A status, are not domiciled in either Canada or Mexico, and will be applying for non-domiciled CDLs each year. Including the individuals in the remaining nonimmigrant categories (E–2) FMCSA estimates that SDLAs will issue approximately 6,000 non-domiciled CDLs per year. The remaining roughly 194,000 current non-domiciled CDL holders will exit the freight market, which is discussed in more detail in the cost section.

Motor Carriers

This IFR will impact motor carriers that currently, or intend to, employ non-domiciled CDL holders that are no longer eligible to receive a credential. Motor carriers that currently employ non-domiciled CDL holders will have some time to adjust to the change as the drivers will be aware if their license will not be renewed under the standards set forth in this IFR. By providing this time for adjustment, FMCSA anticipates that impacts to motor carriers will be mitigated.

Need for the Regulation

As discussed at length in the preamble, the confluence of recent events creates an imminent concern that the current regulatory framework does not provide a sufficient margin of safety to protect the traveling public. The fatal crashes identified above demonstrate that the regulations fail even when properly followed, while the systemic issuance errors confirm the current regulatory framework has allowed for frequent points of failure—enabling ineligible persons to obtain non-domiciled CLPs and CDLs. This combination constitutes an imminent hazard that warrants immediate action to protect the traveling public.

Costs

This IFR will require States and their SDLAs to verify additional documentation, utilize SAVE, and retain copies of the verified documents in their records. FMCSA anticipates that States will issue fewer non-domiciled CDLs, but that each credential will require additional time to verify and retain documents. Currently, States are not required to pay transactions fees to query SAVE and FMCSA does not estimate a fee impact for that transaction. Lastly, States that choose to issue non-domiciled CDLs and CLPs will be required to pause issuance of those CDLs and CLPs until they can ensure compliance with the updated regulations. FMCSA anticipates that States will incur costs in the process of realigning their non-domiciled CDL program issuance with the standards set forth in this IFR.

FMCSA estimates that verifying and retaining additional documentation and running a SAVE query will require approximately 15 minutes of time per query for SDLA personnel. FMCSA estimates that the total cost, across all impacted SDLAs, will total approximately $93,075 per year (6,000 applicants × $62.05 wage rate × 15 minutes).

SDLAs that choose to issue non-domiciled CDLs will be required to pause issuance of the credential until their program is aligned to the standards set forth in this IFR. Each SDLA has

developed a process that is unique to their State, and as such, will incur different costs to adjust their program. Some program adjustments could include reprograming the IT system to interpret SAVE results in alignment with the new standards, changing the credential that is issued to ensure that "non-domiciled" is conspicuously and unmistakably displayed on the face of the CLP or CDL, and ensuring that SDLA employees are properly issuing non-domiciled CDLs and retaining appropriate records. FMCSA is unable to estimate a specific cost for each SDLA due to the variance in current non-domiciled CDL issuance (e.g., many SDLA systems already issue credentials with "non-domiciled" displayed on the face of the credential and some SDLAs were already retaining appropriate records to document the issuance process). FMCSA has previously estimated costs of approximately $70,000 (in 2024 dollars) to develop an interface between the Drug and Alcohol Clearinghouse and the SDLA IT system.[38] This would likely overestimate the cost of reprogramming State IT systems to interpret SAVE results because SDLAs are already interfacing with SAVE for purposes of REAL ID and this change will represent an adjustment to the existing interface. It is, however, a reasonable estimate of the average impact for States to align their non-domiciled CDL program with the standards set forth in this rule (inclusive of IT system upgrades, credential updates, and ensuring staff are properly issuing credentials). FMCSA estimates that each of the 46 effected SDLAs will incur costs of $70,000 in the first year of the analysis, resulting in total first year costs for program realignment of $3.2 million (46 SDLAs × $70,000 = $3,220,000).

This IFR will also result in costs to non-domiciled CDL drivers as they will now be required to renew their license in person every year, which increases the amount of time needed to renew the license. Previously, some drivers were likely able to renew online or via mail and had expiry dates beyond a one-year timeframe. FMCSA assumes that non-domiciled CDL holders previously had a two-year expiry date and spent approximately one hour (or 30 minutes a year) renewing their license. FMCSA estimates they will now spend four hours, or 3.5 additional hours renewing their license each year. FMCSA estimates the annual in person visit will take an additional 3.5 hours of a driver's time, resulting in total annual costs of

[35] See *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers.*

[36] Available at *https://ohss.dhs.gov/topics/immigration/yearbook/2023/table25.*

[37] Available at *https://data.bls.gov/projections/nationalbMatrix?querybParams=111000&ioType=i.*

[38] (86 FR 55718).

$822,990 (6,000 applicants × $39.19 × 3.5 hours).

FMCSA anticipates that drivers who will no longer be eligible for a non-domiciled CDL will be able to find similar employment in other sectors (*e.g.,* construction, driving vehicles that don't require a CDL, etc.). They will experience some de minimis costs as they move from one industry to another when their current credential expires.

Regarding potential economic impacts within the freight market, FMCSA looked at data during and after the COVID–19 pandemic to understand how the market could react to a reduction in CDL holders and found that the freight market tends to be flexible and responsive to external factors. During the COVID–19 pandemic the industry saw a historic increase in spot market rates, followed by a record influx of motor carriers and drivers entering the market to meet the increased demand.[39] In 2021 there was a nearly 20 percent increase in the number of interstate motor carriers and a 6 percent increase in the number of interstate CDL drivers.[40] Since that time, the rates have fallen, as have load volumes and the number of motor carriers. There are roughly 200,000 non-domiciled CDL holders, which is approximately five percent of the 3.8 million active interstate CDL holders in 2024. FMCSA anticipates that these drivers will exit the market within approximately two years as their credential comes up for renewal, and that the market will respond to this change in capacity as it has in the past, with rates adjusting and drivers and carriers entering the market where needed. Further, due to the prolonged two-year period of attrition, motor carriers will have time to adjust their hiring based on the requirements set forth in this IFR, including by marketing available positions to drivers with the proper qualifications to obtain a CDL. As such, FMCSA believes there will be a limited economic impact on the freight market and motor carriers.

Transfers

In addition, drivers who previously paid the renewal fee every two years will now pay that fee annually. As discussed above, the average renewal fee is $55, and will now be paid annually instead of biannually, which results in an increase of $27.50 per year. FMCSA anticipates that drivers will incur additional fees of approximately $165,000 per year (6,000 drivers × $27.50). Fees are considered transfer payments, or monetary payments from one group to another that do not affect the total resources available to society, and therefore do not represent actual costs or benefits of the rule.

Total Costs and Transfers

As shown in the table below, FMCSA estimates that the total 10-year cost of the rulemaking (excluding transfers) is approximately $10.9 million discounted at three percent and $9.4 million discounted at seven percent. Total annualized impacts range from $1.6 million discounted at three percent to $1.3 million discounted at seven percent.

### TABLE 3—TOTAL COSTS AND TRANSFERS
[In 2024 dollars]

| Analysis year | Total state cost | Total driver cost | Total transfers | Total cost (excluding transfers) | Total cost (discounted at 3 percent) | Total cost (discounted at 7 percent) |
|---|---|---|---|---|---|---|
| 1 | $3,313,075 | $822,990 | $165,000 | $4,136,065 | $4,015,597 | $3,865,481 |
| 2 | 93,075 | 822,990 | 165,000 | 916,065 | 863,479 | 800,127 |
| 3 | 93,075 | 822,990 | 165,000 | 916,065 | 838,329 | 747,782 |
| 4 | 93,075 | 822,990 | 165,000 | 916,065 | 813,912 | 698,862 |
| 5 | 93,075 | 822,990 | 165,000 | 916,065 | 790,206 | 653,142 |
| 6 | 93,075 | 822,990 | 165,000 | 916,065 | 767,190 | 610,413 |
| 7 | 93,075 | 822,990 | 165,000 | 916,065 | 744,845 | 570,479 |
| 8 | 93,075 | 822,990 | 165,000 | 916,065 | 723,150 | 533,158 |
| 9 | 93,075 | 822,990 | 165,000 | 916,065 | 702,088 | 498,279 |
| 10 | 93,075 | 822,990 | 165,000 | 916,065 | 681,638 | 465,681 |
| Total | 930,750 | 8,229,900 | 1,650,000 | 12,380,650 | 10,940,434 | 9,443,403 |
| Annualized | .................... | .................... | .................... | .................... | 1,557,672 | 1,344,528 |

Benefits

FMCSA anticipates that restoring the integrity of non-domiciled CDL license issuance will enhance the safety of CMV operations and is likely to result in improved safety outcomes, such as the reduced frequency and/or severity of crashes or reduced frequency of violations. There is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations. FMCSA conducted a literature review and found a few articles focused on the safety performance impacts of undocumented immigrants or illegal aliens, but has not obtained information on how many such drivers have sought to obtain a non-domiciled CDL in the United States.[41][42]

Given insufficient evidence, a direct quantitative estimate of the potential safety benefits resulting from this IFR cannot be developed.

Break-Even Analysis

When it is not possible to quantify and monetize the estimated benefits (or all costs) of a rule, OMB Circular A–4 suggests that agencies perform a threshold or break-even analysis.[43] In the context of this IFR, FMCSA estimated the number of fatal crashes that would need to be avoided as a

[39] Available at *https://www.bts.gov/freight-indicators#spot-rates.*

[40] Data available from MCMIS.

[41] Zhao, Ruinan, *The Impact of granting undocumented immigrants driver's licenses on fatal crashes,* Journal of Policy Analysis and Management (Sept. 1, 2025), available at: *https://*

*onlinelibrary.wiley.com/doi/10.1002/pam.70053?msockid=00e07d21548e668d115f6b375508675a (accessed Sept. 17, 2025).*

[42] Federation for Immigration Reform. Drivers' Licenses for Illegal Aliens: A bad policy that undermines our immigration laws, available at: *https://www.fairus.org/issue/illegal-immigration/*

*drivers-licenses-illegal-aliens-policy-immigration (accessed Sept. 17, 2025).*

[43] OMB, Circular A–4, *Regulatory Analysis* (Sept. 17, 2003), available at: *https://www.whitehouse.gov/wp-content/uploads/2025/08/CircularA-4.pdf (accessed Sept. 10, 2025).*

result of the rule for the benefits to exceed the estimated costs. Applying FMCSA's total annualized cost estimate of $1,344,528 (at a seven percent discount rate) and FMCSA's per-fatal crash cost estimate $15,739,682 (both in 2024 dollars), the interim final rule would have positive net benefits if it were to result in 0.085 fewer fatal crashes involving CMVs each year. Extrapolated to a full year, the break-even number of annual avoided crashes would be just 1.3 percent of the identified crashes. As is discussed in detail in the preamble above, FMCSA has identified five fatal crashes in just the first 8 months of 2025 in which the CMV driver responsible for the crash held a non-domiciled CDL that would not have been issued under this final rule. Therefore, FMCSA is confident that this rule would reduce the crash risk associated with such fatal crashes to at least that degree, and that the benefits would be even greater when accounting for non-fatal crashes that would also be avoided. As a result, FMCSA has determined that the benefits of the interim final rule are likely to exceed its costs, including costs discussed above that are unquantified, but are not expected to be large.

### B. E.O. 14192 (Unleashing Prosperity Through Deregulation)

E.O. 14192, Unleashing Prosperity Through Deregulation, issued on January 31, 2025 (90 FR 9065, Jan. 31, 2025), requires that, for every one new regulation issued by an Agency, at least 10 prior regulations be identified for elimination, and that the cost of planned regulations be prudently managed and controlled through a budgeting process. Final implementation guidance addressing the requirements of E.O. 14192 was issued by OMB on March 26, 2025. This rule does not meet the definition of "rule" or "regulation" as defined in section 5 of E.O. 14192, because it is issued with respect to an immigration-related function of the United States per section 5(a) of E.O. 14192.

### C. Congressional Review Act

This rule is not a *major rule* as defined under the Congressional Review Act (5 U.S.C. 801–808)." [44]

[44] A *major rule* means any rule that OMB finds has resulted in or is likely to result in (a) an annual effect on the economy of $100 million or more; (b) a major increase in costs or prices for consumers, individual industries, geographic regions, Federal, State, or local government agencies; or (c) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets (5 U.S.C. 804(2)).

### D. Advance Notice of Proposed Rulemaking

Under 49 U.S.C. 31136(g), FMCSA is required to publish an advance notice of proposed rulemaking (ANPRM) or proceed with a negotiated rulemaking if a safety rulemaking "under this part" [45] is likely to lead to the promulgation of a major rule. As this IFR is not likely to result in the promulgation of a major rule, FMCSA is not required to issue an ANPRM or to proceed with a negotiated rulemaking.

### E. Regulatory Flexibility Act (Small Entities)

The Regulatory Flexibility Act (RFA, 5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996,[46] requires Federal agencies to consider the effects of the regulatory action on small business and other small entities and to minimize any significant economic impact for any rule subject to notice-and-comment rulemaking under the APA unless the agency head certifies that the rule will not have a significant economic impact on a substantial number of small entities. As discussed above, FMCSA has determined that there is good cause to forego prior notice and comment and amend the FMCSR through this IFR. The Regulatory Flexibility Act, therefore, does not require FMCSA to conduct an RFA.

Nonetheless, FMCSA conducted a screening analysis on the impact of the IFR on small entities. This rule has the potential to impact States and drivers. Under the standards of the RFA, as amended, States are not small entities because they do not meet the definition of a *small entity* in section 601 of the RFA. Specifically, States are not small governmental jurisdictions under section 601(5) of the RFA, both because State government is not among the various levels of government listed in section 601(5), and because, even if this were the case, no State, including the District of Columbia, has a population of less than 50,000, which is the criterion to be a small governmental jurisdiction under section 601(5) of the RFA.

CDL holders are not considered small entities because they do not meet the definition of a small entity in Section 601 of the RFA. Specifically, drivers are considered neither a small business under Section 601(3) of the RFA, nor are they considered a small organization under Section 601(4) of the RFA.

[45] Part B of Subtitle VI of Title 49, United States Code, *i.e.,* 49 U.S.C. chapters 311–317.
[46] Public Law 104–121, 110 Stat. 857, (Mar. 29, 1996).

Therefore, this rule would not impact a substantial number of small entities.

This rule would require that States verify and retain additional documentation on non-domiciled CLP and CDL applicants and complete a check with SAVE. FMCSA estimates costs to all impacted States of approximately $93,000 per year. Further drivers would be required to renew their license annually, in-person at the SDLA at an estimated impact of approximately $988,000 per year, or less than $120 per driver per year. For these reasons, FMCSA certifies that this action will not have a significant economic impact on a substantial number of small entities.

### F. Assistance for Small Entities

In accordance with section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121, 110 Stat. 857), FMCSA wants to assist small entities in understanding this final rule so they can better evaluate its effects on themselves and participate in the rulemaking initiative. If the IFR will affect your small business, organization, or governmental jurisdiction and you have questions concerning its provisions or options for compliance, please consult the person listed under **FOR FURTHER INFORMATION CONTACT.**

Small businesses may send comments on the actions of Federal employees who enforce or otherwise determine compliance with Federal regulations to the Small Business Administration's Small Business and Agriculture Regulatory Enforcement Ombudsman (Office of the National Ombudsman, see *https://www.sba.gov/about-sba/ oversight-advocacy/office-national-ombudsman*) and the Regional Small Business Regulatory Fairness Boards. The Ombudsman evaluates these actions annually and rates each agency's responsiveness to small business. If you wish to comment on actions by employees of FMCSA, call 1–888–REG–FAIR (1–888–734–3247). DOT has a policy regarding the rights of small entities to regulatory enforcement fairness and an explicit policy against retaliation for exercising these rights.

### G. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA, 2 U.S.C. 1531–1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. The Act addresses actions that may result in the expenditure by a State, local, or Tribal government, in the aggregate, or by the private sector of $206 million (which is the value equivalent of $100 million in 1995,

adjusted for inflation to 2024 levels) or more in any one year. Though this IFR would not result in such an expenditure, and the analytical requirements of UMRA do not apply as a result, FMCSA discusses the effects of this rule elsewhere in this preamble.

*H. Paperwork Reduction Act*

This IFR contains information collection requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520). As defined in 5 CFR 1320.3(c), *collection of information* comprises reporting, recordkeeping, monitoring, posting, labeling, and other similar actions. The title and description of the information collection, a description of those who must collect the information, and an estimate of the total annual burden follow. The estimate covers the time for reviewing instructions, searching existing sources of data, gathering and maintaining the data needed, and completing and reviewing the collection.

*Title:* Non-Domiciled Commercial Driver's License Records.

*OMB Control Number:* 2126–0087.

*Summary of the Information Collection:* This information collection request (ICR) covers the collection and retention of the documentation provided to a SDLA during the application process for a non-domiciled CLP or CDL.

*Need for Information:* The licensed drivers in the United States deserve reasonable assurances that their fellow motorists are properly qualified to drive the vehicles they operate. Under the Commercial Motor Vehicle Safety Act of 1986 (CMVSA, 49 U.S.C. 31301 *et seq.*), as amended, FMCSA established the CDL program and the performance standards with which State CDL programs must comply. The CDL regulations in 49 CFR part 383 prescribe uniform minimum standards for testing and ensuring the fitness of individuals who operating commercial motor vehicles (CMVs), and State compliance with the CDL program is addressed in Part 384. In particular, States that issue non-domiciled CDLs must do so in accordance with §§ 383.71, 383.73 and 384.212.

This collection is intended to ensure that States retain all documents involved in the licensing process for non-domiciled CLP and CDL holders for a period of no less than two years from the date of issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL. If States do not retain this

documentation, FMCSA is severely hindered in its efforts to ensure compliance with the regulatory requirements because States are unable to accurately determine the number of non-domiciled CLPs and CDLs they have issued, or to prove to FMCSA officials that such CLPs and CDLs were properly issued.

*Proposed Use of Information:* State officials use the information collected from non-domiciled CDL applicants to determine whether an individual is eligible to receive a non-domiciled CDL and to prevent unqualified, and/or disqualified CLP and CDL holders and applicants from operating CMVs on the Nation's highways. During State CDL compliance reviews, FMCSA officials review this information to ensure that the provisions of the regulations are being carried out. Without the aforementioned requirements, there would be no uniform control over driver licensing practices to prevent uncertified and/or disqualified foreign drivers from being issued a non-domiciled CLP or CDL. Failure to collect this information would render the regulations unenforceable.

*Description of the Respondents:* SDLAs issuing non-domiciled CDLs.

*Number of Respondents:* 51.

*Frequency of Response:* Ongoing.

*Burden of Response:* 6,000 responses. The associated cost burden is $93,075.

*Estimate of Total Annual Burden:* 1,500 hours.

In accordance with 44 U.S.C. 3507(d), FMCSA will submit the proposed information collection amendments to OIRA at OMB for approval.

FMCSA requests comment on any aspect of this information collection, including: (1) Whether the proposed collection is necessary for FMCSA to perform its functions; (2) the accuracy of the estimated burden; (3) ways for FMCSA to enhance the quality, usefulness, and clarity of the collected information; and (4) ways that the burden could be minimized without reducing the quality of the collected information.

*I. E.O. 13132 (Federalism)*

FMCSA has analyzed this rule in accordance with the principles and criteria of E.O. 13132, Federalism, and has determined that it does not have federalism implications. E.O. 13132 applies to "policies that have federalism implications," defined as regulations and other actions that have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various

levels of government" (Sec. 1(a)). The key concept here is "substantial direct effects on the States." Section 3(b) of the E.O. provides that "[n]ational action limiting the policymaking discretion of the States shall be taken only where there is constitutional and statutory authority for the action and the national activity is appropriate in light of the presence of a problem of national significance."

The rule amends a single aspect of the CDL program authorized by the CMVSA (49 U.S.C. chapter 313). States have been required to issue all CDLs in accordance with Federal standards for decades and have been required to issue all CLPs in accordance with Federal standards since 2011. Moreover, the CDL program does not have preemptive effect; it is voluntary, and States may withdraw at any time, though doing so will result in the loss of certain Federal-aid highway funds pursuant to 49 U.S.C. 31314. Because this IFR makes only a modest change to requirements already imposed on participating States, FMCSA has determined that it does not have substantial direct effects on the States, on the relationship between the Federal and State governments, or on the distribution of power and responsibilities among the various levels of government.

Nonetheless, FMCSA recognizes that this rule has an impact on the States and their commercial driver licensing operations. Most notably, it requires all States that issue non-domiciled CLPs and CDLs to amend their existing procedures. The Agency continually works with the States to identify CDL program deficiencies that need to be addressed, and it was mostly through these reviews that systemic deficiencies with the non-domiciled CLP and CDL issuance process were identified. Therefore, States that issue non-domiciled CLPs and CDLs are generally already on notice that this aspect of the CDL program is under scrutiny and that procedural changes may be necessary.

Section 6(b) of E.O. 13132 provides in part that "[t]o the extent practicable and permitted by law, no agency shall promulgate any regulation that has federalism implications, that imposes substantial direct compliance costs on State and local governments, and that is not required by statute, unless . . . the agency, prior to the formal promulgation of the regulation, (A) consulted with State and local officials early in the process of developing the proposed regulation." As described in Section IX.A of the Regulatory Analysis, above, the total cost to States of complying with these new regulations is not expected to be substantial, so the

Agency has determined that consultation is not required. Furthermore, because this is an IFR, there is no "proposed regulation." The expedited process necessitated by the immediate need to address the issues discovered in the recent APRs means it is not practicable to consult with the States prior to promulgation of this rulemaking. However, FMCSA values input from States and will ensure States have the opportunity to provide input after the publication of the IFR. FMCSA will determine whether any revisions to the rule are warranted as a result of information the Agency receives.

*J. Privacy*

The Consolidated Appropriations Act, 2005,[47] requires agencies to assess the privacy impact of a regulation that will affect the privacy of individuals. This rule would not require the collection of personally identifiable information (PII). The supporting Privacy Impact Analysis (PIA), available for review in the docket, gives a full and complete explanation of FMCSA practices for protecting PII in general and specifically in relation to this final rule.

The Privacy Act (5 U.S.C. 552a) applies only to Federal agencies and any non-Federal agency that receives records contained in a system of records from a Federal agency for use in a matching program.

The E-Government Act of 2002,[48] requires Federal agencies to conduct a PIA for new or substantially changed technology that collects, maintains, or disseminates information in an identifiable form. No new or substantially changed technology will collect, maintain, or disseminate information as a result of this rule. Accordingly, FMCSA has not conducted a PIA.

FMCSA will complete a Privacy Threshold Assessment (PTA) to evaluate the risks and effects the proposed rulemaking might have on collecting, storing, and sharing personally identifiable information. The PTA will be submitted to FMCSA's Privacy Officer for review and preliminary adjudication and to DOT's Privacy Officer for review and final adjudication.

*K. E.O. 13175 (Indian Tribal Governments)*

This rule does not have Tribal implications under E.O. 13175, Consultation and Coordination with

Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*L. National Environmental Policy Act of 1969*

FMCSA analyzed this IFR pursuant to the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 *et seq.*). FMCSA believes this IFR will not have a reasonably foreseeable significant effect on the quality of the human environment. This action falls under a published categorical exclusion and is thus excluded from further analysis and documentation in an environmental assessment or environmental impact statement under DOT Order 5610.1D,[49] Subpart B, Subsection e, paragraph (6)(s)(7), and (6)(t)(2), which cover regulations pertaining to requirements for State-issued commercial license documentation and having the appropriate laws, regulations, programs, policies, procedures and information systems concerning the qualification and licensing of persons who apply for a CDL, and persons who are issued a CDL.

List of Subjects

*49 CFR Part 383*

Administrative practice and procedure, Alcohol abuse, Drug abuse, Highway safety, Motor carriers.

*49 CFR Part 384*

Administrative practice and procedure, Alcohol abuse, Drug abuse, Highway safety, Motor carriers.

Accordingly, FMCSA amends 49 CFR parts 383 and 384 as follows:

## PART 383—COMMERCIAL DRIVER'S LICENSE STANDARDS; REQUIREMENTS AND PENALTIES

■ 1. The authority citation for part 383 continues to read as follows:

**Authority:** 49 U.S.C. 521, 31136, 31301 *et seq.,* and 31502; secs. 214 and 215 of Pub. L. 106–159, 113 Stat. 1748, 1766, 1767; sec. 1012(b) of Pub. L. 107–56, 115 Stat. 272, 297, sec. 4140 of Pub. L. 109–59, 119 Stat. 1144, 1746; sec. 32934 of Pub. L. 112–141, 126 Stat. 405, 830; sec. 23019 of Pub. L. 117–58, 135 Stat. 429, 777; and 49 CFR 1.87.

■ 2. Amend § 383.5 by adding, in alphabetical order, the definition for "Evidence of lawful immigration status" to read as follows:

§ 383.5 Definitions.
\* \* \* \* \*

*Evidence of lawful immigration status* for purposes of subpart B of this part, means:

(1) For applicants domiciled in a foreign jurisdiction (except Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, or the Commonwealth of the Northern Mariana Islands):

(i) An unexpired foreign passport; and

(ii) An unexpired Form I–94/94A issued by the U.S. Department of Homeland Security indicating one of the following classifications: H–2A— Temporary Agricultural Workers, H– 2B—Temporary Non-Agricultural Workers, or E–2—Treaty Investors.

(2) For applicants domiciled in Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, or the Commonwealth of the Northern Mariana Islands: any of the documents specified in Table 1 of section 383.71.

\* \* \* \* \*

■ 3. Amend § 383.71 by revising paragraph (f) to read as follows:

§ 383.71 Driver application and certification procedures.
\* \* \* \* \*

(f) *Non-domiciled CLP and CDL.* (1) A person must obtain a Non-domiciled CLP or CDL:

(i) If the applicant is domiciled in a *foreign* jurisdiction, as defined in § 383.5, and the Administrator has not determined that the commercial motor vehicle operator testing and licensing standards of that jurisdiction meet the standards contained in subparts G and H of this part, provided the applicant provides the evidence of lawful immigration status required under paragraph (f)(3)(i)(B) of this section.

(ii) If the applicant is domiciled in a State that is prohibited from issuing CLPs and CDLs in accordance with § 384.405 of this subchapter. That person is eligible to obtain a non-domiciled CLP or CDL from any State that elects to issue a non-domiciled CLP or CDL and that complies with the testing and licensing standards contained in subparts F, G, and H of this part.

(2) An applicant for a non-domiciled CLP and CDL must do both of the following:

(i) Complete the requirements to obtain a CLP contained in paragraph (a) of this section or a CDL contained in paragraph (b) of this section, except as provided in paragraph (f)(3) of this section.

[47] Public Law 108–447, 118 Stat. 2809, 3268, note following 5 U.S.C. 552a (Dec. 4, 2014).
[48] Public Law 107–347, sec. 208, 116 Stat. 2899, 2921 (Dec. 17, 2002).
[49] Available at *https://www.transportation.gov/ mission/dots-procedures-considering- environmental-impacts.*

(ii) After receipt of the non-domiciled CLP or CDL, and for as long as it is valid, notify the State which issued the non-domiciled CLP or CDL of any adverse action taken by any jurisdiction or governmental agency, foreign or domestic, against his/her driving privileges. Such adverse actions include, but are not limited to, license disqualification or disqualification from operating a commercial motor vehicle for the convictions described in § 383.51. Notifications must be made within the time periods specified in § 383.33.

(3) Eligibility for applicants domiciled in a foreign jurisdiction:

(i) To be eligible for a Non-domiciled CLP or CDL, an applicant domiciled in a foreign jurisdiction must:

(A) Have lawful immigration status in the United States, and

(B) Provide *evidence of lawful immigration status,* as defined in § 383.5.

(ii) No proof of domicile is required.

(iii) An applicant for a non-domiciled CLP or CDL is not required to surrender his/her foreign license.

\* \* \* \* \*

■ 4. Amend § 383.73 by:
■ a. Revising paragraph (a)(6);
■ b. Revising paragraph (b)(6);
■ c. Revising paragraph (c)(7);
■ d. Revising paragraph (d)(7);
■ e. Revising paragraph (e)(5);
■ f. Revising the introductory text of paragraph (f)(2);
■ g. Adding paragraph (f)(2)(iv);
■ h. Revising paragraph (f)(3);
■ i. Adding paragraphs (f)(5) and (6); and
■ j. Revising paragraph (m).

The revisions and additions read as follows:

### § 383.73 State procedures.

(a) \* \* \*

(6) Require compliance with the standards for providing proof of citizenship or lawful permanent residency specified in § 383.71(a)(5) and proof of State of domicile specified in § 383.71(a)(6) for applicants domiciled in a State; and for applicants domiciled in a foreign jurisdiction, evidence of lawful immigration status as required by § 383.71(f)(3)(i)(B). Exception: A State is required to check the proof of citizenship or immigration status specified in this paragraph only for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP (for applicants domiciled in a State) and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL (for applicants domiciled in a State) for the first time after July 8, 2011, provided

a notation is made on the driver's record confirming that the proof of citizenship or immigration status check required by this paragraph has been made and noting the date it was done. This exception does not apply to applicants domiciled in a foreign jurisdiction.

\* \* \* \* \*

(b) \* \* \*

(6) Require compliance with the standards for providing proof of citizenship or lawful permanent residency specified in § 383.71(b)(9) and proof of State of domicile specified in § 383.71(b)(10) for applicants domiciled in a State; and for applicants domiciled in a foreign jurisdiction, evidence of lawful immigration status as required by § 383.71(f)(3)(i)(B). Exception: A State is required to check the proof of citizenship or immigration status specified in this paragraph only for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP (for applicants domiciled in a State) and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL (for applicants domiciled in a State) for the first time after July 8, 2011, provided a notation is made on the driver's record confirming that the proof of citizenship or immigration status check required by this paragraph has been made and noting the date it was done. This exception does not apply to applicants domiciled in a foreign jurisdiction.

\* \* \* \* \*

(c) \* \* \*

(7) Require compliance with the standards for providing proof of citizenship or lawful permanent residency specified in § 383.71(b)(9) and proof of State of domicile specified in § 383.71(b)(10) for applicants domiciled in a State; and for applicants domiciled in a foreign jurisdiction, evidence of lawful immigration status as required by § 383.71(f)(3)(i)(B). Exception: A State is required to check the proof of citizenship or immigration status specified in this paragraph only for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP (for applicants domiciled in a State) and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL (for applicants domiciled in a State) for the first time after July 8, 2011, provided a notation is made on the driver's record confirming that the proof of citizenship or immigration status check required by this paragraph has been made and noting the date it was done. This exception does not apply to applicants domiciled in a foreign jurisdiction.

\* \* \* \* \*

(d) \* \* \*

(7) Require compliance with the standards for providing proof of citizenship or lawful permanent residency specified in § 383.71(b)(9) and proof of State of domicile specified in § 383.71(b)(10) for applicants domiciled in a State; and for applicants domiciled in a foreign jurisdiction, evidence of lawful immigration status as required by § 383.71(f)(3)(i)(B). Exception: A State is required to check the proof of citizenship or immigration status specified in this paragraph only for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP (for applicants domiciled in a State) and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL (for applicants domiciled in a State) for the first time after July 8, 2011, provided a notation is made on the driver's record confirming that the proof of citizenship or immigration status check required by this paragraph has been made and noting the date it was done. This exception does not apply to applicants domiciled in a foreign jurisdiction.

\* \* \* \* \*

(e) \* \* \*

(5) Require compliance with the standards for providing proof of citizenship or lawful permanent residency specified in § 383.71(b)(9) and proof of State of domicile specified in § 383.71(b)(10) for applicants domiciled in a State; and for applicants domiciled in a foreign jurisdiction, evidence of lawful immigration status as required by § 383.71(f)(3)(i)(B). Exception: A State is required to check the proof of citizenship or immigration status specified in this paragraph only for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP (for applicants domiciled in a State) and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL (for applicants domiciled in a State) for the first time after July 8, 2011, provided a notation is made on the driver's record confirming that the proof of citizenship or immigration status check required by this paragraph has been made and noting the date it was done. This exception does not apply to applicants domiciled in a foreign jurisdiction.

\* \* \* \* \*

(f) \* \* \*

(2) State procedures for the issuance of a non-domiciled CLP and CDL, for any modifications thereto, and for notifications to the Commercial Driver's License Information System must at a minimum be identical to those pertaining to any other CLP or CDL, except as set forth in paragraphs (f)(2)(i) through (iv) and (f)(3) of this section.

\* \* \* \* \*

(iv) For applicants domiciled in a foreign jurisdiction, the State must ensure that the period of validity of the non-domiciled CLP or CDL does not exceed the Admit Until Date or expiration date on the applicant's I–94/A or 1 year, whichever is sooner.

(3) Documentation of lawful immigration status. (i) Applicants domiciled in a State. The State must require compliance with the standards for providing evidence of lawful immigration status specified in § 383.71(b)(9) of this part.

(ii) Applicants domiciled in a foreign jurisdiction.

(A) Beginning September 29, 2025, the State must not issue (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transfer, renew, or upgrade a non-domiciled CLP or CDL unless, at the time of the transaction, the applicant provides *evidence of lawful immigration status* as defined under § 383.5. Applicants for a non-domiciled CLP or CDL who do not provide evidence of lawful immigration status as required under § 383.71(f)(3)(i)(B) are not eligible for a non-domiciled CLP or CDL.

(B) States must comply with the document verification requirements for applicants domiciled in a foreign jurisdiction set forth in § 383.73(m)(2) before issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL.

(C) States are prohibited from granting non-domiciled CLP or CDL privileges on a temporary or interim basis pending review and validation of an applicant's evidence of lawful immigration status.

\* \* \* \* \*

(5) Downgrade. If after issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL, the State receives information from FMCSA, the Department of Homeland Security, the Department of State, or other Federal agency with jurisdiction that the applicant no longer has lawful immigration status in the United States in a category specified in paragraph (1)(iii) of the definition of *evidence of lawful immigration status* in § 383.5 of this part, the State must initiate established State procedures for downgrading the non-domiciled CLP or CDL. The downgrade must be completed and recorded on the CDLIS driver record within 30 days of the

State's receipt of such information. As used in this paragraph, the term "downgrade" means the State's removal of the CLP or CDL privilege from the driver's license, as set forth in paragraph (4) the definition of *CDL downgrade* in § 383.5.

(6) Non-domiciled CDL renewal. States must require non-domiciled CLP or CDL renewal be conducted in-person only and must not permit renewal by mail or electronic means.

\* \* \* \* \*

(m) *Document verification.* Except as provided in paragraphs (m)(1) and (2) of this section, the State must require at least two persons within the driver licensing agency to participate substantively in the processing and verification of the documents involved in the licensing process for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL. The documents being processed and verified must include, at a minimum, those provided by the applicant to prove lawful immigration status and (if applicable) domicile, the information filled out on the application form, and knowledge and skills test scores. This section does not require two people to process or verify each document involved in the licensing process.

(1) Exception for applicants domiciled in a State. For offices with only one staff member, at least some of the documents must be processed or verified by a supervisor before issuance or, when a supervisor is not available, copies must be made of some of the documents involved in the licensing process and a supervisor must verify them within one business day of issuance of the CLP, non-domiciled CLP, CDL, or non-domiciled CDL.

(2) Document Verification for applicants domiciled in a foreign jurisdiction. States must verify evidence of lawful immigration status for applicants domiciled in a foreign jurisdiction before initial issuance and before any subsequent issuance (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transfer, renewal, or upgrade of a non-domiciled CLP or CDL.

(i) For offices with only one staff member, all documents must be processed or verified by a supervisor before issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL.

(ii) In reviewing the evidence of lawful immigration status an applicant domiciled in a foreign jurisdiction (except an applicant domiciled in Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa or the Commonwealth of the Northern Mariana Islands), the State must query the Systematic Alien Verification for Entitlements (SAVE) system (administered by U.S. Citizenship and Immigration Services). If the SAVE final response, including additional verification if needed, does not confirm the applicant's claim to be in lawful immigration status in a category specified in paragraph (1)(ii) of the definition of *evidence of lawful immigration status* in § 383.5 of this part, the State must not issue (which includes amend, correct, reprint, or otherwise duplicate a previously issued CLP or CDL), transfer, renew, or upgrade a non-domiciled CLP or CDL, and must initiate downgrade procedures in accordance with paragraph (f)(5) of this section if the applicant holds an unexpired non-domiciled CLP or CDL.

(iii) The State must retain copies of all documents involved in the licensing process, including documents provided by the applicant to prove lawful immigration status and documents showing the results of any SAVE query to verify an applicant's lawful immigration status, and a supervisor must verify them within one business day of issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL. The State must retain the documents for no less than 2 years from the date of issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL.

\* \* \* \* \*

## PART 384—STATE COMPLIANCE WITH COMMERCIAL DRIVER'S LICENSE PROGRAM

■ 5. The authority citation for part 384 continues to read as follows:

**Authority:** 49 U.S.C. 31136, 31301, *et seq.,* and 31502; secs. 103 and 215 of Pub. L. 106–159, 113 Stat. 1748, 1753, 1767; sec. 32934 of Pub. L. 112–141, 126 Stat. 405, 830; sec. 5524 of Pub. L. 114–94, 129 Stat. 1312, 1560; and 49 CFR 1.87.

■ 6. Amend § 383.212 by adding paragraphs (a)(1) and (2) to read as follows:

## § 384.212 Domicile requirement.

(a) * * *

(1) For applicants domiciled in a foreign jurisdiction, the State must:

(i) Comply with the document verification requirements set forth in § 383.73(m)(2) before issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL;

(ii) Retain copies of all documents involved in the licensing process, including documents provided by the applicant to prove lawful immigration status, for a period of no less than 2 years from the date of issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL; and

(iii) Provide copies of all documents involved in the licensing process to FMCSA within 48 hours after request.

(2) [Reserved]

* * * * *

■ 7. Amend § 384.301 by adding paragraph (q) to read as follows:

## § 384.301 Substantial compliance-general requirements.

* * * * *

(q) A State must come into substantial compliance with the requirements of subpart B of this part and part 383 of this chapter related to non-domiciled CLPs and CDLs, effective September 29, 2025, prior to issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL.

Issued under authority delegated in 49 CFR 1.87.

**Jesse Elison,**

*Chief Counsel.*

[FR Doc. 2025–18869 Filed 9–26–25; 8:45 am]

**BILLING CODE 4910–EX–P**

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 622

**[Docket No. 140722613–4908–02; RTID 0648–XF240]**

### Coastal Migratory Pelagic Resources of the Gulf and Atlantic Region; Re-Opening of Commercial Harvest for Atlantic Spanish Mackerel in the Northern Zone

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule; re-opening.

**SUMMARY:** NMFS announces the re-opening of commercial harvest of Spanish mackerel in the northern zone of the Atlantic exclusive economic zone (EEZ). NMFS recently approved a second transfer of commercial quota from the southern zone to the northern zone for the 2025–2026 fishing year. Therefore, NMFS re-opens the commercial harvest of Spanish mackerel in the northern zone for an additional 8 days. The purpose of this temporary rule is to allow commercial fishermen to harvest the increased commercial quota of Spanish mackerel in the northern zone while managing the risk of exceeding the commercial quota.

**DATES:** This temporary rule is effective from September 29, 2025, through October 6, 2025.

**FOR FURTHER INFORMATION CONTACT:** Mary Vara, NMFS Southeast Regional Office, telephone: 727–824–5305, or email: *mary.vara@noaa.gov.*

**SUPPLEMENTARY INFORMATION:** The fishery for coastal migratory pelagic fish in the Atlantic includes king mackerel, Spanish mackerel, and cobia on the east coast of Florida, and is managed under the Fishery Management Plan for Coastal Migratory Pelagic Resources of the Gulf and Atlantic Region (FMP). The FMP was prepared by NMFS and the Gulf and South Atlantic Fishery Management Councils, was approved by the Secretary of Commerce, and is implemented by NMFS through regulations at 50 CFR part 622 under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act). All weights described in this document for Spanish mackerel in the Atlantic EEZ apply as either round or gutted weight. The metric conversion for the imperial measurements used in this document is 1 pound (lb) equals approximately 0.45 kilograms.

Atlantic Spanish mackerel are divided into northern and southern zones for management purposes. The northern zone for Spanish mackerel extends in the Atlantic EEZ from New York through North Carolina. The northern boundary of the northern zone extends from an intersection point off New York, Connecticut, and Rhode Island at 41°18′16.249″ N latitude and 71°54′28.477″ W longitude, and proceeds southeast to 37°22′32.75″ N latitude and the intersection point with the outward boundary of the EEZ. The southern boundary of the northern zone extends from the North Carolina and South Carolina state border along a line in a direction of 135°34′55″ from true north beginning at 33°51′07.9″ N latitude and 78°32′32.6″ W longitude to the intersection point with the outward boundary of the EEZ [50 CFR 622.369(b)(2)]. See figure 2 of appendix G to part 622—Spanish Mackerel for an illustration of the management zones.

The commercial annual catch limit (ACL; equal to the commercial quota) for the Atlantic migratory group of Spanish mackerel (Atlantic Spanish mackerel) is 3.33 million lb [50 CFR 622.384(c)(2)]. The commercial quota for Atlantic Spanish mackerel in the northern zone is 662,670 lb and is 2,667,330 lb in the southern zone for the 2025–2026 fishing year, which is March 1, 2025, through February 28, 2026 [50 CFR 622.384(c)(2)(i) and (ii)].

Regulations at 50 CFR 622.384(c)(2)(iii) allow for quota transfers between the northern and southern zones with the approval from the Regional Administrator (RA) of the NMFS Southeast Region. North Carolina or Florida, in consultation with the other states in the respective zones, may request approval from the RA to transfer part or all of a respective zone's annual commercial quota to the other zone. For the purposes of quota closures as described in 50 CFR 622.8, the receiving zone's quota will be the original quota plus any transferred amount for that fishing year only. Landings associated with any transferred quota will be included in the total landings for Atlantic Spanish mackerel, which will be evaluated relative to its total ACL.

NMFS approved and transferred 250,000 lb of Atlantic Spanish mackerel commercial quota from the southern zone to the northern zone in response to a request from the State of Florida in July 2025. Following the transfer, and because NMFS projected that landings of Atlantic Spanish mackerel from the northern zone reached the revised commercial quota, NMFS implemented a commercial closure in the northern

# ADDENDUM 3

# DECLARATION OF JORGE RIVERA LUJAN

I, Jorge Rivera Lujan, declare as follows:

1.      I am a commercial truck driver and the owner-operator of my business, Rivera Bros Transportation LLC, a Utah-based trucking company that transports general freight.

2.      I currently hold a non-domiciled Commercial Driver's License (CDL), issued by the State of Utah, that expires on November 29, 2025.

3.      I have lived in the United States since I was two years old. I am currently a Deferred Action for Childhood Arrivals (DACA) recipient.

4.      Under the Federal Motor Carrier Safety Administration's (FMCSA) regulations previously in effect, I was eligible for a non-domiciled CDL.

5.      I have held a non-domiciled CDL for the past 11 years.

6.      Rivera Bros Transportation is my only source of income.

7.      My livelihood depends on having a CDL so that I can drive trucks for my business. Without a CDL, I will no longer be able to continue my career as a truck driver and will be forced to close my business. The loss of a CDL would threaten my ability to provide for my family, and to pay my housing and grocery bills.

8.    On September 30, 2025, I went to the Utah Department of Motor Vehicles (DMV) to renew my non-domiciled CDL. The DMV representative told me that I could not renew my license because FMCSA had required Utah to pause issuance of non-domiciled CDLs. I then learned that FMCSA had issued a rule on September 29, 2025, under which I am no longer eligible for a non-domiciled CDL.

9.    I received a letter dated October 9, 2025, from the State of Utah's Department of Public Safety, Driver License Division, stating that under FMCSA's rule, DACA recipients like me are not eligible for a non-domiciled CDL.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025

_____

Jorge Rivera Lujan

# ADDENDUM 4

# DECLARATION OF ALEKSEI SEMENOVSKII

I, Aleksei Semenovskii, declare as follows:

1.      I am a commercial truck driver and the owner-operator of a business called SEOLAEXPRESS LLC, a Pennsylvania-based trucking company that transports general freight.

2.      I am an asylum seeker. After facing unjust persecution and threats to my life in Russia, I fled to the United States in 2019. I filed an asylum application in 2019. Since then, I have been waiting for my asylum interview with U.S. Immigration & Customs Enforcement (ICE). I have a U.S. Citizenship and Immigration Services (USCIS) Employment Authorization Document (EAD), authorizing me to work in the United States.

3.      I have held a non-domiciled Commercial Driver's License (CDL) since September 2020. I was eligible to earn a non-domiciled CDL under the federal regulations in effect throughout the time that I have been a trucker.  I have no citations or accidents on my CDL record.

4.      My current CDL, which is issued by the State of Pennsylvania, will expire on September 25, 2026.

5.     I started SEOLAEXPRESS LLC in January 2023. I must hold a non-domiciled CDL to drive trucks for my business.

6.     SEOLAEXPRESS LLC is my only source of income. Without a CDL, I will no longer be able to continue my career as a truck driver. As a result, I will be forced to close my business and will lose all the work that went into it; will be at risk of defaulting on the loans on my truck, trailer, and personal vehicles; and will lose my main ability to provide for my wife and daughter.

7.     Without my income, my family would not be able to afford our rent, groceries, and other life necessities.

8.     Without the ability to work as a truck driver, I will struggle to find another career that will enable me to support my family. I suffered a severe workplace injury in 2022 that led to permanent physical damage to my leg. If I can no longer work as a trucker, my injuries will severely hamper my search for alternative work.

9.     I am aware that the Federal Motor Carrier Safety Administration issued a new rule on September 29, 2025, under which I am not eligible for a non-domiciled CDL.

10.   The new rule has already had an immense impact on my business and my family. I am incredibly fearful of the possibility that my CDL will be revoked without my knowledge while I am on the road. If that were to happen, I could unexpectedly face criminal charges for driving without a valid CDL and could be stuck far from home without the ability to drive my truck back. My fear over this prospect has led me to significantly curtail my driving since the rule went into effect.

11.   The new rule has taken an immense emotional toll on me and my family. For example, my 13-year-old daughter has become fearful and depressed, and her fear is also causing me stress. It is unbearable for me as a father to see her live with this fear, knowing how hard I have worked to give her stability and hope.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on October 19, 2025

Aleksei Semenovskii

# ADDENDUM 5

# DECLARATION OF MICHELLE SFORZA

I, Michelle Sforza, declare as follows:

1.     I am the Associate Director of the Organizing and Field Services Department ("OFS") of the American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME International). I have worked for AFSCME International for over 25 years.  In my role as Associate Director of OFS, I help oversee the organizing and field services staff that support the needs of AFSCME International's subordinate bodies ("AFSCME Affiliates")—on any given day I am responsible for overseeing AFSCME International's response to the developing needs of AFSCME Affiliates, which are broad and far reaching but in my case often focus on evaluating legislative opportunities for promoting pro-worker policies, conducting strategic research in support of organizing campaigns, and helping provide other organizing and field support for labor relations matters including but not limited to collective bargaining negotiations. Under the AFSCME International Constitution, AFSCME Affiliates include councils, locals, or in some cases, associations. Under the AFSCME International Constitution, all members of AFSCME Affiliates are members of both the

AFSCME Affiliate and AFSCME International, and pay voluntary membership dues, a portion of which are remitted to the AFSCME Affiliate and a portion to AFSCME International; these members are referred to in this declaration generally as "AFSCME members."

2. AFSCME International, through AFSCME Affiliates, represents 1.4 million AFSCME members in the United States, including thousands of members who need Commercial Driver's Licenses (CDLs) and Commercial Learning Permits (CLPs) to provide essential services to states, cities, and localities every day. AFSCME members drive buses for school districts and public transit, dispose of wastewater and refuse in specialized vehicles, maintain and repair roadways and highways, and keep streets clean and safe with street sweepers and snowplows.

3. AFSCME International, through AFSCME Affiliates, represents workers across the country that need CDLs and CLPs to perform their essential duties, including non-domiciled CDLs and CLPs. A non-exhaustive survey of AFSCME Affiliate collective bargaining agreements reflects more than 360 agreements that have specific provisions that address CDLs held by AFSCME-represented employees.

4.	A small sampling of employers where an AFSCME Affiliate represents employees that are required to possess a CDL to perform their duties includes:

a. The District of Columbia Water and Sewer Authority, which distributes drinking water and collects and treats wastewater for more than 700,000 residents and 25.95 million annual visitors in the District of Columbia;

b. The State of Illinois Department of Central Management Services, which employs, among other job classifications, correctional transportation officers that play critical roles in keeping Illinois communities safe;

c. AC Transit and Sacramento Regional Transit in California, which provide public transit in the greater San Francisco and Sacramento areas;

d. The Pennsylvania Department of Transportation, which maintains thousands of miles of highways and bridges in the state; and

e. The Columbus City School District in Ohio, which employs bus drivers who transport children to school and on field trips.

5. To take one additional example, the Washington State Council of County and City Employees, AFSCME, AFL-CIO, Local #21-M ("Local #21-M") is an AFSCME Affiliate that represents workers at the Department of Public Works for the City of Mercer Island in Washington State who require CDLs for their job duties. The City of Mercer Island Department of Public Works is responsible for the planning, design, construction, and maintenance of the City's essential infrastructure. The Local #21-M collective bargaining agreement covering these workers, which I have reviewed, includes provisions governing City employees for whom CDLs are required.

6. On September 29, 2025, the Federal Motor Carrier Safety Administration (FMSCA) issued an interim final rule that prohibits states from issuing non-domiciled CDL licenses to most immigrant categories except for H-2A, H-2B, and E-2 visa holders ("Interim Final Rule").

7.     The Interim Final Rule has already led to immediate harms to AFSCME members who have been deprived of access to their CDL certification, thus jeopardizing their job security and, by extension, their livelihoods and health insurance.

8.     One such impacted AFSCME member works for the Department of Public Works for the City of Mercer Island, and he held a non-domiciled CDL until the FMCSA issued its Interim Final Rule with immediate effect.  This member has active Temporary Protected Status (TPS), has a pending application for lawful permanent residency with U.S. Citizenship and Immigration Services (USCIS), and he is authorized to work in the United States.  He has worked for the Department of Public Works, first as a seasonal and then and now as a full-time employee for more than 16 years, and his job duties require that he have a CDL to operate dump trucks used to deposit construction materials when paving roadways, to drive street sweepers on a weekly basis to keep City streets clean, and to man snowplows when the City faces inclement weather.  He first received his CDL in 2019, and in the six years that the member has held a CDL, he has never received a ticket, citation, or been in an accident.

9.     This AFSCME member received a letter from the Washington State Department of Licensing stating that his CDL would be suspended in October 2025, and his CDL is no longer operational.  With a suspended CDL, this member cannot operate street sweepers, dump trucks, or snowplows, even though that is required as part of his job, and thus his job security is threatened.

10.     As of the writing of this declaration, the Washington State Department of Licensing has an alert on its website that reads:

> "Due to a new federal rule, we've stopped processing all non-domicile commercial learner's permit (CLP) and CDL transactions. That includes originals, renewals, upgrades, duplicates, or replacements. We also have suspended all associated knowledge and skills testing for non-domiciled drivers. We'll let you know if or when we will resume processing those documents."

11.     With thousands of AFSCME members across the country who rely on their CDL certification to perform and maintain their jobs, the FMCSA Interim Final Rule presents a grave threat to the livelihoods of AFSCME members, which could not only impact their incomes but also other job-related benefits like health insurance coverage and retirement benefits, which AFSCME members receive under the terms of their collective bargaining agreements.   AFSCME members who have gone

through the extensive testing and certification process of receiving a CDL deserve to have their licenses honored.

12.  The FMCSA Interim Final Rule also threatens state and local governments' ability to provide essential public services, such as transportation of inmates between correctional facilities and courthouses, transportation of schoolchildren on school busses, critical repairs to highways and other public roads, and clearing roadways of snow during inclement winter weather. AFSCME members perform these essential public services as part of their required job duties.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2‍‍, 2025

Michelle Sforza

# ADDENDUM 6

# DECLARATION OF JOHN DOE

I, John Doe, declare as follows:

1.     I work for the Public Works Department for the City of Mercer Island. I am a member of the American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME).

2.     For my job, I have to operate heavy vehicles including dump trucks, a street sweeper, and a snowplow.

3.     I need to hold a commercial drivers license (CDL) to do my job, because it is required to operate the dump truck, street sweeper, and snowplow. I have held a non-domiciled CDL from the State of Washington since 2019. I have driven safely since receiving my CDL, with no violations, accidents, or citations on my driving record.

4.     I am legally present in the United States on Temporary Protected Status (TPS), and I have applied for a green card. I am authorized to work in the United States.

5.     In October 2025, I received a letter from the Washington State Department of Licensing saying that my CDL would be suspended on October 10, 2025, because of a new federal rule saying that TPS holders cannot have CDLs. My CDL is now suspended.

6.     I am worried that I will not be able to keep my job because my CDL has been suspended. I have a wife and children that rely on me and my salary to live our lives and cover our expenses.  We also receive our family's health insurance through my job, and we would lose our health insurance if I lost my job.

7.     I am signing this declaration under the name John Doe because I am worried about retaliation against me if I use my real name.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2025                /s/ John Doe_____
                                            John Doe

# ADDENDUM 7

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Jorge Rivera Lujan, et al., <br><br> Petitioners, <br><br> v. <br><br> Federal Motor Carrier Safety Administration, et al., <br><br> Respondents. | Civil Case No. 25-1215 |

Declaration of Lauren Samet

I, Lauren Samet, declare:

1.    I am over eighteen years old, of sound mind, and fully competent to make this declaration. I base the facts in this declaration on my own personal knowledge, on AFT's business records, and on publicly available records within AFT's possession.

2.    I am the Director of the Paraprofessionals and School-Related Personnel (PSRP) Department at the American Federation of Teachers. I have served in this role since August 2018.

3.     In my role as Director of the AFT PSRP Department, I engage in the day-to-day supervision of all matters for the AFT that support our paraprofessional and school-related personnel members and serve as a core member of the AFT management team.

4.     The AFT is a national labor union representing approximately 1.8 million members who work in every U.S. state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands. The AFT is affiliated with approximately 3,500 local unions throughout the United States. AFT is headquartered in Washington, D.C.

5.     Six divisions within the AFT represent the broad spectrum of AFT's membership: pre-K through 12th-grade teachers; paraprofessionals and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; nurses and other healthcare professionals; and retirees.

6.     Membership in the AFT is usually established by joining an AFT-affiliated local union, a council of locals, or, in some cases, a statewide affiliate. Most AFT locals are organized around a specific

employer, such as a school district, a hospital, or a municipality, and require that members be employed by that employer to receive the full privileges of union membership.

7.    AFT's mission is to champion fairness; democracy; economic opportunity; and high-quality public education, healthcare, and public services for our students, their families, and our communities, in part by advancing the labor interests of its members and would-be members. AFT is committed to advancing these principles through community engagement, organizing, collective bargaining, and political activism, and especially through the work our members do.

8.    AFT believes that high-quality public education is an economic necessity, an anchor of democracy, a moral imperative and a fundamental civil right. Without the foundation a strong education provides, our other rights can never be fully realized. All children— those who have abundant advantages, and those for whom every day is a struggle—deserve the opportunity to succeed. The people who work in schools – including teachers, paraprofessionals, school office personnel, and bus drivers – collectively help students build lives of

great purpose and potential by instilling essential knowledge and skills, including critical reasoning, problem solving and the ability to work with others, and by promoting civic participation.

9.      The AFT has a longstanding history of championing fairness and economic opportunity for workers, those they serve, their families, and communities. AFT furthers its mission to promote economic opportunity by advocating for better working conditions – including fair wages, benefits, and job security – supporting economic justice initiatives that reduce inequality, and promoting workforce development programs that foster upward mobility and financial stability for workers.

10.    AFT's commitment to promote economic opportunity extends to immigrant workers. Although AFT does not collect citizenship information about its members, I am aware that its affiliates include lawfully present, noncitizen members.

11.    AFT represents approximately 13,500 workers in the U.S. transportation industry, including school bus drivers, maintenance drivers, civil engineers, and inspectors. Some of these members are

required to hold a commercial driver's license (CDL) as a condition of their employment.

12. The harm caused by the Federal Motor Carrier Safety Administration's (FMCSA) rule barring asylum seekers, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients who have work authorizations from holding a "non-domiciled" CDL is devastating. These individuals risk losing their jobs or missing career advancement opportunities, making it harder to earn income for themselves and their families.

13. The new FMCSA rule will injure workers represented by AFT-affiliated locals who, under the rule, are excluded from eligibility for CDLs, as well as the individuals whom AFT members serve. These individuals may lose their jobs, and critical positions in communities with desperate transportation shortages may go unfilled. Prospective members are also being excluded from employment opportunities that require a non-domiciled CDL.

14. Many of AFT's members who work in transportation and require CDLs as a condition of employment are school bus drivers. K-

12 school districts throughout the U.S. are facing a severe shortage of school bus drivers. As a result, school districts have had to either cut, shorten, or remove bus routes. The nationwide bus driver shortage has reportedly negatively impacted students—particularly those with disabilities and those from low-income families—as well as teachers, staff, and parents.

15. Because of reduced or unreliable transportation services, students are losing access to critical school resources—such as extracurricular programs and meals—and are experiencing higher rates of tardiness and absenteeism. Tardiness is linked to poorer academic performance and social-emotional outcomes for both the students who are often late and their classmates. Studies have also shown that chronic absenteeism not only affects academic performance, but also negatively impacts teacher job satisfaction and morale. School staff have reportedly had to take time away from their core duties to cover transportation needs. Lastly, working parents, particularly those who may lack cars or flexible jobs, have suffered personal and professional impacts due to their children's school

transportation needs. Excluding lawfully present noncitizens from eligibility for non-domiciled CDLs will deepen the nationwide ripple effects of the school bus driver shortage, undermining AFT's commitment to high-quality public education and a positive work environment for its members.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on October 24, 2025

_____
Lauren Samet

# ADDENDUM 8

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| |
|---|
| Jorge Rivera Lujan, et al., |
| Petitioners, |
| v. |
| Federal Motor Carrier Safety Administration, et al., |
| Respondents. |

Civil Case No. 25-1215

Declaration of Trasell Underwood

I, Trasell Underwood, declare:

1.    I am over eighteen years old, of sound mind, and fully competent to make this declaration. I base the facts in this declaration on my own personal knowledge, on Education Austin's business records, and on publicly available records within Education Austin's possession.

2.    I am the elected Vice-President of Education Austin, a labor union representing both certified and classified employees of the Austin Independent School District (AISD) in Austin, TX. I have served in this role since 2012.

3.    As Vice-President of Education Austin, I support the President in leading and managing the organization, carrying out the policy decisions of Education Austin's executive board, and overseeing the organization's budget and administrative operations. I represent the classified body of Education Austin's membership and participate in negotiations with the AISD regarding terms and conditions of employment that affect all non-supervisory AISD employees. Additionally, I help organize efforts that foster leadership development and promote membership growth.

4.    Formed in 1999, Education Austin is the sole representative of all non-supervisory employees of AISD. While collective bargaining in Texas is prohibited for most public-sector employees, including all school employees, school districts within the state can adopt a "consultation" process allowing employees to elect an organization – a "Consultation Agent" – to represent them in discussions with the school district on wages, hours, and working conditions. AISD has such a policy which establishes a formal, district-recognized system for employee representation. Under AISD policy, the Consultation

Agent has the responsibility of representing the professional interests of the nonsupervisory personnel in the school district. Education Austin was elected by AISD non-supervisory employees to represent their interests as the sole consultation agent.

5.    Education Austin is an affiliate of the American Federation of Teachers (AFT). Membership in Education Austin automatically confers membership in AFT.

6.    As part of its mission, Education Austin provides a unified professional voice for AISD's certified and classified employees that advocates for fair and equitable pay, as well as supports initiatives that advance economic, political, and social justice for AISD employees, students, and families. The organization is also committed to fighting all forms of discrimination, including those based on race, socioeconomic status, or national origin.

7.    AISD employs approximately 700 transportation employees, some of which are school bus drivers that require CDLs as a condition of employment. To attract new drivers, AISD covers the cost of CDL training for prospective drivers.

8.    I became aware of the new Federal Motor Carrier Safety Administration's (FMCSA) regulation prohibiting asylum seekers, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients with work authorizations from obtaining CDLs during a meeting with an AISD administrator. In that meeting, I was informed that AISD had to pull four individuals from school bus driver training because they were no longer eligible to obtain the required CDL.

9.    I am also aware that several current school bus drivers represented by Education Austin fall into the excluded category of noncitizens who are no longer eligible for a non-domiciled CDL. These individuals need non-domiciled CDLs to keep their jobs as school bus drivers, and they face the risk of losing their employment upon the expiration of their non-domiciled CDL. While Education Austin is committed to working with AISD to identify and transition all affected employees into alternative positions that do not require a CDL, there is no guarantee that such opportunities will be available. The risk of job loss for these individuals is imminent.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 24, 2025

Trasell Underwood

Trasell Underwood

**Signature:** *Trasell Underwood*
Trasell Underwood (Oct 24, 2025 09:56:46 CDT)

**Email:** trasellu@educationaustin.org