No. 25-1224

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRCT OF COLUMBIA CIRCUIT

MARTIN LUTHER KING, JR. COUNTY,

Petitioner,

v.

SEAN DUFFY IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE U.S. DEPARTMENT OF TRANSPORTATION; THE U.S.
DEPARTMENT OF TRANSPORTATION; THE FEDERAL MOTOR
CARRIER SAFETY ADMINISTRATION; THE UNITED STATES

Respondents.

**On Petition for Review of an Interim Final Rule of the Federal
Motor Carrier Safety Administration**

**EMERGENCY MOTION FOR STAY PENDING JUDICIAL
REVIEW**

Paul J. Lawrence
Kevin J. Kennedy
Eugene Lee
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 240-1700

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A. Parties and Amici:**

Petitioner is Martin Luther King, Jr. County. Respondents are Sean Duffy, in his official capacity as Secretary of the Department of Transportation; the Department of Transportation; the Federal Motor Carrier Safety Administration; and the United States. No amici have entered appearances before this Court.

**B. Rulings under Review:**

Petitioner petitions for review of the Federal Motor Carrier Safety Administration's interim final rule entitled "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)" (Docket No. FMCSA–2025–0622) and published in the Federal Register on September 29, 2025 at 90 Fed. Reg. 46509.

**C. Related Cases:**

This case has not previously been before this Court or any other appellate court. Another petition for review concerning the same

interim final rule has been filed in this Court: *Jorge Lujan, et al v.*

*FMCSA, et al*, No. 25-1215.

/s/ Kevin J. Kennedy
Kevin J. Kennedy

# CERTIFICATE OF COMPLIANCE WITH RULE 18

This motion complies with Circuit Rule 18. On October 23, 2025, petitioner requested that the Federal Motor Carrier Safety Administration (FMCSA) stay the effective date of the interim final rule at issue pending judicial review. *See* Addendum 2. FMCSA responded on October 24, stating that it was denying the request. *See* Addendum 3.

In accordance with Circuit Rule 18(a)(2), on October 23, 2025, counsel for petitioner contacted counsel for respondents stating that petitioner planned to file this motion. Counsel for respondents oppose the relief requested.

/s/ Kevin J. Kennedy
Kevin J. Kennedy

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES .......i

CERTIFICATE OF COMPLIANCE WITH RULE 18 ........................... iii

TABLE OF AUTHORITIES ....................................................................vi

GLOSSARY .............................................................................................x

INTRODUCTION....................................................................................1

STATEMENT ..........................................................................................2

    A. Congress Imposes Strict Requirements on Drivers of Large
    Vehicles. ...........................................................................................2

    B. The Trump Administration Targets Non-Domiciled CDLs Issued
    to Noncitizens. .................................................................................3

    C. The Trump Administration Responds to Five Reported Crashes...5

    D. FMCSA Issues the IFR .................................................................6

    E. The IFR Disrupts Petitioner's Transit Services ..............................8

ARGUMENT ...........................................................................................9

I. Petitioner Is Likely To Succeed On The Merits. ...................................9

    A. The IFR was improperly issued without APA notice and comment.
    ...........................................................................................................9

    B. The IFR was improperly issued without "consultation" with the
    States. ..............................................................................................12

    C. The IFR exceeds FMCSA's statutory authority. ...........................13

    D. The IFR is Arbitrary and Capricious...........................................16

        1. The IFR does not reflect reasoned ..............................................16

        decision-making.................................................................................16

    2. The IFR is based on a pretextual explanation ...........................21

II. Petitioner Satisfies the Remaining Stay Factors .............................25

CONCLUSION ...........................................................................27

CERTIFICATE OF COMPLIANCE.........................................................27
ADDENDA

    1. Declaration of David Eldred

    2. Petitioner's request of the Department of Transportation to stay the effective date of *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses* (CDL), 90 Fed. Reg. 46509

    3. The Department Transportation's denial of Petitioner's request to stay effective date

    4. *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 90 Fed. Reg. 46509

# TABLE OF AUTHORITIES

Federal Cases

*Am. Radio Relay League, Inc. v. FCC,*
   524 F.3d 227 (D.C. Cir. 2008) ............................................................ 18

*Arizona v. United States,*
   567 U.S. 387 (2012) ............................................................................ 16

*Azar v. Allina Health Servs.,*
   587 U.S. 566 (2019) .............................................................................. 9

*Blue Mountains Biodiversity Project v. Jeffries,*
   99 F.4th 438 (9th Cir. 2024) .............................................................. 22

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.,*
   17 F.4th 604 (5th Cir. 2021) ........................................................ 21, 22

*California Wilderness Coal. v. U.S. Dep't of Energy,*
   631 F.3d 1072 (9th Cir. 2011) ............................................................ 13

*Cboe Futures Exch., LLC v. Sec. & Exch. Comm'n,*
   77 F.4th 971 (D.C. Cir. 2023) ............................................................ 20

*Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
   466 F.3d 134 (D.C. Cir. 2006) ............................................................ 13

*Ctr. for Biological Diversity v. Env't Prot. Agency,*
   861 F.3d 174 (D.C. Cir. 2017) ............................................................ 13

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) .............................................................. 21, 22, 24

*Dist. Hosp. Partners, L.P. v. Burwell,*
   786 F.3d 46 (D.C. Cir. 2015) ........................................................ 17, 20

*E. Bay Sanctuary Covenant v. Biden,*
   993 F.3d 640 (9th Cir. 2021) .............................................................. 11

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) ............................................................. 16

*Fox v. Clinton*,
  684 F.3d 67 (D.C. Cir. 2012) ............................................. 16

*Harrington v. Purdue Pharma L. P.*,
  603 U.S. 204 (2024) ........................................................... 15

*In re NTE Connecticut, LLC*,
  26 F.4th 980 (D.C. Cir. 2022) ................................ 25, 26, 27

*Jifry v. FAA*,
  370 F.3d 1174 (D.C. Cir. 2004) ......................................... 10

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................... 27

*Mack Trucks, Inc. v. E.P.A.*,
  682 F.3d 87 (D.C. Cir. 2012) ............................................... 9

*Marcello v. Bonds*,
  349 U.S. 302 (1955) .............................................................. 9

*McDonnell v. United States*,
  579 U.S. 550 (2016) ........................................................... 15

*Mobil Oil Corp. v. Dep't of Energy*,
  728 F.2d 1477 (Temp. Emer. Ct. App. 1983) ..................... 11

*Mozilla Corp. v. Fed. Commc'ns Comm'n*,
  940 F.3d 1 (D.C. Cir. 2019) ............................................... 26

*Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*,
  34 F.4th 1105 (D.C. Cir. 2022) ......................................... 17

*Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*,
  26 F.4th 960 (D.C. Cir. 2022) ........................................... 13

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
  595 U.S. 109 (2022) ........................................................... 22

*New York Stock Exch. LLC v. Sec. & Exch. Comm'n,*
   962 F.3d 541 (D.C. Cir. 2020) ...................................................... 15

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................... 9, 26

*Sorenson Commc'ns Inc. v. FCC,*
   755 F.3d 702 (D.C. Cir. 2014) ............................................... 10, 11

*Tennessee Gas Pipeline Co. v. FERC,*
   969 F.2d 1141 (D.C. Cir. 1992) ............................................. 10, 11

*Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, &*
   *Transportation Workers v. Fed. R.R. Admin.,*
   988 F.3d 1170 (9th Cir. 2021) .................................................... 23

*United States v. Stanchich,*
   550 F.2d 1294 (2d Cir. 1977) ..................................................... 21

Federal Statutes

5 U.S.C. § 553(b)(B) ........................................................................ 9

5 U.S.C. § 706(2)(A) ...................................................................... 16

28 U.S.C. § 2112(a)(4) ..................................................................... 9

49 U.S.C. § 113(b) ......................................................................... 13

49 U.S.C. § 31311(a)(12) .................................................................. 4

49 U.S.C. §§ 31301–02 ..................................................................... 2

49 U.S.C § 31305 .......................................................................... 14

49 U.S.C § 31305(a) ....................................................................... 14

49 U.S.C § 31305(a)(1)–(8) .............................................................. 15

49 U.S.C § 31308 .......................................................................... 13

Federal Rules

Federal Rule of Appellate Procedure 27(d)(2)(A) ....................................1

Federal Rule of Appellate Procedure 32(a)(5)-(6) ...................................1

Federal Regulations

49 C.F.R. § 383.5 ..............................................................................4, 7

49 C.F.R. § 383.71(a)(2), (b)(2) ..........................................................19

49 C.F.R. § 383.71(f)(3)(i) ....................................................................7

49 C.F.R. § 391.11(b)(2) ........................................................................3

Other Authorities

28, 2025, President Trump issued,
    EO 14286..................................................................................3, 4

90 Fed. Reg. 46509 ................................................................................1

90 Fed. Reg. ................................................................................ passim

90 Fed. Reg. ........................................................................................11

CDLs.,
    90 Fed. Reg............................................................................................11

FMCSA observes,
    90 Fed. Reg............................................................................................12

United States.,
    90 Fed. Reg..........................................................................................4, 7

Executive Order (EO) 14159 ................................................................3

Factors25 ..............................................................................................iv

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CDL | Commercial Driver's License |
| CMV | Commercial Motor Vehicle |
| DOT | Department of Transportation |
| EAD | Employment Authorization Document |
| FMCSA | Federal Motor Carrier Safety Administration |
| IFR | Interim Final Rule |

## INTRODUCTION

The Federal Motor Carrier Safety Administration (FMCSA) (a U.S. Department of Transportation (DOT) operating administration) issued an interim final rule (IFR) that restricts noncitizens' eligibility for commercial driver's licenses (CDL) to those with specific visas. It prohibits asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients from obtaining CDLs even though they are eligible to remain and work in the United States. By its own estimate, the IFR will cause 97% of noncitizens who have a CDL to "exit the freight market." 90 Fed. Reg. 46509, 46518–19. The IFR disrupts not only the lives of these noncitizens who rely on jobs that require CDLs, but also the services provided by their employers. Petitioner King County employs noncitizens with CDLs to drive public transit buses. Without immediate relief staying the IFR, Petitioner faces an immediate shortage of licensed bus drivers, a substantial loss of resources invested in training bus drivers, and budgetary uncertainty.

The IFR should be stayed because it is procedurally and substantively unlawful. In promulgating the IFR, FMCSA bypassed

Administrative Procedure Act (APA) notice-and-comment without good cause and failed to consult with the States as required by statute. FMCSA, moreover, lacks statutory authority to issue the IFR because Congress authorized FMCSA to issue regulations that improve road safety, not rules that forbid entire classes of noncitizens from obtaining CDLs. FMCSA's IFR is also arbitrary and capricious because it is based on unreasoned and pretextual rationales. Indeed, FMCSA concedes that no meaningful data supports the IFR as a driver-safety regulation. Thus, the true purpose of the IFR is plain: to further President Donald J. Trump's immigration enforcement efforts and perpetuating the myth that immigrants are dangerous and criminal.

Petitioner requests a stay by October 31, 2025.

## STATEMENT

## I.   Legal and Factual Background

### A.   Congress Imposes Strict Requirements on Drivers of Large Vehicles.

To ensure road safety, Congress imposes strict requirements on the use of large vehicles like buses and trucks, which are known as "commercial motor vehicles" (CMVs). 49 U.S.C. §§ 31301–02. To use a CMV, a driver must obtain a CDL by completing driver training and

passing written and driving tests. *Id.* § 31308(1). A driver is also subject to pre-employment and random drug testing as well as medical evaluations. *Id.* §§ 31306(b)(1)(A); 31136(a)(3). Congress authorized FMCSA to issue regulations that implement these requirements. *Id.* § 113(b), (f).

### B. The Trump Administration Targets Non-Domiciled CDLs Issued to Noncitizens.

The day President Trump took office, he issued Executive Order (EO) 14159, "Protecting the American People Against Invasion." 90 Fed. Reg. 8443. It begins, "Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," and emphasizes that noncitizens who entered the country unlawfully are "committing vile and heinous acts against innocent Americans." *Id.*

On April 28, 2025, President Trump issued EO 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers" (Truck EO) which seeks to strengthen enforcement of a preexisting requirement that drivers of CMVs be proficient in English, 49 C.F.R. § 391.11(b)(2), and requires FMCSA to review States' issuance of CDLs to noncitizens. 90 Fed. Reg. 18759. This EO was accompanied by a DOT

press release explaining, "FMCSA has documented cases where drivers' inability to read our signs and speak our language may have contributed to a series of fatal accidents," citing accidents from January 2025 and six years ago.[1]

Specifically, the Truck EO targets non-domiciled CDL holders. 90 Fed. Reg. at 18760. A State issues a non-domiciled CDL to a driver who does not consider that State to be their home. *See* 49 U.S.C. § 31311(a)(12); 49 C.F.R. § 383.5 (defining "State of domicile"). Previously, a noncitizen could obtain a non-domiciled CDL if they provided: (1) a government issued unexpired employment authorization document (EAD)[2]; or (2) an unexpired foreign passport and an approved I-94 form regarding their most recent admittance to the United States. 90 Fed. Reg. at 46511. Thus, noncitizens of lawful status or those

---

[1] *Trump's Transportation Secretary Sean P. Duffy: Truck Drivers Who Want to Share Our Roads Must Share Our Language*, U.S. DEP'T TRANSP. (Apr. 28, 2025), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-truck-drivers-who-want-share-our-roads.

[2] The EAD is a work permit available to immigrants who are not permanent lawful residents. *Employment Authorization Document*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://www.uscis.gov/green-card/green-card-processes-and-procedures/employment-authorization-document.

lawfully present in the United States[3] could obtain non-domiciled CDLs. This would change under the IFR.

### C. The Trump Administration Responds to Five Reported Crashes.

FMCSA cites five crashes in 2025 that allegedly demonstrate the need for the IFR. Four of these crashes (in January, March, May, and July) involved drivers who had lawfully issued EADs and thus presumably had valid non-domiciled CDLs. *See* 90 Fed. Reg. at 46513.

The final crash, on August 12, 2025, involved Harjinder Singh and killed three people in Florida. *Id.* at 46512–13 & n.10. At the time of the crash, Singh appears to have been lawfully present in the United States pending the adjudication of his asylum claim.[4] Singh had been issued a non-domiciled CDL in California (based on a valid EAD) at the time of the accident. 90 Fed. Reg. at 46512–13. Singh had previously been issued an improper regular CDL in Washington and had been cited for speeding in New Mexico. *Id.*

---

[3] For simplicity, we refer to immigration status and lawful presence together as "immigration status."

[4] Sophia Bollag & Sara DiNatale, *White House gets key facts wrong as it blames California for 3 traffic deaths in Florida*, S.F. CHRON. (Aug. 18, 2025, 7:15 PM), https://www.sfchronicle.com/politics/article/white-house-florida-california-immigration-20822440.php.

In response to the crash, the U.S. Department of Homeland Security (DHS) posted that it "will work with [DOT] to root out and prevent illegal aliens from obtaining these licenses from sanctuary jurisdictions that put American drivers and passengers in danger."[5] Eight days later, DOT announced that California, Washington, and New Mexico—the three States related to Singh—would lose federal funding unless they adopted and enforced English proficiency requirements for CMV drivers.[6]

## D. FMCSA Issues the IFR

The following month, FMCSA issued the IFR without notice-and-comment or consultation with the States. It explains, "The expedited process necessitated by the immediate need to address the issues discovered in the recent [Annual Performance Reviews (APRs)] means it is not practicable to consult with the States prior to promulgation of this rulemaking." 90 Fed. Reg. at 46523.

---

[5] Homeland Security (@DHSgov), X (Aug. 20, 2025, at 6:20 AM), https://x.com/DHSgov/status/1958157078503030915.

[6] *Trump's Transportation Secretary Sean P. Duffy to California, Washington, and New Mexico: Enforce English Language Requirements or Lose Federal Funding*, FMCSA (Aug. 28, 2025), https://www.fmcsa.dot.gov/newsroom/trumps-transportation-secretary-sean-p-duffy-california-washington-and-new-mexico-enforce.

Under the IFR, a person seeking a non-domiciled CDL must now:

(A) Have lawful immigration status in the United States, and
(B) Provide *evidence of lawful immigration status*, as defined in § 383.5.

49 C.F.R. § 383.71(f)(3)(i). Evidence of lawful immigration status includes:

(i) An unexpired foreign passport; and
(ii) An unexpired Form I-94/94A issued by the U.S. Department of Homeland Security indicating one of the following classifications: H-2A—Temporary Agricultural Workers, H-2B—Temporary Non-Agricultural Workers, or E-2—Treaty Investors.

*Id.* at § 383.5.

By limiting eligibility to those with H-2A, H-2B, and E-2 statuses (the eligible statuses), the IFR excludes, among others, asylum seekers, asylees, refugees, and DACA recipients, who are lawfully present and eligible for employment in the United States. 90 Fed. Reg. at 46515. FMCSA asserts that the eligibility changes will improve safety, but concedes "[t]here is not sufficient evidence . . . to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes" and concludes "a direct quantitative estimate of the potential safety benefits resulting from this IFR cannot be developed." *Id.* at 46520.

The IFR also imposes additional administrative requirements on State agencies, including that States must pause issuance of CDLs until they comply. *Id.* at 46519–20.

### E.     The IFR Disrupts Petitioner's Transit Services

King County has a population of about 2,411,700 and operates transit services (Metro) with an estimated ridership of 302,900 riders per weekday. Eldred Declaration ¶¶ 7–8. Metro employs about 50 bus operators and 50 related employees (e.g., mechanics and supervisors) who require non-domiciled CDLs, but are now ineligible under the IFR. *Id.* at ¶ 22. The number of bus operators is not static; to account for the expansion of services and employee turnover, Metro continually recruits, hires, and trains new drivers. *Id.* at ¶ 21. The IFR disrupts Metro's ability to retain enough bus operators to meet the needs of its communities. *Id.* at ¶¶ 21-22. Absent a stay of the IFR, Metro will incur unbudgeted costs in hiring new bus operators and expose the public to an immediate, rather than gradual, transition to less experienced drivers who pose well-documented safety risks. *Id.* at ¶¶ 29-31.

# ARGUMENT

The Court should stay the IFR, which is currently in effect, pending its review of the IFR. *See* 28 U.S.C. § 2112(a)(4). Petitioner is likely to succeed on the merits; will suffer irreparable harm without a stay; a stay would not substantially harm other parties; and the public interest supports a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (cleaned up).

## I.   Petitioner Is Likely To Succeed On The Merits.

The IFR is both procedurally and substantively unlawful.

### A.   The IFR was improperly issued without APA notice and comment.

The IFR must be set aside because FMCSA lacked "good cause" to bypass notice-and-comment required by 5 U.S.C. § 553(b)(B). Because notice-and-comment allows the public to aid the agency in making an informed decision, *see Azar v. Allina Health Servs.*, 587 U.S. 566, 582 (2019), exceptions to notice-and-comment rulemaking requirements "are not lightly to be presumed." *Marcello v. Bonds*, 349 U.S. 302, 310 (1955). The good-cause exception is "to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 93 (D.C. Cir. 2012) (cleaned up). "The exception excuses notice and

comment in emergency situations, or where delay could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (cleaned up). Contrived emergencies do not pass muster. "[S]omething more than an unsupported assertion is required" to invoke the good-cause exception. *Sorenson Comm'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014).

FMCSA offers just that: a contrived emergency. The agency claims that there is an "imminent hazard to public safety,"[7] 90 Fed. Reg. at 46514, but identifies no serious ongoing safety threat. FMCSA identifies five crashes that occurred this year involving drivers who had lawfully issued non-domiciled CDLs but were not one of the eligible statuses under the IFR. *Id.* at 46512–13. Although reducing accidents is a worthy goal, some fatal car crashes are the cost of doing business in a car and truck-reliant society. Indeed, FMCSA's latest available report states, "In 2021, 5,904 large trucks and buses were involved in fatal crashes."[8] Five crashes over the course of a year are "a thin reed" to justify the good cause exception. *Tennessee Gas Pipeline Co. v. FERC*,

---

[7] FMCSA also mentions national security concerns, which is baseless for reasons discussed *infra* Section II.D.2.

[8] *Large Truck and Bus Crash Facts 2021*, FMCSA, https://www.fmcsa.dot.gov/safety/data-and-statistics/large-truck-and-bus-crash-facts-2021.

969 F.2d 1141, 1145 (D.C. Cir. 1992). A rounding error of crashes involving non-domiciled CDL holders (0.08%) is not an emergency. Moreover, the number of reported fatalities from large truck crashes has been in decline.[9] "Cause for concern? Perhaps. But hardly a crisis." *Sorenson Commc'ns*, 755 F.3d at 707.

FMCSA further claims advance notice of the IFR would create a "surge in applications that would exacerbate the current safety crisis," hypothesizing that non-domiciled CDL holders will move to non-compliant states to apply for CDLs. 90 Fed. Reg. at 46514. But because this sort of argument "is likely often, or even always true," *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676 (9th Cir. 2021), "the anticipated response must involve a significant threat of serious damage to important public interests." *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983).

FMCSA "provide[s] little factual basis for its belief," *Tennessee Gas Pipeline*, 969 F.2d at 1145, that "advance notice would create a perverse incentive," 90 Fed. Reg. 46515. As "evidence" that CDL

---

[9] NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., DOT HS 813 705, OVERVIEW OF MOTOR VEHICLE TRAFFIC CRASHES IN 2023 6–7 (2025), https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813705.

applicants are opportunistic, FMCSA points to application numbers in advance of new training requirements for all CDLs in February 2022. *Id.* at 46514–15. But that situation involved a different set of applicants and a different type of regulatory change. Regardless, because FMCSA does not include information on the number of applications before or after the supposed opportunistic increase, it is impossible to know if applications were slowing down before the supposed surge or abated after the regulatory change went into effect. FMCSA further asserts— without support—the now-ineligible noncitizens are geographically opportunistic. But in Petitioner's experience—and presumably other similar employers'—applicants acquire CDLs in connection with specific jobs. Eldred Declaration ¶¶ 15–17. They do not relocate to obtain CDLs.

FMCSA acted unlawfully in bypassing notice-and-comment.

**B.     The IFR was improperly issued without "consultation" with the States.**

The IFR is also deficient because it was issued without statutorily required consultation with the States. FMCSA's violation of the consultation requirement appears undisputed. FMCSA observes, 90 Fed. Reg. at 46511, Congress imposed an express procedural requirement that the agency issue regulations setting standards for

CDLs only "[a]fter consultation with the States." 49 U.S.C § 31308. FMCSA concedes that it did not abide by that Congressional directive, asserting it was "not practicable to consult with the States prior to promulgation of this rulemaking." 90 Fed. Reg. at 46523.

Because Congressionally-imposed consultation requirements mean what they say and must be followed, the IFR must also be set aside on this ground. *See Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 188 (D.C. Cir. 2017); *Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*, 26 F.4th 960, 974 (D.C. Cir. 2022); *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011).

## C. The IFR exceeds FMCSA's statutory authority.

The IFR exceeds FMCSA's authority to issue regulations concerning motor vehicle safety.

Congress tasked FMCSA with furthering "the highest degree of safety in motor carrier transportation." 49 U.S.C. § 113(b). The rulemaking authority DOT has delegated to FMCSA narrowly pertains to driver and vehicle safety. *See e.g.*, *id.* §§ 31305(a); 31308; *see also Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d

134, 139 (D.C. Cir. 2006) (a grant of "rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority."). The IFR—which fundamentally concerns immigration status—is not an authorized road-safety regulation.

FMCSA invokes 49 U.S.C § 31305(a) as the legal basis for the IFR, but that provision grants only cabined rulemaking authority. That provision states the Secretary shall "prescribe regulations on minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle," and enumerates the regulatory tasks that fall within that ambit. Subsection (a)(1), for example, tasks the Secretary with setting "minimum standards for written and driving tests." The remaining subsections all specify similarly narrow safety-related commands. The IFR addresses none of the subjects specified by Congress, and no subsection delegates open-ended authority to address safety as FMCSA sees fit.

Nor can FMCSA lean on the 49 U.S.C § 31305's introductory reference to "ensuring the fitness" of drivers as permitting it to categorically bar entire classes of lawfully present persons from obtaining CDLs, particularly where there is "insufficient evidence" to

develop an "estimate of potential safety benefits." 90 Fed. Reg. at 46520.

"Under the familiar interpretive canon *noscitur a sociis*," the phrase

must be understood by "the company it keeps.'" *McDonnell v. United*

*States*, 579 U.S. 550, 568–69 (2016). Because the phrase is followed by a

list of specific regulatory tasks, *see e.g.* 49 U.S.C § 31305(a)(1)–(8), that

all pertain narrowly to testing driver safety, it cannot be understood to

confer such a "radically different power" on the agency. *Harrington v.*

*Purdue Pharma L. P.*, 603 U.S. 204, 205 (2024) (cleaned up). And "a

court [does not] presume that an agency's promulgation of a rule is

permissible because Congress did not expressly foreclose the

possibility." *New York Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962

F.3d 541, 546 (D.C. Cir. 2020) (cleaned up).

FMCSA's assertion of rulemaking authority is especially suspect

because it creates conflict with other federal statutes.[10] The Supreme

Court has explained that the Immigration and Naturalization Act is a

"comprehensive framework" requiring that, among other things, "every

employer [] verify the employment authorization status of prospective

---

[10] FMCSA's earlier regulations, by contrast, distinguished between
noncitizens who were lawfully present and permitted to work in the
United States from those who were not—a distinction consistent with
the Immigration and Naturalization Act immigration scheme.

employees." *Arizona v. United States*, 567 U.S. 387, 404 (2012). To be sure, federal law cannot preempt federal law. But courts have a "duty to interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). This Court should not read FMCSA's rulemaking authority to permit intrusion into Congress's comprehensive immigration scheme.

## D. The IFR is Arbitrary and Capricious

Under the APA, courts must "set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The IFR is arbitrary and capricious because it does not reflect reasoned decision-making for two related reasons. First, the agency's explanation that the IFR enhances road safety is not based on reasoned decision-making. Second, this thin explanation is pretext for FMCSA's true aim of immigration enforcement.

### 1. The IFR does not reflect reasoned decision-making

"To survive arbitrary and capricious review, an agency action must be the product of reasoned decision-making." *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012). Although agencies are permitted to

make "reasonable predictive judgment[s]" based on available evidence, they run afoul of reasoned decision-making if they resort to "mere speculation." *Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 34 F.4th 1105, 1113 (D.C. Cir. 2022). And agency action cannot be upheld "if it fails to consider significant and viable and obvious alternatives," *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (quotation marks omitted).

FMCSA falls well short of the reasoned-decision-making standard. It points to five recent accidents involving non-domiciled CDL holders as a basis removing CDL eligibility for the vast majority of lawfully present noncitizens. 90 Fed. Reg. at 46518–19 (the IFR makes 97% of current non-domiciled CDL holders ineligible); *see also* Eldred Declaration at ¶ 27 (estimating only 0.6% of current non-domiciled CDL holders in Washington will be eligible to renew under the IFR). But, as explained *supra* Section I.A, a handful of accidents in an industry where there are roughly 5,000 accidents annually hardly supports an inference that certain drivers are less safe than others and need to be excluded from eligibility.

FMCSA concedes that there is "not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship" between the domicile status of a CDL holder and "safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations." 90 Fed. Reg. at 46520. FMSCA looked at the available evidence, found the evidence insufficient to support a change that benefits safety, and proceeded with the change anyway. This is arbitrary and capricious. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data.").

The only substantive justification for the eligibility restrictions is a conversation with the U.S. Department of Labor's Office of Foreign Labor Certification. FMCSA reportedly learned that employers selecting applicants for employment-based visas "typically" require "some combination of the following job requirements: possess U.S. CDL or foreign CDL equivalent, related work experience (12 months to 2

years), clean driving record, pass drug or medical testing, and knowledge or proficiency in English." 90 Fed. Reg. at 46516.

That justification is fundamentally lacking. The conversation hardly establishes the frequency with which such employers impose these requirements. Many of these requirements are required by separate regulations. Proficiency in English is already accounted for because to obtain a CDL, an applicant must pass a driving or skills test, 49 C.F.R. § 383.71(a)(2), (b)(2), that is administered in English, *id.* § 383.133(5). Similarly, drug testing is addressed by a separate set of regulations establishing "programs designed to prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles." *Id.* § 382.101. Having a U.S. CDL or foreign CDL equivalent is immaterial because non-citizens with these CDLs are not eligible for a non-domiciled CDL. *Id.* § 383.21; *see also id.* at § 383.21(b)(1) n.1.

There is also no evidence to suggest that screening done by employers hiring non-domiciled CDLs to drive trucks and buses differs from the screening that employers of the eligible statuses undertake. Indeed, Metro carefully screens and trains its bus operators. Eldred

Declaration at ¶¶ 15-17. The specter of potential liability intuitively suggests that similar screening and training occurs industry-wide. In short, there is no basis for the comparative judgment that is essential to justify the IFR's eligibility restrictions: namely, that non-domiciled CDL holders with the eligible statuses are *safer drivers* than others. The IFR thus "leaves too many key questions unanswered to satisfy the APA." *Cboe Futures Exch., LLC v. Sec. & Exch. Comm'n*, 77 F.4th 971, 978 (D.C. Cir. 2023).

Furthermore, if additional screening or driving histories are FMCSA's concern, there are "significant and viable and obvious alternatives," that would have accomplished that end. *Dist. Hosp. Partners*, 786 F.3d at 59. The agency could require driving histories, additional screening, and training as a condition of issuing CDLs. The reasoning underlying the IFR's eligibility restrictions—that applicants for employment-based visas are screened for clean driving records—presupposes that individuals can obtain and present evidence of precisely this sort. 90 Fed. Reg. at 46515.

## 2. The IFR is based on a pretextual explanation

That the agency engaged in unreasoned decision-making is explained by the fact that addressing road safety is pretext for an alternative purpose: expanding immigration enforcement.

In reviewing agency actions, courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)). Thus, courts can reject an agency's explanation if it "is incongruent with what the record reveals about the agency's priorities and decision-making process." *Id.* Rejecting "contrived" explanations ensures that "agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 784–85.

Although review of agency action "is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record," *id.* at 780, courts can also consider public statements. The Fifth Circuit has recognized that courts have a duty to examine "the statements of those issuing such pronouncements," including those of the President. *BST Holdings,*

*L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 614 (5th Cir. 2021). The Supreme Court has implicitly endorsed this practice. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 122 (2022) (Gorsuch, J., concurring) (relying on a retweet by the White House Chief of Staff) (quoting *BST Holdings, L.L.C.*, 17 F.4th at 612 & n.13). Indeed, in the absence of an administrative record, "the only way to begin to make a showing of illicit motivation or pretext would be through public statements by decisionmakers or leaks from government insiders." *Blue Mountains Biodiversity Project v. Jeffries,* 99 F.4th 438, 458 (9th Cir. 2024) (Berzon, J., statement respecting denial of rehearing en banc).

Here, "the evidence tells a story that does not match the explanation the [agency] gave for [its] decision." *Dep't of Com.*, 588 U.S. at 784. FMCSA wavers in articulating its purpose, stating that "[a]lthough FMCSA's primary focus in this rulemaking is on highway safety, the Agency notes that issuance of . . . CDLs to foreign individuals does have national security implications that should not be overlooked." 90 Fed. Reg. at 46514. It explains a failure to properly

screen noncitizens "raises the risk that individuals with malicious intent could gain authorized control of CMVs." *Id.* This risk is entirely speculative; the IFR cites a 2017 terrorist attack by someone with a CDL but concedes that "the truck used in this attack did not qualify as a *commercial motor vehicle.*" *Id.* at 46514 n.20.

The record reveals this comment is not an aside but a slip of tongue. Addressing a speculative risk of harm by noncitizens is the impetus for the IFR, not a side effect. The IFR was issued pursuant to the Truck EO, which was part of a flurry of EOs that made vague statements about the harms caused by noncitizens and the role of sanctuary jurisdictions in enabling them.

The IFR also appears prompted by Singh's crash which, while tragic, is "a thin reed on which to base a national rule." *Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transportation Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1183 (9th Cir. 2021). DOT immediately used this crash to justify threatening to cut federal funding from three states and DHS declared that it would "work with [DOT] to root out and prevent illegal aliens from obtaining these

licenses from sanctuary jurisdictions."[11] A month later, DOT issued the IFR, which subjects all noncitizen bus and truck drivers to increased scrutiny by immigration enforcement. And that same week, DHS engaged in a three-day special enforcement effort in Oklahoma, targeting CDL drivers.[12] At no point did DOT indicate that it had engaged with meaningful evidence about the relationship between immigration status and safety. Instead, the IFR is another tool to weed out immigrants that are lawfully present and eligible to work in the United States.

This sequence of events supports a pretextual explanation. The lack of evidence substantiating a connection between immigration status and road safety begs a different explanation. *See Dep't of Com.*, 588 U.S. at 783–85. And because FMCSA justified the IFR based on nonexistent safety concerns rather than a need to expand immigration enforcement efforts for the sake of doing so—a justification that is also unreasoned—the IFR does not stand on any reasoned grounds.

---

[11] *See supra* n.5.
[12] *OCC Port of Entry Utilized for Special Emphasis by ICE and DPS to Safeguard Oklahoma Highways, Motorists*, OKLA. CORP. COMM'N (Sept. 29, 2025), https://oklahoma.gov/occ/news/news-feed/2025/occ-port-of-entry-utilized-for-special-emphasis-by-ice-and-dps-t.html.

## II.     Petitioner Satisfies the Remaining Stay Factors

Petitioner will suffer irreparable harm absent a stay. This Court has "recognized that financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *In re NTE Connecticut, LLC*, 26 F.4th 980, 990–91 (D.C. Cir. 2022) (cleaned up). This is such a case. Metro employs roughly 50 bus drivers who, overnight and without notice, were deemed ineligible by the IFR. Eldred Declaration ¶ 22. Petitioner will lose the substantial investment it incurred in training those bus drivers, with the initial training program alone representing an investment of approximately $15,000 per trainee. *Id.* at ¶ 29. The IFR is already causing Metro to forfeit its investments in these drivers. In the weeks following the IFR, five of Metro's bus drivers had their CDLs revoked by the Washington State Department of Licensing (DOL) acting pursuant to the IFR. *Id.* at ¶ 23. Absent a stay, additional now-ineligible bus drivers may have their licenses revoked at any moment. *Id.* at ¶22-24.

If the IFR were stayed, screened and trained  applicants could take their exams and begin operating buses. Absent a stay, Metro

expects those applicants will be forced to find other work. Eldred Declaration ¶ 29. In total, the 50 active bus drivers and the four recent trainees represent an investment of over $800,000 t will be lost without any recourse absent a stay. *Id.*

The imminent harms are not only economic: the IFR ironically imposes substantial and well-documented safety risks to Metro's operators, riders, and other residents of King County. Metro's data confirms the commonsense intuition that experienced bus drivers are safer than inexperienced ones. Specifically, the vast majority of accidents caused by bus operators in King County each year are caused by first-year drivers. Eldred Declaration at ¶ 31. Losing experienced bus operators who are now ineligible under the IFR requires Metro to put a substantial number of new drivers on the roads causing risk to the public. *Id.* Where "[p]eople could be injured or die," there is irreparable harm. *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 62 (D.C. Cir. 2019) (citing irreparable harm cases involving injury to person, including death).

The balance of the equities and public interest factors, which merge here, also warrant a stay. *See Nken*, 556 U.S. at 435. The IFR is

procedurally and substantively unlawful, and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Aside from the IFR's unlawfulness, the public interest supports Petitioner which—unlike FMCSA—presents data that the IFR will exacerbate, rather than alleviate, road safety concerns. The balance of equities also tilts in favor of a stay, which ensures that FMCSA will "not impose unrecoverable losses" on King County's limited resources— and presumably those of local governments across the nation—"without fulfilling the basic requirements of reasoned explanation." *In re NTE Connecticut, LLC*, 26 F.4th at 991 (considering effects of a stay on non-party consumers).

## CONCLUSION

The IFR is unlawful for both procedural and substantive reasons. It was adopted on an emergency basis, without any evidence of an emergency. And FMCSA concedes that there is no meaningful evidence supporting its safety-based rationale for the IFR. Why then did FMCSA travel so far out of its lane? It likely did so to advance the Trump Administration's heavy-handed immigration policy.

Because Petitioner is likely to succeed on the merits and satisfies the remaining stay factors, the Court should issue a stay of the IFR pending a determination of the Petition's merits.

Respectfully submitted,

Paul J. Lawrence
Kevin J. Kennedy
Eugene Lee
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 240-1700

October 24, 2025

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,106 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

/s/ Kevin J. Kennedy
Kevin J. Kennedy

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2025, I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Kevin J. Kennedy
Kevin J. Kennedy

# ADDENDA

## Index of Addenda

Addendum 1: Declaration of David Eldred

Addendum 2: Petitioner's request of the Department of Transportation to stay the effective date of *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 90 Fed. Reg. 46509

Addendum 3: The Department of Transportation's denial of Petitioner's request to stay the effective date

Addendum 4: *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 90 Fed. Reg. 46509

ADDENDUM 1:

**Declaration of David Eldred, Chief Administrative Officer ("CAO") for the Metro Transit Department of Martin Luther King, Jr. County, Washington**

DAVID ELDRED declares the following subject to the perjury laws of the United States and the State of Washington:

1.      I am over the age of eighteen, competent to testify, and make this declaration based on my personal knowledge and on my review of relevant business records.

2.      I am the Chief Administrative Officer ("CAO") for the Metro Transit Department of Martin Luther King, Jr. County, Washington ("King County Metro").  I have held this position for one and a half years.  Previously, I was Metro's General Counsel for five years and a Senior Deputy Prosecuting Attorney for King County for twenty-three years before that.  I remain a licensed member of the Washington State Bar in good standing.

3.      My responsibilities as CAO for King County Metro include providing strategic planning insights including financial health assessments, assisting in agency goal setting, and collaborating on program implementation.  I oversee resource allocation, evaluate performance, and implement strategies to ensure the seamless operation of King County Metro's enterprise-wide services.  I also manage and oversee all of Metro's internal services, including bus

operator recruitment. I am also familiar with Metro's training program for bus operations and bus maintenance and repair.

4. I am aware of the Interim Final Rule promulgated by the Federal Motor Carrier Safety Administration on September 29, 2025 ("IFR") at 90 Fed. Reg. 46509 and codified at 49 CFR Parts 383 and 384. I am aware that, among other things, the IFR prevents a state from issuing a non-domiciled Commercial Learner Permit ("CLP") or Commercial Driver License ("CDL") to asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients. Under the IFR, apart from citizens and permanent residents, immigrants and nonimmigrants lawfully permitted to work in the United States are barred from obtaining a CLP or CDL unless they fall into one of the following narrow visa categories: H-2A (Temporary Agricultural Workers), H-2B (Temporary Non-Agricultural Workers), or E-2 (Treaty Investors). I understand that after September 29, 2025, anyone who is not a citizen, permanent resident, or a person holding one of those three visas is ineligible to receive, renew, update, or even change the address associated with their non-domiciled CLP or CDL.

**King County**

5.      Located in the Pacific Northwest and covering 2,307 square
miles, King County has almost twice the land area of the State of Rhode
Island and is the twelfth most populous county in the United States.
King County contains over 800,000 acres of forests, more than 60
named lakes, over 3,000 miles of rivers and streams, and is bounded by
Puget Sound to the west.

6.      King County is a general municipal government operating as
a home rule charter county under the authority of the Washington
Constitution, Article II, §4.  The county provides a full range of services
– local and regional, urban and rural – across the County's diverse
geography and communities, managing nearly 17,700 employees and an
overall budget of approximately $10.2 billion dollars per year.

7.      King County's April 1, 2025 estimated population was
2,411,700.  With approximately 25% of its population having been born
outside of the United States, King County is a diverse and vibrant
community.  Upward of 170 languages and dialects are spoken.  A
language other than English is the primary language spoken at home in
roughly 30% of King County households.

8.     In 2024, King County Metro had a ridership of approximately 88,902,700, and it averaged about 302,900 riders per weekday as of the second quarter of 2025.  Ridership counts individual passenger boardings of Metro motor buses, trolley buses, the South Lake Union and First Hill Streetcars in downtown Seattle, and Dial-A-Ride Transit, or DART, a smaller transit vehicle service for communities needing more flexible service due to lower population density, greater distances, and fewer public transportation options.

### Metro

9.     According to the APTA 2025 Public Transportation Fact Book, King County Metro is the tenth largest bus agency in the United States.[1]  Other transit agencies in the top ten include MTA New York City Transit (#1), Chicago Transit Authority (#3), Washington Metropolitan Transportation Authority (#6), Massachusetts Bay Transportation Authority (#6), Southeastern Philadelphia Transportation Authority (#8), and City and County of San Francisco (#9).  *Id.*  Also according to APTA, in 2024 Metro was one of just five

---

[1] https://www.apta.com/wp-content/uploads/APTA-2025-Public-Transportation-Fact-Book.pdf at page 35 (Table 4).

transit agencies in the nation with over 50,000,000 annual riders and had a 14% ridership increase year over year.[2]  King County Metro is one of the few transit agencies that is operated by a general municipal government rather than a special purpose government.

10.    King County Metro operates fixed-route bus, paratransit, and vanpool services throughout the county, which includes 39 cities, towns, and unincorporated areas – among them the cities of Seattle, Bellevue, Kirkland, Redmond, Sammamish, Issaquah, Shoreline, Tukwila, Renton, Auburn, Kent, and Federal Way.  In addition to its bus transit operations, Metro also operates a water taxi system on the Puget Sound.  No Metro transit operations cross state lines.

11.    Metro also operates and maintains the Sound Transit Link light rail system and the Seattle streetcar system through contracts with the Central Puget Sound Regional Transit Agency ("Sound Transit") and the City of Seattle, respectively.

12.    Metro has over 5,800 employees and approximately 1,400 buses in its fleet, spread across eight transit bases and numerous

---

[2] See https://www.metro-magazine.com/10232607/aptas-transit-wrapped-names-agencies-with-top-ridership-gains (visited April 17, 2025). According to the same source, Metro was second only to the Washington D.C. Metropolitan Area Transit Administration (WMATA), which had a 20% ridership increase.

ancillary facilities.  It serves over 7,100 bus stops, numerous park-and-ride lots, sixteen transit centers, and three passenger ferry terminals across the county.  It also maintains substantial maintenance and repair facilities at multiple locations.

## Bus Operator Recruitment and Training

13.    With about 2,600 drivers, King County Metro runs a continuous recruitment process.  Active recruitment is necessary to replace drivers who leave the department, replace retiring drivers, cover leave events, and staff new routes.  In order to serve existing routes, preserve levels of service and staff new routes, Metro must maintain its corps of drivers.  Even relatively small variations in available drivers can negatively impact service to the public.  Because the IFR effectively deprives drivers in the affected categories from holding CDLs, it will disrupt Metro operations and negatively impact transit options available to the public.  These immigrants serve a crucial role in our workforce.

14.    Metro's recruitment efforts for its employees include advertising, attending job fairs, paying amongst the highest regional wages, and offering competitive benefits, including sick and vacation

leave. Legal immigrants have been an important focus of this recruitment effort.

15. Metro thoroughly vets applicants for the Bus Operator position during the hiring process. Prior to receiving a conditional offer of employment, applicants are required to apply for the position and sit for an interview. If they receive a conditional offer, applicants must then successfully complete the Pre-Employment Process (PEP) within 45 days. The PEP requires applicants to:

A. Obtain their Washington State Commercial Learners Permit (CLP) by passing three written knowledge tests. These include the Commercial Driver License (CDL) tests for general knowledge (A, B & C), the air brakes test, and the test for carrying passengers.

B. Pass a Department of Transportation (DOT) physical examination.

C. Pass a five-year driving record review.

D. Pass a drug screening.

E. Pass a criminal background check.

F.  Present documents sufficient to meet U.S. Citizenship and
    Immigration Services ("USCIS") guidelines for employment
    verification.

16.    After their hire, trainees must complete a ten-week training
program.  Federal and state laws require that operators of transit
vehicles maintain valid CDLs.  King County Metro, with the agreement
of Washington State, runs its own CDL training and testing program.
The program consists of two primary components: classroom instruction
including preparation and testing for the CDL (for new hires who do not
already have a CDL) and training on, and practice of, the skills to be a
Transit Operator.  As a part of their training, operators drive with
skilled Metro instructors to learn and practice the skills needed.
Operators must learn and are expected to follow an extensive list of
policies and procedures comprising a 200-page manual.  Important bus
operator skills include operating a coach in traffic, providing good
customer service to all passengers, and requesting assistance when
needed via radio to the Transit Control Center.  This training focuses on
safety and includes practice operating a bus in revenue service, which
means under supervision while paying customers are on board.

Trainees are assessed on their ability to drive safely, provide good customer service, be aware of their surroundings, and manage distractions before they graduate from the program.

17.     Following completion of CDL training, each trainee must complete mandatory CDL testing.  Under U.S. Department of Transportation ("DOT") rule 49 C.F.R.§ 391.11(b)(2), all commercial motor vehicle drivers must be able to read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records.

**Impact of the IFR on Metro Operations**

18.     If a current King County Metro Transit Operator loses their CDL, they cannot perform their job and will be terminated.  If a person who is in the training program loses their CLP or CDL or becomes ineligible to obtain one, they are not able to complete the training program and will not continue in employment.

19.     Nationwide, transit agencies have been struggling to rebuild their workforce since the pandemic.  Agencies, including King County Metro, have suspended service and been unable to deliver promised

levels of service. This includes both operating routes with shortened hours of service or less frequent service and suspending other routes entirely. As agencies attempt to staff service levels, drivers work more overtime, which may lead to fatigue and safety issues. This overtime also impacts budget and raises the general cost of service. Although these issues impacted Metro prior to the adoption of the IFR, DOT's actions in adopting the IFR make the situation worse by excluding otherwise eligible drivers from the workforce.

20. When the Federal Motor Carrier Safety Administration ("FMCSA") restricted "evidence of lawful immigration status" to just three narrow visa classifications – the H-2A, Temporary Agricultural Workers, H-2B, Temporary Non-Agricultural Workers, and E-2, Treaty Investors – it limited the availability of CDLs for non-domiciled drivers to the stringent caps on those three visas. As a practical matter, none of these visa categories provide the longer-term workers that Metro requires for an effective bus transit system. Few commercial drivers will qualify for a Temporary Agricultural Worker or Treaty Investor visa. The H-2B visa is for temporary jobs where there is a one-time need, seasonal need, peak load, or intermittent need – common fields

10

include landscaping, construction, hospitality, and seafood processing. As described below, these criteria are not useful for the continual need for training, hiring, and retaining Metro's drivers. Moreover, the visa cap for H-2B visas is 66,000 for FY 2026. These visas are issued in two half-year tranches. The first 33,000 cap for FY 2026 was reached on September 12, two weeks before FMCSA announced its new IFR.[3]

21.    Due to expansion of service, retirement, and other types of employee turnover, King County Metro recruits, hires, and trains drivers on a continuous basis to ensure we can deliver planned levels of service and meet the needs of the community. The implementation of the IFR will shrink our available applicant pool at the same time it causes loss of existing experienced, highly trained drivers who are lawfully permitted to work in the United States under federal law. Metro estimates about 10% of the trainees in this year's recruitment classes are directly impacted and rendered ineligible for CDLs under the IFR.

---

[3] https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-non-agricultural-workers/cap-count-for-h-2b-nonimmigrants (accessed Oct. 22, 2025).

22.     King County Metro estimates that up to 100 current Metro employees work in job classifications that require or often require a CDL but are now ineligible to hold a CDL under the IFR.  More than half of these employees are bus operators, all of whom are required to have a valid CDL.  The remaining employees include positions such as mechanics and first line supervisors, many, but not all of whom, must possess a CDL.  As these other workers lose their CDLs, they will no longer be able to drive buses for testing, vehicle recovery, etc., and Metro will need to redeploy existing assets or, potentially, hire and train new employees for these tasks.  Together, these impacts will add stress on Metro's ability to provide transit services to the public.

23.     After the IFR was issued, the Washington State Department of Licensing ("DOL") directed King County Metro to forbid trainees who are disqualified under the IFR from taking the CDL exam.  Four trainees in the current training class were not permitted to take the exam, and they will not be allowed to train in revenue service.  Metro will be required to remove these four trainees from the training program, and they will lose the opportunity to become bus operators.

24.     King County Metro made conditional employment offers to eleven additional applicants who are also ineligible for non-domiciled CDLs under the IFR.  Because they will not be allowed to take the CDL exam or obtain a CDL, Metro was required to rescind these eleven conditional offers of employment.

25.     Five King County Metro bus operators were issued incorrect CDLs by DOL and needed to have them replaced with corrected versions.  However, before DOL could issue corrected CDLs, FMCSA adopted the IFR, and those five drivers, who remain authorized to work in the United States, now can no longer receive a corrected CDL.  These five drivers will not be able to continue in their bus operator positions.

26.     Going forward, as a result of the IFR, other King County Metro drivers who previously would have been eligible to renew their non-domiciled CDLs because they are legally authorized to work in the United States will now be unable to renew.  They will lose their livelihoods and community identities as public transit drivers – not for any safety-related reason, but simply because they are not citizens, permanent residents, or people who possess an E-2, H-2A, or H-2B visa.

27.     King County Metro understands from DOL that approximately 4,200 drivers currently hold Washington State-issued non-domiciled CDLs, and only about 26 will be eligible to renew under the new IFR – roughly 0.6%.  The impact on Metro operations is substantial.  The IFR removes nearly all non-domiciled drivers from the available applicant pool and the bus operator workforce.

28.     Going forward, the IFR would require Metro to significantly adjust its recruitment approach to comply with the limitations that the IFR places on applicants in the affected immigration categories.  This will have the impact of excluding immigrants in these affected categories from being employed as bus operators or in any other positions requiring a CDL.  This will narrow the pool of potential applicants, limiting Metro's ability to select the very best candidates to join its training program.

29.     The cost of training a replacement bus operator is approximately $15,000 per driver.  This money is now a loss for each of the drivers whose CDL has or will be revoked or for whom CDL testing was denied.  Specifically, King County spent approximately $60,000 on the four trainees that recently completed its training program but are

now ineligible to take the CDL exam.  If the IFR were stayed within the next week, these trainees could proceed to take the CDL exam and continue their training to become King County Metro bus operators.  If the IFR remains in effect for months, however, King County Metro faces a substantial risk these applicants will move on to other employment and Metro will permanently lose those investments.  King County Metro had also spent approximately $75,000 training the bus drivers who recently had their CDLs revoked by DOL because they became ineligible under the IFR.  King County Metro expects that if the IFR were stayed, DOL would begin the process of restoring those CDLs.  If the IFR is not stayed, King County Metro will permanently lose the investments it made in those drivers.  Finally, King County Metro spent approximately $675,000 training the roughly 45 bus drivers that currently hold CDLs but are now ineligible to renew their licenses under the IFR and thus will become ineligible to drive within the next year.  Once those now-ineligible drivers are refused renewal of their CDLs, King County Metro will lose the investments it made in training those bus operators.  Metro operates on a very tight budget that is built months in advance of the budget year.  The loss of Metro's investment

in its operator training cannot be easily replaced.  Not only is there limited budget to pay for recruiting and training new operators, the uncertainty caused by the IFR also creates significant challenges in creating future budgets.

30.     There is also an opportunity cost to King County Metro of replacing these operators.  Metro closely tracks attrition in the bus operator classification and is aggressively hiring and training both to replace leaving operators and to increase the overall number of operators.  Metro is growing its bus operator workforce in order to restore suspended service and meet planned new growth in bus service. Metro has not estimated the specific impacts to its ability to deliver added hours of bus service, but at present we believe that another likely negative impact of the IFR would be a reduced frequency of service compared to what Metro had planned going forward.

31.     The loss of experienced operators due to the IFR will also have a negative impact on safety.  In our experience, newly trained operators are involved in more accidents than their more experienced colleagues.  We understand this to be normal in the transit industry. As operators gain experience, they become safer drivers.  This trend is

demonstrated by Metro's "Accidents by Seniority" 2016-2025 data illustrated in the chart below, which identifies the total number of preventable accidents Metro bus operators have for each year of driving experience, aggregated over a ten-year span. The data confirm a consistent trend over time – the longer King County Metro can keep drivers in service, the safer the service Metro provides to King County residents and visitors. If Metro must hire and train new operators to replace experienced operators who lose their CDLs as a result of the IFR, Metro expects to experience a negative safety impact in its operations.



//
//

I declare under penalty of perjury under the laws of the United States of America and Washington State that the foregoing is true and correct.

SIGNED this 24th day of _October_, 2025, in Martin Luther King, Jr. County, Washington.

_____
David Eldred

ADDENDUM 2:

**Petitioner's request of the Department of Transportation to stay the effective date of *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 90 Fed. Reg. 46509**



**T** 206.245.1700
401 Union Street, Suite 1600
Seattle, WA 98101-2668
pacificalawgroup.com

Kevin Kennedy
kevin.kennedy@pacificalawgroup.com

Via Email:     Jesse.Elison@dot.gov

October 23, 2025

Jesse Elison
Office of the Chief Counsel
Federal Motor Carrier Safety Administration
U.S. Department of Transportation
1200 New Jersey Avenue SE
Washington, DC 20590

Re:     Interim Final Rule "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)"

Dear Mr. Elison:

We write to request a stay of the interim final rule (IFR) entitled "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)" (Docket No. FMCSA–2025–0622) and published in the Federal Register on September 29, 2025 at 90 Fed. Reg. 46509. We represent King County of Washington State and have filed a petition for review of the IFR with the U.S. Court of Appeals for the District of Columbia Circuit. A copy of the petition is attached.

The IFR should be stayed because it is both procedurally and substantively unlawful.

*First*, the IFR is procedurally deficient. It was improperly issued without notice-and-comment or consultation with the States as required under 49 U.S.C. § 31308. The IFR does not demonstrate good cause for bypassing notice-and-comment. 5 U.S.C. § 553(b)(B). It merely cites five accidents this year involving drivers who had non-domiciled CDLs and provides little basis for the belief that notice-and-comment would create a "surge in applications." 90 Fed. Reg. at 46512–14. Nor does the IFR provide good cause for why consultation with the States was impracticable.

*Second*, the IFR is substantively unlawful. The IFR exceeds FMCSA's statutory authority because it is only authorized to issue regulations concerning driver fitness. *See e.g.*, 49 U.S.C. § 31305(a). It is not authorized to make distinctions between noncitizens. The IFR is also arbitrary and capricious because it is not based on reasoned decisionmaking. 5 U.S.C. § 706(2)(A). Indeed, it admits that "[t]here is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship" between the domicile status of a CDL holder and "safety outcomes in the United States." 90 Fed. Reg. at 46520.

For these reasons, we request that the Administrator use his discretion to stay the IFR. If we do not hear back by 5 pm EST Friday, October 24, 2025, we plan to move to stay the IFR in the court of appeals.

Sincerely,

PACIFICA LAW GROUP LLP

Kevin Kennedy

ADDENDUM 3:

**The Department of Transportation's denial of Petitioner's request to stay the effective date**



**U.S. Department
of Transportation**

**Federal Motor Carrier
Safety Administration**

1200 New Jersey Ave, SE
Washington, DC 20590

October 24, 2025

Kevin Kennedy
Pacifica Law Group
401 Union Street, Suite 1600
Seattle, WA 98101

      Re: Request to Stay the Interim Final Rule (IFR), Restoring Integrity to the Issuance of
      Non- Domiciled Commercial Drivers Licenses (CDL), 90 Fed. Reg. 46509

Dear Mr. Kennedy:

FMCSA has received King County's request to stay the IFR, Restoring Integrity to the Issuance
of Non- Domiciled Commercial Drivers Licenses, published on September 29, 2025. After due
consideration, FMCSA denies King County's request.

                  Sincerely,

                  Jesse Elison
                  Chief Counsel

ADDENDUM 4:

*Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 90 Fed. Reg. 46509



§ 131.48 Water quality standards to protect aquatic life in the Delaware River.

(a) *Scope.* (1) The designated use in paragraph (b) of this section applies to river miles 108.4 to 70.0 of the mainstem Delaware River for the States of New Jersey and Pennsylvania.

(2) The aquatic life criteria in paragraph (c) of this section apply to river miles 108.4 to 70.0 of the mainstem Delaware River for the States of Delaware, New Jersey, and Pennsylvania.

(b) *Aquatic life designated use.* The aquatic life designated use is protection and propagation of resident and migratory aquatic life.

(c) *Dissolved oxygen criteria.* The applicable dissolved oxygen criteria are shown in table 1 to this paragraph (c).

TABLE 1 TO PARAGRAPH (c)—DISSOLVED OXYGEN CRITERIA

| Season | Magnitude (percent oxygen saturation) | Duration | Exceedance frequency |
|---|---|---|---|
| Spawning and Larval Development *(March 1–June 30)*. | 66 | Daily Average ....... | 12 Days Cumulative *(10% of the 123-day season).* |
| Juvenile Development *(July 1–October 31)* .......... | 66 | Daily Average ....... | 12 Days Cumulative *(10% of the 123-day season).* |
| | 74 | Daily Average ....... | 61 Days Cumulative *(50% of the 123-day season).* |
| Overwintering *(November 1–February 28/29)* ....... | 66 | Daily Average ....... | 12 Days Cumulative *(10% of the 123-day season).* |

(d) *Applicability.* (1) The aquatic life designated use in paragraph (b) of this section applies concurrently with other applicable designated uses in New Jersey and Pennsylvania for river miles 108.4 to 70.0 of the mainstem Delaware River.

(2) The dissolved oxygen aquatic life water quality criteria in paragraph (c) of this section are the applicable dissolved oxygen criteria in Delaware, New Jersey, and Pennsylvania for river miles 108.4 to 70.0 of the mainstem Delaware River and apply concurrently with other applicable water quality criteria.

(3) The designated use and criteria established are subject to Delaware's, New Jersey's, and Pennsylvania's general rules of applicability in the same way and to the same extent as are other federally promulgated and State-adopted water quality standards in those States.

[FR Doc. 2025–18816 Filed 9–26–25; 8:45 am]

BILLING CODE 6560–50–P

# DEPARTMENT OF TRANSPORTATION

## Federal Motor Carrier Safety Administration

## 49 CFR Parts 383 and 384

[Docket No. FMCSA–2025–0622]

RIN 2126–AC98

## Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), Department of Transportation (DOT).

**ACTION:** Interim final rule; request for comments.

**SUMMARY:** FMCSA amends the Federal regulations for State Driver's Licensing Agencies (SDLAs) issuing commercial driving credentials to foreign-domiciled individuals. Through this interim final rule (IFR), FMCSA restores the integrity of the commercial driver's license (CDL) issuance processes by significantly limiting the authority for SDLAs to issue and renew non-domiciled commercial learner's permits (CLPs) and CDLs to individuals domiciled in a foreign jurisdiction. This change strengthens the security of the CDL issuance process and enhances the safety of commercial motor vehicle (CMV) operations.

**DATES:** This IFR is effective September 29, 2025. Comments must be received on or before November 28, 2025.

**ADDRESSES:** You may submit comments identified by Docket Number FMCSA–2025–0622 using any of the following methods:

• *Federal eRulemaking Portal:* Go to *https://www.regulations.gov/docket/FMCSA-2025-0622/document.* Follow the online instructions for submitting comments.

• *Mail:* Dockets Operations, U.S. Department of Transportation, 1200 New Jersey Avenue SE, West Building, Ground Floor, Washington, DC 20590–0001.

• *Hand Delivery or Courier:* Dockets Operations, U.S. Department of Transportation, 1200 New Jersey Avenue SE, West Building, Ground Floor, Washington, DC 20590–0001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. To be sure someone is there to help you, please call (202) 366–9317 or (202) 366–9826 before visiting Dockets Operations.

• *Fax:* (202) 493–2251.

To avoid duplication, please use only one of these four methods. See the

"Public Participation and Request for Comments" portion of the **SUPPLEMENTARY INFORMATION** section for instructions on submitting comments, including information collection comments for the Office of Information and Regulatory Affairs (OIRA), Office of Management and Budget (OMB).

**FOR FURTHER INFORMATION CONTACT:** Philip Thomas, Deputy Associate Administrator, Office of Safety, FMCSA, 1200 New Jersey Avenue SE, Washington, DC 20590–0001; (202) 366–9554; *Philip.Thomas@dot.gov.* If you have questions on viewing or submitting material to the docket, call Dockets Operations at (202) 366–9826.

**SUPPLEMENTARY INFORMATION:** FMCSA organizes this IFR as follows:

I. Public Participation and Request for Comments
  A. Submitting Comments
  B. Viewing Comments and Documents
  C. Privacy
  D. Comments on the Information Collection
II. Executive Summary
III. Abbreviations
IV. Legal Basis
V. Background
  A. Existing Requirements for Issuance of Non-Domiciled CLPs and CDLs
  B. The Need for Secure Identification
  C. Annual Program Reviews (APRs) of SDLAs
  D. Recent, Fatal Crashes Involving Drivers With Non-Domiciled CDLs
VI. Discussion of the Interim Final Rule
  A. Justification for the IFR
  B. Overview of the IFR
VII. International Impacts
VIII. Section-by-Section Analysis
  A. Regulatory Provisions
  B. Guidance Statements and Interpretations
IX. Regulatory Analyses
  A. E.O. 12866 (Regulatory Planning and Review), E.O. 13563 (Improving

Regulation and Regulatory Review), and DOT Regulatory Policies and Procedures
B. E.O. 14192 (Unleashing Prosperity Through Deregulation)
C. Congressional Review Act
D. Advance Notice of Proposed Rulemaking
E. Regulatory Flexibility Act (Small Entities)
F. Assistance for Small Entities
G. Unfunded Mandates Reform Act of 1995
H. Paperwork Reduction Act
I. E.O. 13132 (Federalism)
J. Privacy
K. E.O. 13175 (Indian Tribal Governments)
L. National Environmental Policy Act of 1969

## I. Public Participation and Request for Comments

### A. Submitting Comments

If you submit a comment, please include the docket number for this IFR (FMCSA–2025–0622), indicate the specific section of this document to which your comment applies, and provide a reason for each suggestion or recommendation. You may submit your comments and material online or by fax, mail, or hand delivery, but please use only one of these means. FMCSA recommends that you include your name and a mailing address, an email address, or a phone number in the body of your document so FMCSA can contact you if there are questions regarding your submission.

To submit your comment online, go to *https://www.regulations.gov/docket/FMCSA-2025-0622/document*, click on this IFR, click "Comment," and type your comment into the text box on the following screen.

If you submit your comments by mail or hand delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing.

FMCSA will consider all comments and material received during the comment period.

#### Confidential Business Information (CBI)

CBI is commercial or financial information that is both customarily and actually treated as private by its owner. Under the Freedom of Information Act (5 U.S.C. 552), CBI is exempt from public disclosure. If your comments responsive to the IFR contain commercial or financial information that is customarily treated as private, that you actually treat as private, and that is relevant or responsive to the IFR, it is important that you clearly designate the submitted comments as CBI. Please mark each page of your submission that constitutes CBI as "PROPIN" to indicate it contains proprietary information. FMCSA will treat such marked

submissions as confidential under the Freedom of Information Act, and they will not be placed in the public docket of the IFR. Submissions containing CBI should be sent to Brian Dahlin, Chief, Regulatory Evaluation Division, Office of Policy, FMCSA, 1200 New Jersey Avenue SE, Washington, DC 20590–0001 or via email at *brian.g.dahlin@dot.gov*. At this time, you need not send a duplicate hardcopy of your electronic CBI submissions to FMCSA headquarters. Any comments FMCSA receives not specifically designated as CBI will be placed in the public docket for this rulemaking.

### B. Viewing Comments and Documents

To view any documents mentioned as being available in the docket, go to *https://www.regulations.gov/docket/FMCSA-2025-0622/document* and choose the document to review. To view comments, click this IFR, then click "Browse Comments." If you do not have access to the internet, you may view the docket online by visiting Dockets Operations on the ground floor of the DOT West Building, 1200 New Jersey Avenue SE, Washington, DC 20590–0001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. To be sure someone is there to help you, please call (202) 366–9317 or (202) 366–9826 before visiting Dockets Operations.

### C. Privacy

In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its regulatory process. DOT posts these comments, including any personal information the commenter provides, to *www.regulations.gov* as described in the system of records notice DOT/ALL 14 (Federal Docket Management System (FDMS)), which can be reviewed at *https://www.transportation.gov/individuals/privacy/privacy-act-system-records-notices*. The comments are posted without edits and are searchable by the name of the submitter.

### D. Comments on the Information Collection

Written comments and recommendations for the information collection discussed in this IFR should be sent within 60 days of publication to *www.reginfo.gov/public/do/PRAMain*. Find this information collection by clicking the link that reads "Currently under Review—Open for Public Comments" or by entering OMB control number 2126–0087 in the search bar and clicking on the last entry to reach the "comment" button.

## II. Executive Summary

This IFR revises the regulations that allow SDLAs to issue and renew non-domiciled CLPs and CDLs to individuals domiciled in a foreign jurisdiction. The changes strengthen the security of the CDL issuance process and enhance the safety of CMV operations by revising to whom an SDLA may issue a non-domiciled CLP or CDL, what the requirements are for issuance, and when a non-domiciled CLP or CDL must be canceled or revoked. Non-domiciled CDL holders have been involved in several recent fatal crashes. In addition, FMCSA recently uncovered evidence of systemic, nationwide regulatory non-compliance by SDLAs in the issuance of non-domiciled CLPs and CDLs at SDLAs. This IFR revises the regulations to restrict issuance of non-domiciled CLPs and CDLs to individuals maintaining lawful immigration status in the United States in certain employment-based nonimmigrant categories, to certain individuals domiciled in a U.S. territory, and to individuals domiciled in a State that is prohibited from the issuance of CLPs or CDLs as a result of the decertification of the State's CDL program. The revisions will help ensure that individuals who do not have lawful immigration status in the United States, and those who do have lawful immigration status but whose status is not directly connected to a legitimate, employment-based reason to hold a CDL, will no longer be eligible to obtain non-domiciled CLPs or CDLs.

This rule: (1) limits individuals eligible for non-domiciled CLPs and CDLs to those maintaining lawful immigration status in certain employment-based nonimmigrant categories, certain individuals domiciled in a U.S. territory, and individuals domiciled in a State that is prohibited from issuing CLPs or CDLs because the State's CDL program is decertified; (2) requires non-citizen applicants (except for lawful permanent residents) to provide an unexpired foreign passport and an unexpired Form I–94/I–94A (Arrival/Departure Record) indicating a specified type of employment-based nonimmigrant status at every issuance, transfer, renewal, and upgrade action defined in the regulation; (3) requires SDLAs to query Systematic Alien Verification for Entitlements (SAVE),[1] administered by U.S. Citizenship and Immigration Services (USCIS), to confirm the applicant's claim to be in lawful

---

[1] Available at *https://www.uscis.gov/save*.

immigration status in a specified category; (4) requires that SDLAs retain copies of the application documents for no less than 2 years; (5) requires the expiration date for any non-domiciled CLP or CDL to match the expiration date of the Form I–94/I–94A or 1 year, whichever is sooner; (6) requires the applicant to be present in-person at each renewal; and (7) requires an SDLA to downgrade the non-domiciled CLP or CDL if the State becomes aware that the holder is no longer eligible to hold a non-domiciled CLP or CDL.

## III. Abbreviations

APA  Administrative Procedure Act
APR  Annual Program Review
BLS  Bureau of Labor Statistics
CDL  Commercial Driver's License
CDLIS  Commercial Driver's License Information System
CFR  Code of Federal Regulations
CLP  Commercial Learner's Permit
CMV  Commercial Motor Vehicle
DACA  Deferred Action for Childhood Arrivals
DOL  Department of Labor
DOT  Department of Transportation
EAD  Employment Authorization Document
E.O.  Executive Order
FARS  Fatality Analysis Reporting System
FR  Federal Register
ICR  Information Collection Request
IFR  Interim Final Rule
MCMIS  Motor Carrier Management Information System
NAICS  North American Industry Classification System
OES  Occupational Employment Statistics
OIG  Office of the Inspector General
OIRA  Office of Information and Regulatory Affairs
OMB  Office of Management and Budget
RFA  Regulatory Flexibility Act
SAS  Service Annual Survey
SAVE  Systematic Alien Verification for Entitlements
Secretary  The Secretary of Transportation
SDLA  State Driver's Licensing Agency
SSN  Social Security Number
U.S.C.  United States Code
USCIS  U.S. Citizenship and Immigration Services

## IV. Legal Basis

This IFR is based on the broad authority of the Commercial Motor Vehicle Safety Act of 1986 (CMVSA, 49 U.S.C. 31301, *et seq.*), as amended, which was also the basis on which FMCSA relied in establishing the CDL program and the performance standards with which State CDL programs must comply. The statute requires the Secretary of Transportation (Secretary), after consultation with the States, to prescribe uniform minimum standards "for testing and ensuring the fitness of an individual operating a commercial motor vehicle" (49 U.S.C. 31305(a)). In addition, the statute requires States that issue non-domiciled CDLs to do so in

accordance with regulations established by the Secretary (49 U.S.C. 31311(a)(12)(B)(ii)). The Administrator of FMCSA is delegated authority under 49 U.S.C. 113(f) and 49 CFR 1.87 to carry out the functions vested in the Secretary by 49 U.S.C. chapters 311, 313, and 315 as they relate to CMV operators, programs, and safety.

This IFR is also consistent with the concurrent authorities of the Motor Carrier Safety Act of 1984 (49 U.S.C. 31131, *et seq.*), as amended, and the Motor Carrier Act of 1935 (49 U.S.C. 31502), as amended. The 1984 Act granted the Secretary broad authority to issue regulations "on commercial motor vehicle safety," including regulations to ensure that "commercial motor vehicles are . . . operated safely" (49 U.S.C. 31136(a)(1)). This IFR is consistent with the safe operation of CMVs. In accordance with 49 U.S.C. 31136(a)(2), the amendments contained in this rule will not impose any "responsibilities . . . on operators of commercial motor vehicles [that would] impair their ability to operate the vehicles safely." This IFR does not directly address medical standards for drivers (49 U.S.C. 31136(a)(3)) or possible physical effects caused by driving CMVs (49 U.S.C. 31136(a)(4)). FMCSA does not anticipate that this rule will result in the coercion of CMV drivers by motor carriers, shippers, receivers, or transportation intermediaries to operate a CMV in violation of the Federal Motor Carrier Safety Regulations (FMCSRs, 49 U.S.C. 31136(a)(5)).

Pursuant to 49 U.S.C. 31502(b), "[t]he Secretary of Transportation may prescribe requirements for—(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation." This IFR, which addresses the ability of individuals who are domiciled in foreign jurisdictions to operate CMVs in the United States, is related to the safe operation of motor carrier equipment because the CDL program is designed to ensure that only individuals who have been determined by relevant State licensing agencies—in accordance with Federal standards—to be qualified to operate large commercial vehicles are allowed to drive such vehicles on the Nation's roadways. Both identity verification and skills testing are integral to the determination of a driver's qualifications and are implicated in this rule.

## V. Background

### A. Existing Requirements for Issuance of Non-Domiciled CLPs and CDLs

The implementing regulations relating to CDL standards and State compliance with the CDL program are codified under 49 CFR part 383, Commercial Driver's License Standards; Requirements and Penalties, and 49 CFR part 384, State Compliance with Commercial Driver's License Program. Under 49 U.S.C. 31311(a)(12)(B)(ii), States are authorized to issue CDLs to individuals who are "not domiciled in a State that issues [CDLs]," but if they choose to issue non-domiciled CDLs, they must do so in accordance with regulations prescribed by FMCSA (49 U.S.C. 31311(a)(12)(B)). The regulations setting forth the standards States must apply when issuing non-domiciled CLPs and CDLs are found at 49 CFR 383.23, 383.71(f), 383.73(f), 384.201, and 384.212(a). To obtain a non-domiciled CLP or CDL under existing § 383.71(f), the applicant must be domiciled either in a *foreign* jurisdiction (defined in § 383.5 to mean "outside the fifty United States and the District of Columbia") other than a jurisdiction the Administrator has determined to have comparable testing and licensing standards (*i.e.,* Canada and Mexico, see § 383.23, note 1), or in a State that is prohibited from issuing CLPs and CDLs in accordance with § 384.405. A person in these jurisdictions is eligible to apply for a non-domiciled CLP or CDL from any State that elects to issue a non-domiciled CLP or CDL and that complies with the testing and licensing standards contained in subparts F, G, and H of part 383.

State procedures for issuing non-domiciled CLPs and CDLs under § 383.71(f)(2)(i) must require that an applicant domiciled in a foreign jurisdiction show that he or she is registered by providing an unexpired employment authorization document (EAD) issued by USCIS or an unexpired foreign passport accompanied by an approved I–94 form documenting the applicant's most recent admittance into the United States.

### B. The Need for Secure Identification

The events of September 11, 2001, highlighted the need for secure identification, as all but one of the 9/11 hijackers acquired some form of U.S. identification document. Acquisition of these forms of identification assisted them in boarding commercial flights, renting cars, and other activities. The report from the 9/11 Commission recommended that the Federal government set standards for the

issuance of sources of identification, such as driver's licenses, emphasizing that fraud in identification documents goes beyond theft, and that "[a]t many entry points to vulnerable facilities, including gates for boarding aircraft, sources of identification are the last opportunity to ensure that people are who they say they are and to check whether they are terrorists." [2]

In 2006, section 703(a) of the Security and Accountability for Every Port Act of 2006 [3] required FMCSA to issue regulations implementing the recommendations in a management advisory issued by DOT's Office of the Inspector General (OIG) concerning verification of the legal status of commercial drivers. [4] In its advisory to DOT's Deputy Secretary, OIG noted vulnerabilities in the CDL program that allowed applicants to obtain a CDL without being legally present in the United States. OIG also noted that the requirement in FMCSR at that time to provide a Social Security number (SSN), without additional verified documentation, did not ensure the applicant's U.S. citizenship or legal presence. OIG recommended that all CDL applicants be required to demonstrate that they are either a U.S. citizen, a permanent legal resident, or otherwise legally present in the United States. OIG further recommended having a requirement for verification of SSNs or for fingerprinting when issuing a CDL to help prevent fraud in the program and further enhance security by verifying applicants' identification.

On May 9, 2011, FMCSA published a final rule implementing section 703 and addressing OIG recommendations. [5] The rulemaking strengthened the legal presence requirements and increased the documentation required for CLP and CDL applicants to demonstrate their legal presence in the United States. The final rule revised the CDL regulations to specify that a State may issue a CLP or CDL only to an applicant who is a U.S. citizen or lawful permanent resident of the United States, and may issue a non-domiciled CLP or CDL to foreign applicants (other than applicants from Canada or Mexico) who have temporary or indefinite legal presence in the United States. [6]

## C. Annual Program Reviews (APRs) of SDLAs

Each year, FMCSA conducts Annual Program Reviews (APRs) of SDLAs in accordance with 49 U.S.C. 31311 and 49 CFR 384.307 to gauge the States' compliance with the CDL program. This year's APRs (2025 APRs) included a heightened focus on the issuance of non-domiciled CDLs, consistent with Executive Order (E.O.) 14286. [7] The 2025 APRs uncovered systemic procedural and computer programming errors, significant problems with staff training and quality assurance, and policies that lack sufficient management controls in the issuance of non-domiciled CLPs and CDLs by multiple SDLAs. As a result, SDLAs have issued non-domiciled CDLs to drivers who do not qualify, [8] issued non-domiciled CDLs that extend beyond a driver's expiration of lawful presence known at the time of issuance, issued non-domiciled CDLs without first validating the drivers' eligibility under § 383.71(f)(2)(i), and engaged in other noncompliant practices. For example, as part of California's APR, FMCSA reviewed a sample of records of drivers issued non-domiciled CDLs and recently found that approximately one in four non-domiciled CDLs were not compliant with requirements in 49 CFR parts 383 and 384. In that same APR, FMCSA uncovered instances where the SDLA issued non-domiciled CDLs with expiration dates as long as 4 years after the EAD's expiration date—well beyond the driver's authorized employment period. Even more troubling was that some of these non-domiciled CDLs included a passenger and school bus endorsement. Furthermore, the 2025 APRs have shown at least five other States including Colorado, Pennsylvania, South Dakota, Texas, and Washington that have issued non-domiciled CDLs in violation of the regulatory requirements. The 2025 APRs have revealed inconsistencies or failures that demonstrate acute systemic problems across the country in the non-domiciled CDL issuance processes. FMCSA expects the number of States discovered to have improperly issued non-domiciled CDLs to grow as FMCSA's APRs continue.

## D. Recent, Fatal Crashes Involving Drivers With Non-Domiciled CDLs

Since the beginning of the 2025 calendar year, FMCSA has identified at least five fatal crashes involving non-domiciled CDL holders. At least two of these drivers were improperly issued a CDL, while others held CDLs that complied with the regulations in place at the time of issuance but would not be eligible for a non-domiciled CDL under the revised regulations. These crashes show the tangible impact of States failing to follow the proper procedures when issuing non-domiciled CDLs, as well as the need for stronger regulations to ensure that non-domiciled drivers present in the United States without lawful immigration status are not able to obtain CLPs and CDLs.

Most recently, on August 12, 2025, the driver of a tractor-trailer, who did not have lawful immigration status [9] and held a non-domiciled CDL based on a valid USCIS-issued EAD, caused a crash in Florida that killed three people. The Florida Department of Highway Safety and Motor Vehicles stated that its initial, but ongoing, investigation showed that the driver attempted to execute a U-turn in an unauthorized area on the Florida Turnpike in St. Lucie County. [10] A dashcam video widely broadcast across various forms of media shows the CMV crossing in front of a minivan, which crashed into the truck and became lodged under its trailer. [11] The driver was later arrested in California on three counts of vehicular

[2] Thomas H. Kean, Lee H. Hamilton, and the National Commission on Terrorist Attacks, *The 9/11 Commission report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (9/11 Report), Washington, DC, U.S. Government Printing Office, Official Government Edition, July 22, 2004, p. 390. Available at *https://www.gpo.gov/fdsys/pkg/GPO-911REPORT/content-detail.html*.

[3] Public Law 109–347, 120 Stat 1884 at 1944 (2006); See 49 U.S.C. 31100 note.

[4] DOT, OIG, Management Advisory to the Deputy Secretary of Transportation, *Need to Establish a Legal Presence Requirement for Obtaining a Commercial Driver's License*, June 4, 2004, *https://www.oig.dot.gov/sites/default/files/cc2004054.pdf*. See also DOT, OIG, *Improving Testing and Licensing of Commercial Drivers*, Report No. MH–2002–093, May 8, 2002, *https://www.oig.dot.gov/sites/default/files/mh2002093e.pdf*.

[5] 76 FR 26854 (May 9, 2011). The final rule was effective July 8, 2011, and States were required to be in compliance with subpart B of Part 384 by July 8, 2014. On March 25, 2013, in response to various petitions for reconsideration, FMCSA made minor clarifications to the final rule and extended the date for State compliance to July 8, 2015. See 78 FR 17875 (Mar. 25, 2013); 49 CFR 384.301(f).

[6] See 76 FR 26854, 26858. The final rule changed the term "Nonresident" to "Non-domiciled" for both CLPs and CDLs to provide greater consistency with FMCSA's authorizing statute (which bases jurisdictional authority to issue CDLs on domicile, not residency), to avoid confusion, and to eliminate any actual or perceived conflicts with DHS immigration programs. Other than the change to "Non-domiciled," the rule remained as proposed in the NPRM. See 73 FR 19282, 19285 (Apr. 9, 2008).

[7] Enforcing Commonsense Rules of the Road for America's Truck Drivers, 90 FR 18759, May 2, 2025. See also, *https://www.fmcsa.dot.gov/newsroom/president-trumps-transportation-secretary-sean-p-duffy-announces-nationwide-audit-states*.

[8] For example, FMCSA is aware that numerous States have issued non-domiciled CDLs to drivers who are domiciled in Mexico, despite the fact that Mexican and Canadian drivers are not eligible for non-domiciled CDLs under 49 CFR 383.71(f).

[9] The driver was present in the United States without being inspected and admitted or paroled and was in removal proceedings before the Executive Office for Immigration Review.

[10] *https://www.flhsmv.gov/2025/08/16/illegal-u-turn-truck-driver-arrested-for-vehicular-homicide/* (accessed Sep. 19, 2025).

[11] *https://www.youtube.com/watch?v=HDgHr8KHOzw* (accessed Sep. 19, 2025).

homicide and three counts of manslaughter and returned to Florida for prosecution. The Department of Homeland Security announced that a U.S. Immigration and Customs Enforcement investigation revealed that the driver had been living in the U.S. without lawful immigration status since 2018 after unlawfully crossing the border from Mexico.[12] Preliminary findings from FMCSA's post-crash investigation showed that the driver was not proficient in the English language and also revealed that he had previously been cited for speeding in New Mexico.

This driver had an unexpired EAD and was therefore eligible for a non-domiciled CDL under the existing regulations but was improperly issued a standard (full-term) CDL in Washington in 2023. He was subsequently issued a proper non-domiciled CDL in California, but would not have been eligible for a non-domiciled CDL under the revised regulations requiring a driver to provide an I–94 or I–94A indicating a specified employment-based nonimmigrant status.

In another crash, which occurred on July 11, 2025, a truck tractor traveling on the Delaware Memorial Bridge from New Jersey into Delaware crossed three lanes of traffic and crashed into a concrete wall. The Delaware River and Bay Authority stated that the impact collapsed the concrete wall, and the truck tractor careened into the Delaware River.[13] The driver of the vehicle, who was killed in the crash, held a non-domiciled CDL. The emergency response for this incident involved significant recovery resources and personnel including a crane and barge repositioned from the active construction site of the Bridge Ship Collision Protection project, the Delaware State Police Marine dive unit, and a fire company. This driver similarly had entered the United States unlawfully, was in removal proceedings, and had a valid USCIS-issued EAD. Because a standalone EAD will no longer suffice as proof of employment eligibility for issuance of non-domiciled CDLs and this driver did not provide an I–94 or I–94A indicating a specified employment-based nonimmigrant status, he would not have been able to obtain his CDL under the revised regulations.

Another crash took place on May 6, 2025, in Thomasville, AL, in which a tractor-trailer hit four vehicles from behind as they were stopped at a red light.[14] Two people were killed and four people were injured. The driver of the CMV held a valid USCIS-issued EAD, which allowed him to obtain a non-domiciled CDL, but did not provide an I–94 or I–94A indicating a specified employment-based nonimmigrant status. FMCSA's ongoing post-crash investigation has revealed that the driver held the CDL for less than six weeks and initially failed his CDL skills test for speeding and failing to obey a traffic control device before passing the test a few days later. The crash occurred on the driver's third day of employment with the carrier. Because a standalone EAD will no longer suffice as proof of employment eligibility for issuance of non-domiciled CDLs, this driver would not have been able to obtain his CDL under the revised regulations.

On March 14, 2025, a CMV driver caused a multi-vehicle collision in Austin, TX. Witnesses stated that the driver of the 18-wheeler failed to brake and crashed into a long line of stopped and slow-moving traffic ahead of him.[15] The incident involved 17 vehicles, killed five people including two children, and caused 11 more people to be hospitalized. The post-crash scene extended for approximately one-tenth of a mile.[16] The driver was improperly issued a standard (full-term) CDL in Texas despite being eligible for only a non-domiciled CDL, a fact that demonstrates the difficulty SDLAs are currently having in correctly applying the existing regulations. Moreover, since this driver did not provide an I–94 or I–94A indicating a specified employment-based nonimmigrant status, he would not be eligible for a CDL under the revised regulations. A post-crash investigation revealed that this driver's driving record showed two prior citations, for failure to obey a sign/traffic control device and erratic (unsafe) lane changes. The investigation also found that the driver was not in possession of a current medical certificate and had violated the hours of service rules multiple times in the 11 days preceding the crash.

A crash in West Virginia on January 19, 2025, involved a driver of a tractor-trailer who held a non-domiciled CDL and had two prior citations for speeding. The driver entered the United States unlawfully, is in removal proceedings, and had a valid USCIS-issued EAD. According to news reports, the driver caused a collision on a bridge over Cheat Lake on Interstate 68 resulting in a vehicle falling from the bridge into the lake, killing the person inside.[17] Those reports also state that investigators determined that the driver, who had also struck another vehicle prior to the crash on the bridge, was traveling at an unsafe speed.[18] After being arrested in California and extradited to West Virginia, he was charged with negligent homicide.[19] As with other crashes described above, the driver's lack of an I–94 or I–94A indicating a specified employment-based nonimmigrant status and specifically allowing him to work as a truck driver would have prevented him from receiving a CDL under the revised regulations.

## VI. Discussion of the Interim Final Rule

### A. Justification for the IFR

Under the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.,* an agency must typically provide prior notice and an opportunity for public comment before a rule becomes effective. However, the APA provides an exception "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest" (5 U.S.C. 553(b)(B)). With good cause, an agency may also make a rule effective immediately upon publication (5 U.S.C. 553(d)(3)).

FMCSA finds good cause to issue this IFR without prior notice and comment and to make it effective immediately. This finding is based on the determination that notice and public procedure are both contrary to the public interest and impracticable because it would delay the adoption and immediate implementation of strict standards concerning the issuance and renewal of non-domiciled CLPs and CDLs necessary to address a recently

---

[12] https://www.dhs.gov/news/2025/08/18/criminal-illegal-alien-recklessly-driving-18-wheeler-kills-three-florida (accessed Sep. 19, 2025).

[13] https://www.drba.net/drba-police-investigating-bobtail-tractor-accident (accessed Sep. 19, 2025).

[14] https://www.waka.com/2025/05/07/2-dead-4-injured-in-thomasville-multi-wreck-crash-suspect-in-custody/; https://www.southalabamian.com/articles/tuesday-wreck-claims-two/ (accessed Sep. 19, 2025).

[15] https://apnews.com/article/austin-texas-crash-pileup-five-killed-509a46da52ec4552158d5b1d33f645af; https://www.fox7austin.com/news/austin-i-35-crash-lawsuit (accessed Sep. 19, 2025).

[16] https://abcnews.go.com/US/5-people-dead-massive-car-crash-involving-17/story?id=119786467 (accessed Sep. 19, 2025).

[17] https://www.wvnews.com/news/wvnews/tragic-fatal-accident-on-cheat-lake-bridge-leads-to-pending-criminal-charges/article_fed01d9c-f846-11ef-9e84-5bcd6ca70bef.html (accessed Sep. 19, 2025).

[18] https://www.wtae.com/article/fayette-county-cheat-lake-missing-man-charges/64017724 (accessed Sep. 19, 2025).

[19] https://www.wdtv.com/2025/05/24/sukhjinder-singh-booked-north-central-regional-jail/ (accessed Sep. 19, 2025).

discovered, two-front crisis that constitutes an imminent hazard to public safety and a direct threat to national security.

FMCSA has recently become aware of a critical safety failure that is occurring in two distinct and dangerous ways: the eligibility requirements for obtaining a non-domiciled CLP and CDL are not narrowly tailored to provide a sufficient margin of safety to protect the traveling public, and the existing regulatory framework is unworkable in practice due to systemic deficiencies in State implementation. FMCSA cannot, in good faith, permit a demonstrably failed non-domiciled credential issuance regulatory framework and implementation to continue while conducting a notice and comment rulemaking process.

The first front of this crisis—the overly broad eligibility requirements of the current regulations—has been tragically demonstrated by multiple fatal crashes in 2025 involving drivers who held non-domiciled CDLs (or who were mistakenly issued a standard CDL instead of a non-domiciled CDL), most of which were properly issued in accordance with existing regulations. As discussed in Section V.D. of this preamble, non-domiciled CDL holders have been involved in several recent, fatal crashes that claimed the lives of 12 people (including two children) and caused injuries to 15 people (at least 11 of which were hospitalized). One driver had been in the U.S. illegally since 2018 and would not have been eligible for a non-domiciled CDL under the revised regulation. Two of the drivers had prior citations on their driving records, with one of those drivers also having inconsistencies in his hours-of-service record leading up to the day of the crash. These crashes demonstrate that the existing non-domiciliary credentialing framework is dangerously permissive, creating an untenable risk to the public even when the CDLs were properly issued under the existing standards.

The second front of the crisis is a systemic breakdown in State implementation of the rule, which can have disastrous consequences, as evidenced by the March 14, 2025, fatal crash in Texas caused by a driver with a license improperly issued by Texas and another crash in Florida on August 12, 2025, where the driver had previously been issued an improper license by Washington. As discussed in Section V.C. of this preamble, the scale of this implementation failure was recently uncovered by FMCSA's 2025 APRs, which revealed that States are fundamentally failing to administer the

issuance of non-domiciled credentials to foreign-domiciled applicants properly. FMCSA's APR has demonstrated that approximately one in four non-domiciled CDLs California issued were not compliant with the requirements in 49 CFR parts 383 and 384. Moreover, FMCSA has already confirmed improperly issued non-domiciled CDLs across six States, including California, Colorado, Washington, Texas, Pennsylvania, and South Dakota. FMCSA expects the number of States discovered to have improperly issued non-domiciled CDLs to grow as FMCSA's APRs continue.

When the integrity of the non-domiciled CDL process is in question, the credential itself is compromised and can no longer be trusted to verify an individual's eligibility and qualifications. Although FMCSA's primary focus in this rulemaking is on highway safety, the Agency notes that issuance of CLPs and CDLs to foreign individuals does have national security implications that should not be overlooked. Failure to properly vet such individuals raises the risk that individuals with malicious intent could gain authorized control of CMVs, which can be used to transport hazardous materials and target critical infrastructure or to otherwise carry out a terrorist attack.[20] Therefore the non-domiciled CLP and CDL issuance process must be protected to prevent exploitation by bad actors.

In addition, the current regulations for issuing non-domiciled CLPs and CDLs require States to obtain an applicant's complete 10-year driving history from all States where the individual was previously licensed. See § 383.73(b)(3)(iv). However, States are unable to carry out this requirement for individuals whose driving history exists predominantly or solely within a foreign jurisdiction. Without a verified driving record, there is a serious risk that unsafe or high-risk drivers—who may have prior violations, suspensions, or a history of crashes in foreign jurisdictions—could be granted non-domiciled CLPs and CDLs and operate large trucks and buses on U.S.

roadways. This undermines the integrity and safety of the CLP and CDL issuance process. Though there is a need to handle the issuance processes differently (due to the lack of authority to compel foreign jurisdictions to provide driving records), FMCSA believes that limiting eligibility for non-domiciled CLPs and CDLs (particularly when limited to employees holding an I–94 or I–94A indicating a specified employment-based nonimmigrant status that ensure additional screening of drivers) will increase safety by appreciably reducing the number of non-domiciled CLP and CDL drivers with unknown driver safety records on the Nation's roadways.

The confluence of these recent events and recently uncovered factors creates an imminent concern that the current regulatory framework does not provide a sufficient margin of safety to protect the traveling public. The recent fatal crashes demonstrate that the current regulations related to non-domiciled credentials fail even when properly followed, while the systemic issuance errors and fatal crashes caused by drivers who were improperly issued a license confirm the current regulatory framework has allowed for frequent points of failure—allowing ineligible persons to obtain non-domiciled CLPs and CDLs. This combination constitutes an imminent hazard that warrants immediate action to protect the traveling public.

Furthermore, providing advance notice through a proposed rule is impracticable and contrary to the public interest because it would actively subvert the rule's purpose by creating a foreseeable and concentrated surge in applications that would exacerbate the current safety crisis. A non-domiciled CDL is a high-value economic credential, and historical precedent shows that announcing a closing window for such an opportunity invariably triggers a rush of applicants. For example, when the compliance date for FMCSA's entry-level driver training requirements was approaching, SDLAs saw a large spike in CLP and CDL issuances immediately before applicants would have been subject to the new training requirements. The compliance date for the requirements was February 7, 2022. Data from the Commercial Driver's License Information System (CDLIS)[21] shows that CLP and CDL issuances steadily increased during 2021 culminating in numbers for December 2021 through February 2022

---

[20] On October 31, 2017, Sayfullo Saipov, who possessed a CDL, carried out a terrorist attack when he used a 6,000-lb. truck to murder eight victims and injure many more, including a 14-year old child, on the Hudson River Bike Path in lower Manhattan. See *https://www.justice.gov/usao-sdny/pr/sayfullo-saipov-be-sentenced-life-prison-2017-truck-attack-isis*. Though the truck used in this attack did not qualify as a *commercial motor vehicle* under the definition in 49 U.S.C. 31132 (because it did not have a gross vehicle weight rating or gross vehicle weight of at least 10,0001 pounds), it shows the lethal damage that can be inflicted by a single vehicle in the wrong hands.

[21] See *https://www.aamva.org/technology/systems/driver-licensing-systems/cdlis*.

that were around twice as high as the same time period in the previous year.[22]

The incentive and willingness to seek a CDL during a pendency period between a proposed rule and its potential finalization is amplified by the unique nature of the non-domiciled foreign applicant pool. Unlike U.S. citizens, non-citizen nationals residing in a U.S. territory, or lawful permanent residents who must apply for a CDL or CLP in their State of domicile, non-domiciled CDL or CLP applicants are not bound by such requirements. They are uniquely mobile and can strategically apply in any State that issues non-domiciled CDLs or CLPs.

The public notice itself would effectively serve as a guide for this forum shopping. The justification for the rulemaking would identify States with systemic weaknesses and high error rates, inadvertently advertising the path of least resistance. This is likely to funnel a national, and even international, pool of applicants toward the very State agencies least equipped to handle them, overwhelming their capacity for due diligence. Knowing that their window of opportunity was closing, those seeking to obtain a CDL improperly would rush to secure a license before the final rule takes effect. This would dramatically exacerbate the very danger the rulemaking is designed to eliminate, flooding the Nation's roadways with a new cohort of ineligible drivers.

The harm from such a concentrated surge is not speculative—it is foreseeable. Based on FMCSA's own 2025 APRs, California was found to have an error rate in excess of 25 percent and issued approximately 3,820 non-domiciled CDLs and CLPs in June 2025 alone. FMCSA expects a notice-and-comment period would result in this State being inundated with applicants, and extrapolating from the 2025 APR finding in June, could lead to the issuance of potentially over 1,000 improperly issued credentials every month. Even if fewer drivers than expected seek to secure licenses before the regulatory changes take effect, the current processes in noncompliant States indicate that as many as one in four drivers who would normally apply during that timeframe could be issued non-domiciled CLPs and CDLs improperly. Dangerous drivers who would be eligible to obtain a non-domiciled CLP or CDL under the current framework but are at risk of causing

fatal crashes such as those involved in the fatal crashes cited above in West Virginia, Alabama, Delaware, and Florida would equally be incentivized to obtain a non-domiciled CLP or CDL before the enhanced standards became effective, resulting in a higher number of dangerous drivers on America's roadways and threatening public safety.

Therefore, advance notice would create a perverse incentive, turning the period between the publication of the notice and the publication of the final rule into a window of heightened danger and making the standard rulemaking process unworkable and self-defeating. For the same reasons described above, FMCSA finds good cause to make the rule effective on publication, rather than making it effective at least 30 days after publication. States that choose to issue non-domiciled CDLs and CLPs will be required to pause issuance of those CDLs and CLPs until they can ensure compliance with the updated regulations.

Though this IFR is effective immediately, FMCSA invites comments from interested members of the public. These comments must be submitted on or before November 28, 2025. FMCSA will consider these comments and determine whether to make any revisions to the rule as a result of these comments.

## B. Overview of the IFR

The current regulations focus on an individual's possession of a valid USCIS-issued EAD or an unexpired foreign passport accompanied by evidence that the individual was inspected and admitted or paroled into the United States. As some of the recent incidents highlighted in Section V demonstrate, this allows individuals without lawful immigration status, including those who entered the United States illegally, to receive non-domiciled CLPs or CDLs as long as they obtain an EAD. This IFR revises the regulations to focus on lawful immigration status in the United States in certain employment-based nonimmigrant categories. An EAD will no longer be sufficient to obtain a non-domiciled CLP or CDL. An EAD only serves as proof that an individual is authorized to work in the United States for a specific time period, not that the individual entered the United States legally by presenting themselves at a port of entry.[23] This standard of

documentation is no longer sufficient to ensure that the non-domiciled CLP and CDL issuance process is narrowly tailored to those individuals who have lawfully entered the United States and should be allowed to drive a CMV. Individuals who do not possess evidence of lawful immigration status as defined in this IFR in certain employment-based nonimmigrant categories, will no longer be eligible to receive non-domiciled CLPs or CDLs. These individuals excluded from eligibility for a non-domiciled CLP or CDL would include asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients. Although these individuals may be eligible for employment in the United States, they would not be eligible to apply for a non-domiciled CLP or CDL. The rule will continue to allow U.S. citizens and lawful permanent residents, and non-citizen nationals domiciled in a U.S. territory (other than the 50 States and the District of Columbia) to obtain a non-domiciled CLP or CDL in a U.S. State. This rule also does not impact the ability of an individual domiciled in a State that is prohibited from issuing CDLs to obtain a non-domiciled CLP or CDL in another State.

Only those in lawful status in the United States in one of the following employment-based nonimmigrant categories will be permitted to obtain a non-domiciled CLP or CDL: H–2A (Temporary Agricultural Workers), H–2B (Temporary Non-Agricultural Workers), or E–2 (Treaty Investors). No other immigration categories will be eligible for a non-domiciled CLP or CDL under the IFR. These nonimmigrant categories require either a labor certification through the Department of Labor (DOL), current employment, or other specified proof of work established through the Federal visa process.[24] These requirements ensure that individuals in the United States under these nonimmigrant categories are already approved to work specific jobs that may require acquisition of a non-domiciled CDL. In addition, being issued the visa by the Department of State, presenting themselves at a valid port of entry to be screened by U.S. Customs and Border Protection, and being issued a Form I–94/94A ensures that these visa holders have entered the United States lawfully and have lawful immigration status. This list of specified nonimmigrant categories does not include every employment-based

[22] According to CDLIS CLPs and CDLs issued by month and year: 32,970 in December 2020; 37,571 in January 2021; 43,366 in February 2021; 63,462 in December 2021; 84,291 in January 2022; and 87,672 in February 2022.

[23] An EAD may be issued to certain groups of individuals who may not have presented themselves at a valid port of entry to be screened. See 8 CFR 274a.12.

[24] For more information on the requirements and processes required for the listed visas see https://www.uscis.gov/working-in-the-united-states.

nonimmigrant category, but encompasses the vast majority of individuals working in such categories that cover jobs that would require the acquisition of a non-domiciled CDL. Keeping the list targeted to CDL-specific employment-based nonimmigrant categories will eliminate confusion regarding who may be eligible for a non-domiciled CLP or CDL and ensure that those credentials are being issued only to those who need them for specific employment purposes. In addition, as discussed in Section VI.A of this preamble, limiting eligibility for non-domiciled CLPs and CDLs (particularly when limited to employees working under one of the specified employment-based nonimmigrant categories that ensure additional screening of drivers) will also increase safety by appreciably reducing the number of non-domiciled CLP and CDL drivers with unknown driver safety records on the Nation's roadways. In consulting with DOL's Office of Foreign Labor Certification, FMCSA understands that employer applications related to commercial trucking typically include some combination of the following job requirements: possess U.S. CDL or foreign CDL equivalent, related work experience (12 months to 2 years), clean driving record, pass drug or medical testing, and knowledge or proficiency in English. This employer screening, in addition to the incentive to avoid unnecessarily repeating the lengthy job order process,[25] helps ensure that the population of drivers being hired under one of the specified employment-based nonimmigrant categories are more likely to be drivers with safe driving records.

Individuals in approved employment-based nonimmigrant categories will be required to provide an unexpired Form I–94/94A and unexpired foreign passport at every issuance, transfer, renewal, and upgrade action defined in the regulation. Applicants who are U.S. citizens, lawful permanent residents, or non-citizen nationals domiciled in a U.S. territory will be required to provide any of the documents specified in Table

1 of § 383.71 as proof that they are eligible to receive a non-domiciled CLP or CDL. The expiration date for any non-domiciled CLP or CDL will be the expiration of the alien's period of admission documented on the Form I–94/94A or 1 year, whichever is sooner. This ensures that the SDLA will verify U.S. citizens and non-citizen nationals domiciled in a U.S. territory will be issued a non-domiciled CLP or CDL with an expiration date one year from the date of issuance to ensure consistency in the licensing process, which will reduce confusion for SDLAs issuing these non-domiciled credentials.

Once an applicant has presented the proper documentation, SDLAs will be required to utilize SAVE,[26] administered by USCIS, to verify the immigration status and employment-based nonimmigrant category information provided by the applicant. If the information received from SAVE does not confirm the applicant's claim to be in lawful immigration status (i.e., if the applicant's Form I–94/94A "admit until date" has expired) or the applicant's nonimmigrant category as reflected by SAVE is no longer one of those specified in this rule (i.e., no longer denotes H–2A (Temporary Agricultural Workers), H–2B (Temporary Non-Agricultural Workers), or E–2 (Treaty Investors), the SDLA would be prohibited from issuing the non-domiciled CLP or CDL. However, the SDLA may not rely solely on the SAVE response; it must confirm the applicant's claim to be in lawful immigration status in a specified category, it must retain copies of the required documents in its records, and it must provide copies of these documents and proof of SAVE verification to FMCSA upon request. The SDLA will also be required to retain these documents for no less than 2 years. The new requirements for verification through SAVE and records retention ensures that FMCSA has access to relevant information during APRs moving forward to verify the integrity of a State's non-domiciled CLP and CDL issuance process. This will address many of the challenges the Agency encountered in assessing a State's compliance during the current round of APRs caused by the lack of documentation showing the number of non-domiciled CLPs and CDLs issued or that such CLPs and CDLs were properly issued.

SDLAs will be prohibited from renewing non-domiciled CLPs or CDLs by mail and must require the applicant to be present in-person at each renewal.

The rule also contains a mandatory downgrade provision. If a State receives notification from FMCSA, the Department of Homeland Security, the Department of State, or other Federal agency with jurisdiction that a non-domiciled CLP or CDL holder licensed in that State no longer holds lawful nonimmigrant status in a category established in this rule, or if the non-domiciled CLP or CDL holder violates any terms of their immigration status, the SDLA will be required to initiate a process to remove the commercial privilege from the license within 30 days. Each time an SDLA renews, transfers upgrades, amends, corrects, reprints, or otherwise duplicates a previously issued CLP or CDL, the SDLA (in addition to confirming that the applicant's foreign passport is unexpired) must verify through SAVE that the applicant's I–94/94A "admit until date" has not expired and that the applicant's immigration category as noted on the I–94/94A or as confirmed by SAVE, remains listed as H–2A (Temporary Agricultural Workers), H–2B (Temporary Non-Agricultural Workers), or E–2 (Treaty Investors).

## VII. International Impacts

Motor carriers and drivers are subject to the laws and regulations of the countries where they operate, unless an international agreement states otherwise. Drivers and carriers should be aware of the regulatory differences between nations in which they operate.

This rule will not impact drivers domiciled in Canada or Mexico. FMCSA has previously determined that CDLs issued by Canadian Provinces and Territories in conformity with the Canadian National Safety Code and "Licencias Federales de Conductor" issued by the United Mexican States are in accordance with the standards of part 383. Under these reciprocity determinations, drivers that live in Canada and Mexico would operate in the United States with the license issued by their country of domicile. Therefore, under the single license provision of § 383.21, a driver holding a CDL issued under the Canadian National Safety Code or a "Licencia Federal de Conductor" issued by Mexico is prohibited from obtaining a non-domiciled CDL, or any other type of driver's license, from a State or other jurisdiction in the United States.

## VIII. Section-By-Section Analysis

This section-by-section analysis describes the changes to the regulatory text in numerical order.

---

[25] For example, employers that would like to hire H–2B workers are required by DOL to submit a job order ("Application for Temporary Employment Certification") no more than 90 days and no less than 75 days before the work start date. See 20 CFR 655.15(b). Each job qualification and requirement must be listed in the job order and must be bona fide and consistent with the normal and accepted qualifications and requirements imposed by non-H–2B employers in the same occupation and area of intended employment. 20 CFR 655.18(a)(2). An employer therefore has an incentive to thoroughly screen a prospective employee's driver safety record and apply similar qualifications and requirements to avoid having to go through the application process again, as this would delay the hiring of another driver for more than 75 days.

[26] Available at *https://www.uscis.gov/save.*

## A. Regulatory Provisions

Section 383.5 Definitions

FMCSA adds a definition of *evidence of lawful immigration status* to § 383.5.

Section 383.71 Driver Application and Certification Procedures

FMCSA revises paragraph (f) of § 383.71.

Section 383.73 State Procedures

FMCSA amends § 383.73 by revising paragraphs (a)(6), (b)(6), (c)(7), (d)(7), and (e)(5); revising the introductory text of paragraph (f)(2); adding a new paragraph (f)(2)(iv), revising paragraph (f)(3), adding new paragraphs (f)(5) and (6), and revising paragraph (h).

Section 384.212 Domicile Requirement

FMCSA adds new paragraphs (a)(1) and (2) to § 384.212.

Section 384.301 Substantial Compliance—General Requirements

FMCSA adds new paragraphs (q) to § 384.301.

## B. Guidance Statements and Interpretations

This IFR amends a regulation that has associated guidance statements. Such guidance statements do not have the force and effect of law, are strictly advisory, and are not meant to bind the public in any way. Conformity with guidance statements is voluntary. Guidance is intended only to provide information to the public regarding existing requirements under the law or FMCSA policies. A guidance statement does not alter the substance of a regulation.

FMCSA rescinds the following guidance:

1. FMCSA–CDL–383.23–FAQ001(2023–05–08):[27]

This guidance document, which refers to individuals present under the DACA immigration policy as a citizen of Mexico, is rescinded. It is no longer applicable under the new requirements to provide evidence of legal status.

2. FMCSA–CDL–383.23–Q1[28]

This guidance document, which refers to foreign drivers with employment authorization documents, is rescinded. Foreign drivers must meet the new requirements in this rule to obtain non-domiciled CLPs and CDLs and the rest

of the guidance is unnecessary as it is simply a restatement of what is already explained in footnote 1 to § 383.23.

Nomenclature for Non-Domiciled CLPs and CDLs

In addition, some SDLAs were operating under informal guidance previously issued by FMCSA that permitted States to refer to their non-domiciled credentials under different nomenclature. FMCSA notes that during the 2025 APRs, SDLA use of these disparate terms generated confusion for some SDLAs because it made it difficult to determine whether the State did in fact issue non-domiciled credentials in the first place. This IFR supersedes any past guidance on this issue and clarifies that §§ 383.73(f)(2)(ii) and 383.153(c) require that the word "non-domiciled" appear across a CLP or CDL and must "be conspicuously and unmistakably displayed" on the face of the CLP or CDL when a State issues a non-domiciled CLP or CDL. States may not use other nomenclature (such as "limited term" or "temporary") as a substitute for "non-domiciled," use restriction codes that require the examination of fine print on the back of the license as a substitute for "non-domiciled" on the face of the credential, or use any other alternatives to conspicuously and unmistakably displaying "non-domiciled" on the face of the CDL or CLP.

## IX. Regulatory Analyses

### A. E.O. 12866 (Regulatory Planning and Review), E.O. 13563 (Improving Regulation and Regulatory Review), and DOT Regulatory Policies and Procedures

OMB has determined that this rulemaking is a significant regulatory action under E.O. 12866 (58 FR 51735, Oct. 4, 1993), Regulatory Planning and Review, as supplemented by E.O. 13563 (76 FR 3821, Jan. 21, 2011), Improving Regulation and Regulatory Review, because of the substantial Congressional and public interest concerning issuance of non-domiciled CLPs and CDLs. The rulemaking is also significant under DOT Regulatory Policies and Procedures.

This IFR amends the Federal regulations for SDLAs issuing commercial driving credentials to foreign-domiciled individuals. Through this rulemaking, FMCSA restores the integrity of the CDL issuance processes by significantly limiting the authority for SDLAs to issue and renew non-domiciled CLPs and CDLs to individuals domiciled in a foreign jurisdiction.

The analysis below discusses the affected entities, the need for the regulation, and the costs, benefits, and transfers that may result from this IFR.

Analysis Inputs

Wage Rates

FMCSA computes its estimates of labor costs using data gathered from several sources. Labor costs are comprised of wages, fringe benefits, and overhead. Fringe benefits include paid leave, bonuses and overtime pay, health and other types of insurance, retirement plans, and legally required benefits (Social Security, Medicare, unemployment insurance, and workers compensation insurance). Overhead includes any expenses to a firm associated with labor that are not part of employees' compensation; this typically includes many types of fixed costs of managing a body of employees, such as management and human resource staff salaries or payroll services. The economic costs of labor to a firm should include the costs of all forms of compensation and labor related expenses.

FMCSA used the driver wage rate to represent the value of the drivers' time that, in the absence of the rule, would have been spent being gainfully employed and performing duties as a CMV driver. The source for driver wages is the median hourly wage data (May 2024) from DOL, Bureau of Labor Statistics (BLS), Occupational Employment Statistics (OES).[29] The CMV driver wage is a weighted average of three occupational codes that require a CDL: 53–3032 Heavy and Tractor-Trailer Truck Drivers, 53–3051 Bus Drivers, School, and 53–3052, Bus Drivers, Transit and Intercity. BLS does not publish data on fringe benefits for specific occupations, but it does for the broad industry groups in its Employer Costs for Employee Compensation release. To calculate the fringe benefits rate, this analysis uses an average hourly wage of $32.71 and average hourly benefits of $14.99 for private industry workers in "transportation and warehousing"[30] to estimate that fringe benefits are equal to 45.83 percent ($14.99 ÷ $32.71) of wages.[31]

---

[27] Available at *https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-state-drivers-licensing-agency-sdla-issue-non-domiciled*.

[28] Available at *https://www.fmcsa.dot.gov/registration/commercial-drivers-license/may-foreign-driver-employment-authorization-document-obtain*.

[29] DOL, BLS. *Occupational Employment Statistics (OES). National. May 2024.* Available at: *https://www.bls.gov/oes/tables.htm* (accessed Aug. 27, 2025).

[30] DOL, BLS. *Table 4: Employer Costs for Employee Compensation for private industry workers by occupational and industry group, December 2024.* Available at: *https://www.bls.gov/news.release/archives/ecec_03142025.htm* (accessed Sept. 9, 2025).

[31] FMCSA's standard approach to accounting for the opportunity cost of drivers' time considers
Continued

FMCSA used the wage rate for employees in office and administrative support to represent the value of the SDLA employees' time that, in the absence of the rule, would have been spent performing other duties and responsibilities. The source for SDLA employees' wages is the median hourly wage data (May 2024) from the BLS' OES. To calculate the fringe benefits rate, this analysis uses an average hourly wage of $25.56 and average hourly benefits of $18.95 for State and local government workers in "office and administrative support" to estimate that fringe benefits are equal to 74.14 percent ($18.95 ÷ $25.56) of wages. FMCSA uses the Census Bureau's Service Annual Survey (SAS) Table 5 to calculate overhead expenses and their ratio to gross annual payroll expenses for the North American Industry Classification System (NAICS) 484 (Truck Transportation) and NAICS 485 (Transit and Ground Passenger) industries.[32]

FMCSA reviewed SAS data from 2013 through 2021, finding 2015 to be the most appropriate baseline from which to estimate industry overhead rates. While it is typically preferable to use the most recent information, data from 2020 was an anomalous year with especially high overhead rates, likely due to the coronavirus disease 2019 pandemic and subsequent business disruptions. For the 2018 and 2019 SAS tables, Census greatly reduced the number of expenses published in Table 5. Based on the assigned expense categories as overhead, FMCSA followed two steps to calculate the overhead rate. First, FMCSA added together the seven overhead expense categories (expensed purchases of software; data processing and other purchased computer services; purchased repairs and maintenance to buildings, structures, and offices; lease and rental payments for land, buildings, structures, store spaces, and offices; purchased advertising and promotional

services; purchased professional and technical services; and cost of insurance). FMCSA then divided the sum of the overhead expense categories by gross annual payroll. Following this approach including only the seven expense categories most focused on firm fixed expenses, the 2015 overhead expenses in truck transportation would be $13.0 billion.[33] Dividing the $13.0 billion overhead by $62 billion gross annual payroll gives a 21 percent overhead rate for NAICS 484. The 2015 overhead expenses in passenger and ground transportation would be $3.1 billion. Dividing the $3.1 billion overhead by the $13 million gross annual payroll gives a 23 percent overhead rate for NAICS 485. FMCSA then combined the expense and payroll categories for both industries to calculate an average transportation industry overhead rate of 21 percent for use in this analysis.

**TABLE 1—HOURLY MEDIAN WAGE RATE, FRINGE BENEFITS, AND OVERHEAD RATES**

| BLS occupation code | Occupation | Hourly median wage | Fringe benefits rate (%) | Overhead rate (%) | Median hourly base wage + fringe benefits | Median hourly base wage + fringe benefits + overhead |
|---|---|---|---|---|---|---|
| 53–3032; 53–3051; 53–3052. | CDL Driver Composite ................. | NA | 45.83 | NA | $39.19 | NA |
| 43–1011 ...................... | First-Line Supervisors of Office and Administrative Support Workers. | $31.80 | 74.14 | 21 | 55.38 | $62.05 |

### Average SDLA Fee for License Renewal

FMCSA reviewed fees for CDL renewal across all 51 (50 States and the District of Columbia) jurisdictions and found that renewal fees range from $5 to $164.50. The average renewal fee is $55.28, and FMCSA uses an estimate of $55 to represent the renewal fee paid by non-domiciled CDL applicants.

### Crash Costs

FMCSA uses crash cost values to assess and estimate the safety benefits of various regulatory initiatives. FMCSA publishes its methodology for calculating crash costs for fatal, injury, and non-injury crashes on its website.[34] The values below incorporate the most

recent crash data from the National Highway Traffic Safety Administration, from calendar year 2023, inflated to 2024 values based on the Consumer Price Index for All Urban Consumers.

**TABLE 2—CMV CRASH COST, BY CRASH TYPE**

[In 2024 dollars]

| Crash type | CMV crash costs |
|---|---|
| Cost per non injury crash ..... | $52,864 |
| Cost per injury crash ............ | 400,025 |
| Cost per fatal crash .............. | 15,739,682 |

### Affected Entities

#### SDLAs

This IFR will impact the SDLAs in 46 States that currently issue non-domiciled CDLs (AL, MS, NH, TN, and WV do not issue non-domiciled CDLs).

#### Drivers

This final rule will impact current and prospective non-domiciled CDL holders. Drivers will be required to provide additional documentation, and in some cases will no longer be eligible for a non-domiciled CDL. FMCSA gathered information on current CLP and CDL holders during the APRs discussed earlier in the preamble, and estimates that there are approximately

---

hourly base wage plus fringe benefits, but exclusive of overhead, representing the value to the driver of his or her forgone best alternative (i.e., in the absence of this rule it is assumed these individuals would be working during that time and as such, the analysis values that time at the same amount that they accept in exchange for it, that is, their base wage plus fringe benefits). Including an overhead rate as a component element of the driver wage rate, over and above the base wage and fringe benefits, for the purposes of evaluating the opportunity cost to drivers does not accurately reflect the value as

incident upon the driver (because the value of the overhead component of wage rates is not incident upon, nor received as compensation by, the driver, as are base wages and fringe benefits).

[32] See SAS Table 5. Available at: *https://www.census.gov/programs-surveys/sas/data/tables.html* (accessed: Sept. 10, 2025).

[33] The seven expense categories included in this overhead estimate are: "Expensed purchases of software" ($321 million), "Data processing and other purchased computer services" ($320 million), "Purchased repairs and maintenance to buildings,

structures, and offices" ($541 million), "Lease and rental payments for land, buildings, structures, store spaces, and offices" ($3,067 million), "Purchased advertising and promotional services" ($507 million), "Purchased professional and technical services" ($1,782 million), and "Cost of insurance" ($6,535 million).

[34] Available at *https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2024-12/FMC-PRE-240812-001-Federal%20Motor%20Carrier%20Safety%20Administraction%20Crash%20Cost%20Methdology%20Report-2024_0.pdf.*

200,000 non-domiciled CDL holders, and approximately 20,000 non-domiciled CLP holders. Upon renewal, some number of these individuals will no longer be eligible for a non-domiciled CDL and will have their credential downgraded. In an effort to determine the number of drivers that will still be eligible for non-domiciled CDLs, FMCSA spoke with other Government agencies and reviewed data from SDLAs and other on-line resources. Approximately 500 to 600 individuals receive a H–2B status with the intent to operate a CMV each year. This nonimmigrant classification can be granted for up to the period of time authorized on the temporary labor certification and may be extended for qualifying employment in increments of up to one year.[35] FMCSA thus assumes that 500 to 600 individuals will seek a non-domiciled CDL, including renewals or extensions, each year. FMCSA does not have clear estimates of the number of H–2A workers that intend to operate a CMV because it is often incidental to the work they are doing. The Office of Homeland Security Statistics yearbook estimates that approximately 27,240 H–2A visas were issued to individuals from countries other than Canada and Mexico in 2023.[36] This represents an upper bound in that it is highly unlikely that all of these individuals would seek a CDL. The Bureau of Labor Statistics (BLS) reports employment based on industry and occupational code. In 2024, BLS estimates that there were approximately 15,000 heavy and tractor-trailer truck drivers in the agricultural industry.[37] Many of these drivers are U.S. citizens and would not seek a non-domiciled CDL. FMCSA makes the simplifying assumption that ⅓ of these individuals hold H–2A status, are not domiciled in either Canada or Mexico, and will be applying for non-domiciled CDLs each year. Including the individuals in the remaining nonimmigrant categories (E–2) FMCSA estimates that SDLAs will issue approximately 6,000 non-domiciled CDLs per year. The remaining roughly 194,000 current non-domiciled CDL holders will exit the freight market, which is discussed in more detail in the cost section.

## Motor Carriers

This IFR will impact motor carriers that currently, or intend to, employ non-

domiciled CDL holders that are no longer eligible to receive a credential. Motor carriers that currently employ non-domiciled CDL holders will have some time to adjust to the change as the drivers will be aware if their license will not be renewed under the standards set forth in this IFR. By providing this time for adjustment, FMCSA anticipates that impacts to motor carriers will be mitigated.

## Need for the Regulation

As discussed at length in the preamble, the confluence of recent events creates an imminent concern that the current regulatory framework does not provide a sufficient margin of safety to protect the traveling public. The fatal crashes identified above demonstrate that the regulations fail even when properly followed, while the systemic issuance errors confirm the current regulatory framework has allowed for frequent points of failure—enabling ineligible persons to obtain non-domiciled CLPs and CDLs. This combination constitutes an imminent hazard that warrants immediate action to protect the traveling public.

## Costs

This IFR will require States and their SDLAs to verify additional documentation, utilize SAVE, and retain copies of the verified documents in their records. FMCSA anticipates that States will issue fewer non-domiciled CDLs, but that each credential will require additional time to verify and retain documents. Currently, States are not required to pay transactions fees to query SAVE and FMCSA does not estimate a fee impact for that transaction. Lastly, States that choose to issue non-domiciled CDLs and CLPs will be required to pause issuance of those CDLs and CLPs until they can ensure compliance with the updated regulations. FMCSA anticipates that States will incur costs in the process of realigning their non-domiciled CDL program issuance with the standards set forth in this IFR.

FMCSA estimates that verifying and retaining additional documentation and running a SAVE query will require approximately 15 minutes of time per query for SDLA personnel. FMCSA estimates that the total cost, across all impacted SDLAs, will total approximately $93,075 per year (6,000 applicants × $62.05 wage rate × 15 minutes).

SDLAs that choose to issue non-domiciled CDLs will be required to pause issuance of the credential until their program is aligned to the standards set forth in this IFR. Each SDLA has

developed a process that is unique to their State, and as such, will incur different costs to adjust their program. Some program adjustments could include reprograming the IT system to interpret SAVE results in alignment with the new standards, changing the credential that is issued to ensure that "non-domiciled" is conspicuously and unmistakably displayed on the face of the CLP or CDL, and ensuring that SDLA employees are properly issuing non-domiciled CDLs and retaining appropriate records. FMCSA is unable to estimate a specific cost for each SDLA due to the variance in current non-domiciled CDL issuance (e.g., many SDLA systems already issue credentials with "non-domiciled" displayed on the face of the credential and some SDLAs were already retaining appropriate records to document the issuance process). FMCSA has previously estimated costs of approximately $70,000 (in 2024 dollars) to develop an interface between the Drug and Alcohol Clearinghouse and the SDLA IT system.[38] This would likely overestimate the cost of reprogramming State IT systems to interpret SAVE results because SDLAs are already interfacing with SAVE for purposes of REAL ID and this change will represent an adjustment to the existing interface. It is, however, a reasonable estimate of the average impact for States to align their non-domiciled CDL program with the standards set forth in this rule (inclusive of IT system upgrades, credential updates, and ensuring staff are properly issuing credentials). FMCSA estimates that each of the 46 effected SDLAs will incur costs of $70,000 in the first year of the analysis, resulting in total first year costs for program realignment of $3.2 million (46 SDLAs × $70,000 = $3,220,000).

This IFR will also result in costs to non-domiciled CDL drivers as they will now be required to renew their license in person every year, which increases the amount of time needed to renew the license. Previously, some drivers were likely able to renew online or via mail and had expiry dates beyond a one-year timeframe. FMCSA assumes that non-domiciled CDL holders previously had a two-year expiry date and spent approximately one hour (or 30 minutes a year) renewing their license. FMCSA estimates they will now spend four hours, or 3.5 additional hours renewing their license each year. FMCSA estimates the annual in person visit will take an additional 3.5 hours of a driver's time, resulting in total annual costs of

---

[35] See https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers.

[36] Available at https://ohss.dhs.gov/topics/immigration/yearbook/2023/table25.

[37] Available at https://data.bls.gov/projections/nationalbMatrix?queryb Params=111000&ioType=i.

[38] (86 FR 55718).

$822,990 (6,000 applicants × $39.19 × 3.5 hours).

FMCSA anticipates that drivers who will no longer be eligible for a non-domiciled CDL will be able to find similar employment in other sectors (*e.g.,* construction, driving vehicles that don't require a CDL, etc.). They will experience some de minimis costs as they move from one industry to another when their current credential expires.

Regarding potential economic impacts within the freight market, FMCSA looked at data during and after the COVID–19 pandemic to understand how the market could react to a reduction in CDL holders and found that the freight market tends to be flexible and responsive to external factors. During the COVID–19 pandemic the industry saw a historic increase in spot market rates, followed by a record influx of motor carriers and drivers entering the market to meet the increased demand.[39] In 2021 there was a nearly 20 percent increase in the number of interstate motor carriers and a 6 percent increase in the number of interstate CDL

drivers.[40] Since that time, the rates have fallen, as have load volumes and the number of motor carriers. There are roughly 200,000 non-domiciled CDL holders, which is approximately five percent of the 3.8 million active interstate CDL holders in 2024. FMCSA anticipates that these drivers will exit the market within approximately two years as their credential comes up for renewal, and that the market will respond to this change in capacity as it has in the past, with rates adjusting and drivers and carriers entering the market where needed. Further, due to the prolonged two-year period of attrition, motor carriers will have time to adjust their hiring based on the requirements set forth in this IFR, including by marketing available positions to drivers with the proper qualifications to obtain a CDL. As such, FMCSA believes there will be a limited economic impact on the freight market and motor carriers.

Transfers

In addition, drivers who previously paid the renewal fee every two years

will now pay that fee annually. As discussed above, the average renewal fee is $55, and will now be paid annually instead of biannually, which results in an increase of $27.50 per year. FMCSA anticipates that drivers will incur additional fees of approximately $165,000 per year (6,000 drivers × $27.50). Fees are considered transfer payments, or monetary payments from one group to another that do not affect the total resources available to society, and therefore do not represent actual costs or benefits of the rule.

Total Costs and Transfers

As shown in the table below, FMCSA estimates that the total 10-year cost of the rulemaking (excluding transfers) is approximately $10.9 million discounted at three percent and $9.4 million discounted at seven percent. Total annualized impacts range from $1.6 million discounted at three percent to $1.3 million discounted at seven percent.

TABLE 3—TOTAL COSTS AND TRANSFERS
[In 2024 dollars]

| Analysis year | Total state cost | Total driver cost | Total transfers | Total cost (excluding transfers) | Total cost (discounted at 3 percent) | Total cost (discounted at 7 percent) |
|---|---|---|---|---|---|---|
| 1 | $3,313,075 | $822,990 | $165,000 | $4,136,065 | $4,015,597 | $3,865,481 |
| 2 | 93,075 | 822,990 | 165,000 | 916,065 | 863,479 | 800,127 |
| 3 | 93,075 | 822,990 | 165,000 | 916,065 | 838,329 | 747,782 |
| 4 | 93,075 | 822,990 | 165,000 | 916,065 | 813,912 | 698,862 |
| 5 | 93,075 | 822,990 | 165,000 | 916,065 | 790,206 | 653,142 |
| 6 | 93,075 | 822,990 | 165,000 | 916,065 | 767,190 | 610,413 |
| 7 | 93,075 | 822,990 | 165,000 | 916,065 | 744,845 | 570,479 |
| 8 | 93,075 | 822,990 | 165,000 | 916,065 | 723,150 | 533,158 |
| 9 | 93,075 | 822,990 | 165,000 | 916,065 | 702,088 | 498,279 |
| 10 | 93,075 | 822,990 | 165,000 | 916,065 | 681,638 | 465,681 |
| Total | 930,750 | 8,229,900 | 1,650,000 | 12,380,650 | 10,940,434 | 9,443,403 |
| Annualized | .................. | .................. | .................. | .................. | 1,557,672 | 1,344,528 |

Benefits

FMCSA anticipates that restoring the integrity of non-domiciled CDL license issuance will enhance the safety of CMV operations and is likely to result in improved safety outcomes, such as the reduced frequency and/or severity of crashes or reduced frequency of violations. There is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the

nation of domicile for a CDL driver and safety outcomes in the United States such as changes in frequency and/or severity of crashes or changes in frequency of violations. FMCSA conducted a literature review and found a few articles focused on the safety performance impacts of undocumented immigrants or illegal aliens, but has not obtained information on how many such drivers have sought to obtain a non-domiciled CDL in the United States.[41] [42]

Given insufficient evidence, a direct quantitative estimate of the potential safety benefits resulting from this IFR cannot be developed.

Break-Even Analysis

When it is not possible to quantify and monetize the estimated benefits (or all costs) of a rule, OMB Circular A–4 suggests that agencies perform a threshold or break-even analysis.[43] In the context of this IFR, FMCSA estimated the number of fatal crashes that would need to be avoided as a

[39] Available at *https://www.bts.gov/freight-indicators#spot-rates.*

[40] Data available from MCMIS.

[41] Zhao, Ruinan, *The Impact of granting undocumented immigrants driver's licenses on fatal crashes,* Journal of Policy Analysis and Management (Sept. 1, 2025), available at: *https://*

onlinelibrary.wiley.com/doi/10.1002/pam.70053?msockid=00e07d21548e668d115f6b375508675a (accessed Sept. 17, 2025).

[42] Federation for Immigration Reform. Drivers' Licenses for Illegal Aliens: A bad policy that undermines our immigration laws, available at: *https://www.fairus.org/issue/illegal-immigration/*

drivers-licenses-illegal-aliens-policy-immigration (accessed Sept. 17, 2025).

[43] OMB, Circular A–4, *Regulatory Analysis* (Sept. 17, 2003), available at: *https://www.whitehouse.gov/wp-content/uploads/2025/08/CircularA-4.pdf* (accessed Sept. 10, 2025).

result of the rule for the benefits to exceed the estimated costs. Applying FMCSA's total annualized cost estimate of $1,344,528 (at a seven percent discount rate) and FMCSA's per-fatal crash cost estimate $15,739,682 (both in 2024 dollars), the interim final rule would have positive net benefits if it were to result in 0.085 fewer fatal crashes involving CMVs each year. Extrapolated to a full year, the break-even number of annual avoided crashes would be just 1.3 percent of the identified crashes. As is discussed in detail in the preamble above, FMCSA has identified five fatal crashes in just the first 8 months of 2025 in which the CMV driver responsible for the crash held a non-domiciled CDL that would not have been issued under this final rule. Therefore, FMCSA is confident that this rule would reduce the crash risk associated with such fatal crashes to at least that degree, and that the benefits would be even greater when accounting for non-fatal crashes that would also be avoided. As a result, FMCSA has determined that the benefits of the interim final rule are likely to exceed its costs, including costs discussed above that are unquantified, but are not expected to be large.

### B. E.O. 14192 (Unleashing Prosperity Through Deregulation)

E.O. 14192, Unleashing Prosperity Through Deregulation, issued on January 31, 2025 (90 FR 9065, Jan. 31, 2025), requires that, for every one new regulation issued by an Agency, at least 10 prior regulations be identified for elimination, and that the cost of planned regulations be prudently managed and controlled through a budgeting process. Final implementation guidance addressing the requirements of E.O. 14192 was issued by OMB on March 26, 2025. This rule does not meet the definition of "rule" or "regulation" as defined in section 5 of E.O. 14192, because it is issued with respect to an immigration-related function of the United States per section 5(a) of E.O. 14192.

### C. Congressional Review Act

This rule is not a *major rule* as defined under the Congressional Review Act (5 U.S.C. 801–808)." [44]

[44] A *major rule* means any rule that OMB finds has resulted in or is likely to result in (a) an annual effect on the economy of $100 million or more; (b) a major increase in costs or prices for consumers, individual industries, geographic regions, Federal, State, or local government agencies; or (c) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets (5 U.S.C. 804(2)).

### D. Advance Notice of Proposed Rulemaking

Under 49 U.S.C. 31136(g), FMCSA is required to publish an advance notice of proposed rulemaking (ANPRM) or proceed with a negotiated rulemaking if a safety rulemaking "under this part" [45] is likely to lead to the promulgation of a major rule. As this IFR is not likely to result in the promulgation of a major rule, FMCSA is not required to issue an ANPRM or to proceed with a negotiated rulemaking.

### E. Regulatory Flexibility Act (Small Entities)

The Regulatory Flexibility Act (RFA, 5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996,[46] requires Federal agencies to consider the effects of the regulatory action on small business and other small entities and to minimize any significant economic impact for any rule subject to notice-and-comment rulemaking under the APA unless the agency head certifies that the rule will not have a significant economic impact on a substantial number of small entities. As discussed above, FMCSA has determined that there is good cause to forego prior notice and comment and amend the FMCSR through this IFR. The Regulatory Flexibility Act, therefore, does not require FMCSA to conduct an RFA.

Nonetheless, FMCSA conducted a screening analysis on the impact of the IFR on small entities. This rule has the potential to impact States and drivers. Under the standards of the RFA, as amended, States are not small entities because they do not meet the definition of a *small entity* in section 601 of the RFA. Specifically, States are not small governmental jurisdictions under section 601(5) of the RFA, both because State government is not among the various levels of government listed in section 601(5), and because, even if this were the case, no State, including the District of Columbia, has a population of less than 50,000, which is the criterion to be a small governmental jurisdiction under section 601(5) of the RFA.

CDL holders are not considered small entities because they do not meet the definition of a small entity in Section 601 of the RFA. Specifically, drivers are considered neither a small business under Section 601(3) of the RFA, nor are they considered a small organization under Section 601(4) of the RFA.

[45] Part B of Subtitle VI of Title 49, United States Code, *i.e.*, 49 U.S.C. chapters 311–317.

[46] Public Law 104–121, 110 Stat. 857, (Mar. 29, 1996).

Therefore, this rule would not impact a substantial number of small entities.

This rule would require that States verify and retain additional documentation on non-domiciled CLP and CDL applicants and complete a check with SAVE. FMCSA estimates costs to all impacted States of approximately $93,000 per year. Further drivers would be required to renew their license annually, in-person at the SDLA at an estimated impact of approximately $988,000 per year, or less than $120 per driver per year. For these reasons, FMCSA certifies that this action will not have a significant economic impact on a substantial number of small entities.

### F. Assistance for Small Entities

In accordance with section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121, 110 Stat. 857), FMCSA wants to assist small entities in understanding this final rule so they can better evaluate its effects on themselves and participate in the rulemaking initiative. If the IFR will affect your small business, organization, or governmental jurisdiction and you have questions concerning its provisions or options for compliance, please consult the person listed under **FOR FURTHER INFORMATION CONTACT**.

Small businesses may send comments on the actions of Federal employees who enforce or otherwise determine compliance with Federal regulations to the Small Business Administration's Small Business and Agriculture Regulatory Enforcement Ombudsman (Office of the National Ombudsman, see *https://www.sba.gov/about-sba/oversight-advocacy/office-national-ombudsman*) and the Regional Small Business Regulatory Fairness Boards. The Ombudsman evaluates these actions annually and rates each agency's responsiveness to small business. If you wish to comment on actions by employees of FMCSA, call 1–888–REG–FAIR (1–888–734–3247). DOT has a policy regarding the rights of small entities to regulatory enforcement fairness and an explicit policy against retaliation for exercising these rights.

### G. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA, 2 U.S.C. 1531–1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. The Act addresses actions that may result in the expenditure by a State, local, or Tribal government, in the aggregate, or by the private sector of $206 million (which is the value equivalent of $100 million in 1995,

adjusted for inflation to 2024 levels) or more in any one year. Though this IFR would not result in such an expenditure, and the analytical requirements of UMRA do not apply as a result, FMCSA discusses the effects of this rule elsewhere in this preamble.

*H. Paperwork Reduction Act*

This IFR contains information collection requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520). As defined in 5 CFR 1320.3(c), *collection of information* comprises reporting, recordkeeping, monitoring, posting, labeling, and other similar actions. The title and description of the information collection, a description of those who must collect the information, and an estimate of the total annual burden follow. The estimate covers the time for reviewing instructions, searching existing sources of data, gathering and maintaining the data needed, and completing and reviewing the collection.

*Title:* Non-Domiciled Commercial Driver's License Records.

*OMB Control Number:* 2126–0087.

*Summary of the Information Collection:* This information collection request (ICR) covers the collection and retention of the documentation provided to a SDLA during the application process for a non-domiciled CLP or CDL.

*Need for Information:* The licensed drivers in the United States deserve reasonable assurances that their fellow motorists are properly qualified to drive the vehicles they operate. Under the Commercial Motor Vehicle Safety Act of 1986 (CMVSA, 49 U.S.C. 31301 *et seq.*), as amended, FMCSA established the CDL program and the performance standards with which State CDL programs must comply. The CDL regulations in 49 CFR part 383 prescribe uniform minimum standards for testing and ensuring the fitness of individuals who operating commercial motor vehicles (CMVs), and State compliance with the CDL program is addressed in Part 384. In particular, States that issue non-domiciled CDLs must do so in accordance with §§ 383.71, 383.73 and 384.212.

This collection is intended to ensure that States retain all documents involved in the licensing process for non-domiciled CLP and CDL holders for a period of no less than two years from the date of issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL. If States do not retain this

documentation, FMCSA is severely hindered in its efforts to ensure compliance with the regulatory requirements because States are unable to accurately determine the number of non-domiciled CLPs and CDLs they have issued, or to prove to FMCSA officials that such CLPs and CDLs were properly issued.

*Proposed Use of Information:* State officials use the information collected from non-domiciled CDL applicants to determine whether an individual is eligible to receive a non-domiciled CDL and to prevent unqualified, and/or disqualified CLP and CDL holders and applicants from operating CMVs on the Nation's highways. During State CDL compliance reviews, FMCSA officials review this information to ensure that the provisions of the regulations are being carried out. Without the aforementioned requirements, there would be no uniform control over driver licensing practices to prevent uncertified and/or disqualified foreign drivers from being issued a non-domiciled CLP or CDL. Failure to collect this information would render the regulations unenforceable.

*Description of the Respondents:* SDLAs issuing non-domiciled CDLs.

*Number of Respondents:* 51.

*Frequency of Response:* Ongoing.

*Burden of Response:* 6,000 responses. The associated cost burden is $93,075.

*Estimate of Total Annual Burden:* 1,500 hours.

In accordance with 44 U.S.C. 3507(d), FMCSA will submit the proposed information collection amendments to OIRA at OMB for approval.

FMCSA requests comment on any aspect of this information collection, including: (1) Whether the proposed collection is necessary for FMCSA to perform its functions; (2) the accuracy of the estimated burden; (3) ways for FMCSA to enhance the quality, usefulness, and clarity of the collected information; and (4) ways that the burden could be minimized without reducing the quality of the collected information.

*I. E.O. 13132 (Federalism)*

FMCSA has analyzed this rule in accordance with the principles and criteria of E.O. 13132, Federalism, and has determined that it does not have federalism implications. E.O. 13132 applies to "policies that have federalism implications," defined as regulations and other actions that have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various

levels of government" (Sec. 1(a)). The key concept here is "substantial direct effects on the States." Section 3(b) of the E.O. provides that "[n]ational action limiting the policymaking discretion of the States shall be taken only where there is constitutional and statutory authority for the action and the national activity is appropriate in light of the presence of a problem of national significance."

The rule amends a single aspect of the CDL program authorized by the CMVSA (49 U.S.C. chapter 313). States have been required to issue all CDLs in accordance with Federal standards for decades and have been required to issue all CLPs in accordance with Federal standards since 2011. Moreover, the CDL program does not have preemptive effect; it is voluntary, and States may withdraw at any time, though doing so will result in the loss of certain Federal-aid highway funds pursuant to 49 U.S.C. 31314. Because this IFR makes only a modest change to requirements already imposed on participating States, FMCSA has determined that it does not have substantial direct effects on the States, on the relationship between the Federal and State governments, or on the distribution of power and responsibilities among the various levels of government.

Nonetheless, FMCSA recognizes that this rule has an impact on the States and their commercial driver licensing operations. Most notably, it requires all States that issue non-domiciled CLPs and CDLs to amend their existing procedures. The Agency continually works with the States to identify CDL program deficiencies that need to be addressed, and it was mostly through these reviews that systemic deficiencies with the non-domiciled CLP and CDL issuance process were identified. Therefore, States that issue non-domiciled CLPs and CDLs are generally already on notice that this aspect of the CDL program is under scrutiny and that procedural changes may be necessary.

Section 6(b) of E.O. 13132 provides in part that "[t]o the extent practicable and permitted by law, no agency shall promulgate any regulation that has federalism implications, that imposes substantial direct compliance costs on State and local governments, and that is not required by statute, unless . . . the agency, prior to the formal promulgation of the regulation, (A) consulted with State and local officials early in the process of developing the proposed regulation." As described in Section IX.A of the Regulatory Analysis, above, the total cost to States of complying with these new regulations is not expected to be substantial, so the

Agency has determined that consultation is not required. Furthermore, because this is an IFR, there is no "proposed regulation." The expedited process necessitated by the immediate need to address the issues discovered in the recent APRs means it is not practicable to consult with the States prior to promulgation of this rulemaking. However, FMCSA values input from States and will ensure States have the opportunity to provide input after the publication of the IFR. FMCSA will determine whether any revisions to the rule are warranted as a result of information the Agency receives.

*J. Privacy*

The Consolidated Appropriations Act, 2005,[47] requires agencies to assess the privacy impact of a regulation that will affect the privacy of individuals. This rule would not require the collection of personally identifiable information (PII). The supporting Privacy Impact Analysis (PIA), available for review in the docket, gives a full and complete explanation of FMCSA practices for protecting PII in general and specifically in relation to this final rule.

The Privacy Act (5 U.S.C. 552a) applies only to Federal agencies and any non-Federal agency that receives records contained in a system of records from a Federal agency for use in a matching program.

The E-Government Act of 2002,[48] requires Federal agencies to conduct a PIA for new or substantially changed technology that collects, maintains, or disseminates information in an identifiable form. No new or substantially changed technology will collect, maintain, or disseminate information as a result of this rule. Accordingly, FMCSA has not conducted a PIA.

FMCSA will complete a Privacy Threshold Assessment (PTA) to evaluate the risks and effects the proposed rulemaking might have on collecting, storing, and sharing personally identifiable information. The PTA will be submitted to FMCSA's Privacy Officer for review and preliminary adjudication and to DOT's Privacy Officer for review and final adjudication.

*K. E.O. 13175 (Indian Tribal Governments)*

This rule does not have Tribal implications under E.O. 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*L. National Environmental Policy Act of 1969*

FMCSA analyzed this IFR pursuant to the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 *et seq.*). FMCSA believes this IFR will not have a reasonably foreseeable significant effect on the quality of the human environment. This action falls under a published categorical exclusion and is thus excluded from further analysis and documentation in an environmental assessment or environmental impact statement under DOT Order 5610.1D,[49] Subpart B, Subsection e, paragraph (6)(s)(7), and (6)(t)(2), which cover regulations pertaining to requirements for State-issued commercial license documentation and having the appropriate laws, regulations, programs, policies, procedures and information systems concerning the qualification and licensing of persons who apply for a CDL, and persons who are issued a CDL.

List of Subjects

*49 CFR Part 383*

Administrative practice and procedure, Alcohol abuse, Drug abuse, Highway safety, Motor carriers.

*49 CFR Part 384*

Administrative practice and procedure, Alcohol abuse, Drug abuse, Highway safety, Motor carriers.

Accordingly, FMCSA amends 49 CFR parts 383 and 384 as follows:

## PART 383—COMMERCIAL DRIVER'S LICENSE STANDARDS; REQUIREMENTS AND PENALTIES

■ 1. The authority citation for part 383 continues to read as follows:

**Authority:** 49 U.S.C. 521, 31136, 31301 *et seq.,* and 31502; secs. 214 and 215 of Pub. L. 106–159, 113 Stat. 1748, 1766, 1767; sec. 1012(b) of Pub. L. 107–56, 115 Stat. 272, 297, sec. 4140 of Pub. L. 109–59, 119 Stat. 1144, 1746; sec. 32934 of Pub. L. 112–141, 126 Stat. 405, 830; sec. 23019 of Pub. L. 117–58, 135 Stat. 429, 777; and 49 CFR 1.87.

■ 2. Amend § 383.5 by adding, in alphabetical order, the definition for "Evidence of lawful immigration status" to read as follows:

### § 383.5 Definitions.
\* \* \* \* \*

*Evidence of lawful immigration status* for purposes of subpart B of this part, means:

(1) For applicants domiciled in a foreign jurisdiction (except Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, or the Commonwealth of the Northern Mariana Islands):

(i) An unexpired foreign passport; and

(ii) An unexpired Form I–94/94A issued by the U.S. Department of Homeland Security indicating one of the following classifications: H–2A— Temporary Agricultural Workers, H– 2B—Temporary Non-Agricultural Workers, or E–2—Treaty Investors.

(2) For applicants domiciled in Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, or the Commonwealth of the Northern Mariana Islands: any of the documents specified in Table 1 of section 383.71.

\* \* \* \* \*

■ 3. Amend § 383.71 by revising paragraph (f) to read as follows:

### § 383.71 Driver application and certification procedures.
\* \* \* \* \*

(f) *Non-domiciled CLP and CDL.* (1) A person must obtain a Non-domiciled CLP or CDL:

(i) If the applicant is domiciled in a *foreign* jurisdiction, as defined in § 383.5, and the Administrator has not determined that the commercial motor vehicle operator testing and licensing standards of that jurisdiction meet the standards contained in subparts G and H of this part, provided the applicant provides the evidence of lawful immigration status required under paragraph (f)(3)(i)(B) of this section.

(ii) If the applicant is domiciled in a State that is prohibited from issuing CLPs and CDLs in accordance with § 384.405 of this subchapter. That person is eligible to obtain a non-domiciled CLP or CDL from any State that elects to issue a non-domiciled CLP or CDL and that complies with the testing and licensing standards contained in subparts F, G, and H of this part.

(2) An applicant for a non-domiciled CLP and CDL must do both of the following:

(i) Complete the requirements to obtain a CLP contained in paragraph (a) of this section or a CDL contained in paragraph (b) of this section, except as provided in paragraph (f)(3) of this section.

[47] Public Law 108–447, 118 Stat. 2809, 3268, note following 5 U.S.C. 552a (Dec. 4, 2014).

[48] Public Law 107–347, sec. 208, 116 Stat. 2899, 2921 (Dec. 17, 2002).

[49] Available at *https://www.transportation.gov/mission/dots-procedures-considering-environmental-impacts.*

(ii) After receipt of the non-domiciled CLP or CDL, and for as long as it is valid, notify the State which issued the non-domiciled CLP or CDL of any adverse action taken by any jurisdiction or governmental agency, foreign or domestic, against his/her driving privileges. Such adverse actions include, but are not limited to, license disqualification or disqualification from operating a commercial motor vehicle for the convictions described in § 383.51. Notifications must be made within the time periods specified in § 383.33.

(3) Eligibility for applicants domiciled in a foreign jurisdiction:

(i) To be eligible for a Non-domiciled CLP or CDL, an applicant domiciled in a foreign jurisdiction must:

(A) Have lawful immigration status in the United States, and

(B) Provide *evidence of lawful immigration status,* as defined in § 383.5.

(ii) No proof of domicile is required.

(iii) An applicant for a non-domiciled CLP or CDL is not required to surrender his/her foreign license.

\* \* \* \* \*

■ 4. Amend § 383.73 by:

■ a. Revising paragraph (a)(6);

■ b. Revising paragraph (b)(6);

■ c. Revising paragraph (c)(7);

■ d. Revising paragraph (d)(7);

■ e. Revising paragraph (e)(5);

■ f. Revising the introductory text of paragraph (f)(2);

■ g. Adding paragraph (f)(2)(iv);

■ h. Revising paragraph (f)(3);

■ i. Adding paragraphs (f)(5) and (6); and

■ j. Revising paragraph (m).

The revisions and additions read as follows:

### § 383.73  State procedures.

(a) \* \* \*

(6) Require compliance with the standards for providing proof of citizenship or lawful permanent residency specified in § 383.71(a)(5) and proof of State of domicile specified in § 383.71(a)(6) for applicants domiciled in a State; and for applicants domiciled in a foreign jurisdiction, evidence of lawful immigration status as required by § 383.71(f)(3)(i)(B). Exception: A State is required to check the proof of citizenship or immigration status specified in this paragraph only for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP (for applicants domiciled in a State) and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL (for applicants domiciled in a State) for the first time after July 8, 2011, provided

a notation is made on the driver's record confirming that the proof of citizenship or immigration status check required by this paragraph has been made and noting the date it was done. This exception does not apply to applicants domiciled in a foreign jurisdiction.

\* \* \* \* \*

(b) \* \* \*

(6) Require compliance with the standards for providing proof of citizenship or lawful permanent residency specified in § 383.71(b)(9) and proof of State of domicile specified in § 383.71(b)(10) for applicants domiciled in a State; and for applicants domiciled in a foreign jurisdiction, evidence of lawful immigration status as required by § 383.71(f)(3)(i)(B). Exception: A State is required to check the proof of citizenship or immigration status specified in this paragraph only for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP (for applicants domiciled in a State) and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL (for applicants domiciled in a State) for the first time after July 8, 2011, provided a notation is made on the driver's record confirming that the proof of citizenship or immigration status check required by this paragraph has been made and noting the date it was done. This exception does not apply to applicants domiciled in a foreign jurisdiction.

\* \* \* \* \*

(c) \* \* \*

(7) Require compliance with the standards for providing proof of citizenship or lawful permanent residency specified in § 383.71(b)(9) and proof of State of domicile specified in § 383.71(b)(10) for applicants domiciled in a State; and for applicants domiciled in a foreign jurisdiction, evidence of lawful immigration status as required by § 383.71(f)(3)(i)(B). Exception: A State is required to check the proof of citizenship or immigration status specified in this paragraph only for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP (for applicants domiciled in a State) and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL (for applicants domiciled in a State) for the first time after July 8, 2011, provided a notation is made on the driver's record confirming that the proof of citizenship or immigration status check required by this paragraph has been made and noting the date it was done. This exception does not apply to applicants domiciled in a foreign jurisdiction.

\* \* \* \* \*

(d) \* \* \*

(7) Require compliance with the standards for providing proof of citizenship or lawful permanent residency specified in § 383.71(b)(9) and proof of State of domicile specified in § 383.71(b)(10) for applicants domiciled in a State; and for applicants domiciled in a foreign jurisdiction, evidence of lawful immigration status as required by § 383.71(f)(3)(i)(B). Exception: A State is required to check the proof of citizenship or immigration status specified in this paragraph only for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP (for applicants domiciled in a State) and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL (for applicants domiciled in a State) for the first time after July 8, 2011, provided a notation is made on the driver's record confirming that the proof of citizenship or immigration status check required by this paragraph has been made and noting the date it was done. This exception does not apply to applicants domiciled in a foreign jurisdiction.

\* \* \* \* \*

(e) \* \* \*

(5) Require compliance with the standards for providing proof of citizenship or lawful permanent residency specified in § 383.71(b)(9) and proof of State of domicile specified in § 383.71(b)(10) for applicants domiciled in a State; and for applicants domiciled in a foreign jurisdiction, evidence of lawful immigration status as required by § 383.71(f)(3)(i)(B). Exception: A State is required to check the proof of citizenship or immigration status specified in this paragraph only for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP (for applicants domiciled in a State) and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL (for applicants domiciled in a State) for the first time after July 8, 2011, provided a notation is made on the driver's record confirming that the proof of citizenship or immigration status check required by this paragraph has been made and noting the date it was done. This exception does not apply to applicants domiciled in a foreign jurisdiction.

\* \* \* \* \*

(f) \* \* \*

(2) State procedures for the issuance of a non-domiciled CLP and CDL, for any modifications thereto, and for notifications to the Commercial Driver's License Information System must at a minimum be identical to those pertaining to any other CLP or CDL, except as set forth in paragraphs (f)(2)(i) through (iv) and (f)(3) of this section.

\* \* \* \* \*

(iv) For applicants domiciled in a foreign jurisdiction, the State must ensure that the period of validity of the non-domiciled CLP or CDL does not exceed the Admit Until Date or expiration date on the applicant's I–94/A or 1 year, whichever is sooner.

(3) Documentation of lawful immigration status. (i) Applicants domiciled in a State. The State must require compliance with the standards for providing evidence of lawful immigration status specified in § 383.71(b)(9) of this part.

(ii) Applicants domiciled in a foreign jurisdiction.

(A) Beginning September 29, 2025, the State must not issue (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transfer, renew, or upgrade a non-domiciled CLP or CDL unless, at the time of the transaction, the applicant provides *evidence of lawful immigration status* as defined under § 383.5. Applicants for a non-domiciled CLP or CDL who do not provide evidence of lawful immigration status as required under § 383.71(f)(3)(i)(B) are not eligible for a non-domiciled CLP or CDL.

(B) States must comply with the document verification requirements for applicants domiciled in a foreign jurisdiction set forth in § 383.73(m)(2) before issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL.

(C) States are prohibited from granting non-domiciled CLP or CDL privileges on a temporary or interim basis pending review and validation of an applicant's evidence of lawful immigration status.

* * * * *

(5) Downgrade. If after issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL, the State receives information from FMCSA, the Department of Homeland Security, the Department of State, or other Federal agency with jurisdiction that the applicant no longer has lawful immigration status in the United States in a category specified in paragraph (1)(iii) of the definition of *evidence of lawful immigration status* in § 383.5 of this part, the State must initiate established State procedures for downgrading the non-domiciled CLP or CDL. The downgrade must be completed and recorded on the CDLIS driver record within 30 days of the

State's receipt of such information. As used in this paragraph, the term "downgrade" means the State's removal of the CLP or CDL privilege from the driver's license, as set forth in paragraph (4) the definition of *CDL downgrade* in § 383.5.

(6) Non-domiciled CDL renewal. States must require non-domiciled CLP or CDL renewal be conducted in-person only and must not permit renewal by mail or electronic means.

* * * * *

(m) *Document verification.* Except as provided in paragraphs (m)(1) and (2) of this section, the State must require at least two persons within the driver licensing agency to participate substantively in the processing and verification of the documents involved in the licensing process for initial issuance, renewal or upgrade of a CLP or non-domiciled CLP and for initial issuance, renewal, upgrade or transfer of a CDL or non-domiciled CDL. The documents being processed and verified must include, at a minimum, those provided by the applicant to prove lawful immigration status and (if applicable) domicile, the information filled out on the application form, and knowledge and skills test scores. This section does not require two people to process or verify each document involved in the licensing process.

(1) Exception for applicants domiciled in a State. For offices with only one staff member, at least some of the documents must be processed or verified by a supervisor before issuance or, when a supervisor is not available, copies must be made of some of the documents involved in the licensing process and a supervisor must verify them within one business day of issuance of the CLP, non-domiciled CLP, CDL, or non-domiciled CDL.

(2) Document Verification for applicants domiciled in a foreign jurisdiction. States must verify evidence of lawful immigration status for applicants domiciled in a foreign jurisdiction before initial issuance and before any subsequent issuance (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transfer, renewal, or upgrade of a non-domiciled CLP or CDL.

(i) For offices with only one staff member, all documents must be processed or verified by a supervisor before issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL.

(ii) In reviewing the evidence of lawful immigration status an applicant domiciled in a foreign jurisdiction (except an applicant domiciled in Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa or the Commonwealth of the Northern Mariana Islands), the State must query the Systematic Alien Verification for Entitlements (SAVE) system (administered by U.S. Citizenship and Immigration Services). If the SAVE final response, including additional verification if needed, does not confirm the applicant's claim to be in lawful immigration status in a category specified in paragraph (1)(ii) of the definition of *evidence of lawful immigration status* in § 383.5 of this part, the State must not issue (which includes amend, correct, reprint, or otherwise duplicate a previously issued CLP or CDL), transfer, renew, or upgrade a non-domiciled CLP or CDL, and must initiate downgrade procedures in accordance with paragraph (f)(5) of this section if the applicant holds an unexpired non-domiciled CLP or CDL.

(iii) The State must retain copies of all documents involved in the licensing process, including documents provided by the applicant to prove lawful immigration status and documents showing the results of any SAVE query to verify an applicant's lawful immigration status, and a supervisor must verify them within one business day of issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL. The State must retain the documents for no less than 2 years from the date of issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL.

* * * * *

## PART 384—STATE COMPLIANCE WITH COMMERCIAL DRIVER'S LICENSE PROGRAM

■ 5. The authority citation for part 384 continues to read as follows:

**Authority:** 49 U.S.C. 31136, 31301, *et seq.,* and 31502; secs. 103 and 215 of Pub. L. 106–159, 113 Stat. 1748, 1753, 1767; sec. 32934 of Pub. L. 112–141, 126 Stat. 405, 830; sec. 5524 of Pub. L. 114–94, 129 Stat. 1312, 1560; and 49 CFR 1.87.

■ 6. Amend § 383.212 by adding paragraphs (a)(1) and (2) to read as follows:

## § 384.212 Domicile requirement.

(a) * * *

(1) For applicants domiciled in a foreign jurisdiction, the State must:

(i) Comply with the document verification requirements set forth in § 383.73(m)(2) before issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL;

(ii) Retain copies of all documents involved in the licensing process, including documents provided by the applicant to prove lawful immigration status, for a period of no less than 2 years from the date of issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL; and

(iii) Provide copies of all documents involved in the licensing process to FMCSA within 48 hours after request.

(2) [Reserved]

*       *       *       *       *

■ 7. Amend § 384.301 by adding paragraph (q) to read as follows:

## § 384.301 Substantial compliance-general requirements.

*       *       *       *       *

(q) A State must come into substantial compliance with the requirements of subpart B of this part and part 383 of this chapter related to non-domiciled CLPs and CDLs, effective September 29, 2025, prior to issuing (which includes amending, correcting, reprinting, or otherwise duplicating a previously issued CLP or CDL), transferring, renewing, or upgrading a non-domiciled CLP or CDL.

Issued under authority delegated in 49 CFR 1.87.

**Jesse Elison,**

*Chief Counsel.*

[FR Doc. 2025–18869 Filed 9–26–25; 8:45 am]

**BILLING CODE 4910–EX–P**

## DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

**50 CFR Part 622**

**[Docket No. 140722613–4908–02; RTID 0648–XF240]**

**Coastal Migratory Pelagic Resources of the Gulf and Atlantic Region; Re-Opening of Commercial Harvest for Atlantic Spanish Mackerel in the Northern Zone**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule; re-opening.

**SUMMARY:** NMFS announces the re-opening of commercial harvest of Spanish mackerel in the northern zone of the Atlantic exclusive economic zone (EEZ). NMFS recently approved a second transfer of commercial quota from the southern zone to the northern zone for the 2025–2026 fishing year. Therefore, NMFS re-opens the commercial harvest of Spanish mackerel in the northern zone for an additional 8 days. The purpose of this temporary rule is to allow commercial fishermen to harvest the increased commercial quota of Spanish mackerel in the northern zone while managing the risk of exceeding the commercial quota.

**DATES:** This temporary rule is effective from September 29, 2025, through October 6, 2025.

**FOR FURTHER INFORMATION CONTACT:** Mary Vara, NMFS Southeast Regional Office, telephone: 727–824–5305, or email: *mary.vara@noaa.gov.*

**SUPPLEMENTARY INFORMATION:** The fishery for coastal migratory pelagic fish in the Atlantic includes king mackerel, Spanish mackerel, and cobia on the east coast of Florida, and is managed under the Fishery Management Plan for Coastal Migratory Pelagic Resources of the Gulf and Atlantic Region (FMP). The FMP was prepared by NMFS and the Gulf and South Atlantic Fishery Management Councils, was approved by the Secretary of Commerce, and is implemented by NMFS through regulations at 50 CFR part 622 under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act). All weights described in this document for Spanish mackerel in the Atlantic EEZ apply as either round or gutted weight. The metric conversion for the imperial measurements used in this document is 1 pound (lb) equals approximately 0.45 kilograms.

Atlantic Spanish mackerel are divided into northern and southern zones for management purposes. The northern zone for Spanish mackerel extends in the Atlantic EEZ from New York through North Carolina. The northern boundary of the northern zone extends from an intersection point off New York, Connecticut, and Rhode Island at 41°18′16.249″ N latitude and 71°54′28.477″ W longitude, and proceeds southeast to 37°22′32.75″ N latitude and the intersection point with the outward boundary of the EEZ. The southern boundary of the northern zone extends from the North Carolina and South Carolina state border along a line in a direction of 135°34′55″ from true north beginning at 33°51′07.9″ N latitude and 78°32′32.6″ W longitude to the intersection point with the outward boundary of the EEZ [50 CFR 622.369(b)(2)]. See figure 2 of appendix G to part 622—Spanish Mackerel for an illustration of the management zones.

The commercial annual catch limit (ACL; equal to the commercial quota) for the Atlantic migratory group of Spanish mackerel (Atlantic Spanish mackerel) is 3.33 million lb [50 CFR 622.384(c)(2)]. The commercial quota for Atlantic Spanish mackerel in the northern zone is 662,670 lb and is 2,667,330 lb in the southern zone for the 2025–2026 fishing year, which is March 1, 2025, through February 28, 2026 [50 CFR 622.384(c)(2)(i) and (ii)].

Regulations at 50 CFR 622.384(c)(2)(iii) allow for quota transfers between the northern and southern zones with the approval from the Regional Administrator (RA) of the NMFS Southeast Region. North Carolina or Florida, in consultation with the other states in the respective zones, may request approval from the RA to transfer part or all of a respective zone's annual commercial quota to the other zone. For the purposes of quota closures as described in 50 CFR 622.8, the receiving zone's quota will be the original quota plus any transferred amount for that fishing year only. Landings associated with any transferred quota will be included in the total landings for Atlantic Spanish mackerel, which will be evaluated relative to its total ACL.

NMFS approved and transferred 250,000 lb of Atlantic Spanish mackerel commercial quota from the southern zone to the northern zone in response to a request from the State of Florida in July 2025. Following the transfer, and because NMFS projected that landings of Atlantic Spanish mackerel from the northern zone reached the revised commercial quota, NMFS implemented a commercial closure in the northern