# NOT YET SCHEDULED FOR ORAL ARGUMENT

## Nos. 25-1215, -1224

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

JORGE RIVERA LUJAN, et al.,
*Petitioners*,

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION, et al.,
*Respondents*.

*(caption continued on inside cover)*

———————————

On Petitions for Review of a Rule of the
Federal Motor Carrier Safety Administration

———————————

**JOINT RESPONSE TO EMERGENCY MOTIONS FOR
STAY PENDING REVIEW**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
SIMON G. JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-1673*
  *simon.g.jerome@usdoj.gov*

MARTIN LUTHER KING, JR. COUNTY,
*Petitioner,*

v.

SEAN P. DUFFY, in his official capacity, et al.,
*Respondents.*

# INTRODUCTION

Because of the danger large commercial vehicles pose to other drivers, federal law has long set standards for the issuance of commercial driver's licenses (CDLs). From the beginning, those standards have required that the State issuing the CDL obtain and review an applicant's driving history from any State in which the applicant previously held a driver's license to determine if prior violations call into question the applicant's fitness for a CDL. States, however, cannot review similar driving history records of aliens not domiciled in the United States, as their driving histories are entirely or predominantly overseas and States cannot compel the production of such records.

On September 29, recognizing the risks inherent in granting CDLs to individuals whose foreign driving histories cannot be reviewed, the Federal Motor Carrier Safety Administration (FMCSA) promulgated an interim final rule limiting non-domiciliaries' eligibility for CDLs. The agency opted to forgo notice and comment in light of the public safety implications of failing to do so: put simply, as evidenced by recent accidents involving non-domiciliaries, continuing under the prior licensing regime posed an unacceptable margin of risk to the traveling public. Additionally, merely

proposing the Rule would threaten to endanger the public further by encouraging a rush of applicants to obtain or renew their CDLs before the restriction went into effect. Three weeks after the Rule became effective, petitioners filed for review in this Court and requested that the agency stay the Rule. When the agency declined to do so, petitioners filed their instant motions for stay.

Neither the merits nor the equities justify interim relief. The Rule is both an authorized and reasonable exercise of the agency's statutory authority to regulate non-domiciled CDL issuance in the interest of highway safety. Moreover, a stay would disserve the public interest by undermining the safety benefits the Rule provides to the public. This Court should deny the motions for stay pending review.

## STATEMENT

1. In 1986, commercial truck drivers posed a serious threat to those traveling on the nation's highways. That year alone, crashes involving large trucks and buses accounted for 5,895 deaths in the United States. Federal Motor Carrier Safety Admin., Large Truck & Bus Crash Facts 2020, at 4 (Sept. 2022), https://perma.cc/A2C7-WE5S.

Congress responded to the problem through the Commercial Motor Vehicle Safety Act. Pub. L. 99–570, 100 Stat. 3207 (Oct. 27, 1986). The Act aims "to eliminate unsafe commercial drivers and equipment" from U.S. roads in several ways. 132 Cong. Rec. S16919 (daily ed. Oct. 17, 1986) (statement of Sen. John C. Danforth). To operate certain large vehicles, individuals are required to obtain one (and only one) CDL, 49 U.S.C. § 31302, and to notify their employers of any driving violations, *id.* § 31303. Employers are prohibited from using drivers they know (or reasonably should know) are not properly credentialed. *Id.* § 31304. The Secretary of Transportation is required to prescribe "minimum standards for testing and ensuring the fitness of" a commercial driver, *id.* § 31305(a), and to establish a testing program for alcohol and drug use, *id.* § 31306. And, as a condition of receiving certain federal highway funds, the States—which retain their traditional authority to issue driver's licenses—must enforce the standards set by the Secretary.[1] *Id.* § 31311(a)(1).

Generally, States may issue CDLs only to their domiciliaries. 49 U.S.C. § 31311(a)(12)(A). The Act, however, also permits the Secretary to prescribe

---

[1] The Secretary has delegated the relevant regulatory authorities to the Federal Motor Carrier Safety Administrator. *See* 49 U.S.C. § 113(f); 49 C.F.R. § 1.87.

the conditions under which a non-domiciliary may obtain a CDL from a State. *Id.* § 31311(a)(12)(B)(ii). Under that authority, FMCSA in 2011 promulgated a rule creating the category of "non-domiciled commercial driver's license" for applicants domiciled outside the United States or in a State that does not issue CDLs. *Commercial Driver's License Testing and Commercial Learner's Permit Standards*, 76 Fed. Reg. 26,854, 26,878 (May 9, 2011). At present, all States issue CDLs, and so in practice non-domiciled CDLs are issued almost entirely to aliens domiciled outside the United States.

The substantive requirements for non-domiciled and domiciled CDLs alike are largely identical. *See generally* 49 C.F.R. § 383.71 (prescribing criteria generally applicable to both U.S.-domiciled and non-domiciled applicants); *id.* § 383.73 (mandating State procedures for issuing CDLs, U.S.-domiciled and non-domiciled alike). This includes a requirement that a State obtain the "complete driving record" of the applicant from any "State[] where the applicant was previously licensed over the past 10 years." *Id.* § 383.73(b)(3)(iv). The States' inability to access a single, reliable driving record for CDL applicants was, in fact, described by the agency as a "major area[] of concern" to be addressed in early versions of minimum standards

promulgated under the Act. *Commercial Driver's Licensing Standards*, 52 Fed. Reg. 20,574, 20,576 (June 1, 1987).

The requirement to check an applicant's driving history, however, is of limited effect for individuals domiciled outside the United States. Many such applicants—such as aliens present in the United States on parole or as asylees—will have little domestic driving history, if any, and virtually all of their relevant driving history would be found abroad. States lack the means to compel or otherwise to obtain formally an applicant's foreign driving history, so that information is unavailable to a State in assessing driver fitness. *See Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*, 90 Fed. Reg. 46,509, 46,514 (Sept. 29, 2025).

2. In May, President Trump ordered a review of "non-domiciled commercial driver's licenses … issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities with respect to non-domiciled CDL issuance," and for the agency to "evaluate and take appropriate actions to improve the effectiveness of current protocols for verifying the authenticity and validity of both domestic and international commercial driving credentials." *Enforcing Commonsense Rules of the Road for America's Truck Drivers*, Exec. Order 14,286, § 4, 90 Fed. Reg.

18,759, 18,759 (May 2, 2025); *see also* 49 C.F.R. § 384.307 (providing for periodic reviews of States' compliance with CDL regulations).

The agency's subsequent review of State-level licensing practices revealed "systemic procedural and computer programming errors, significant problems with staff training and quality assurance, and policies that lack[ed] sufficient management controls," resulting in the issuance of "non-domiciled CDLs to drivers who do not qualify" and of licenses "that extend beyond a driver's expiration of lawful presence," as well as failures to verify driver eligibility and "other noncompliant practices." 90 Fed. Reg. at 46,512 (internal footnote omitted). The review revealed inconsistencies or failures demonstrating acute, systemic problems across the country in the non-domiciled CDL issuance processes. *Id.*

In addition, the agency identified at least five fatal accidents involving 12 deaths in which non-domiciled CDL holders were behind the wheel in the first nine months of 2025. 90 Fed. Reg. at 46,512-13.

3. The Administrator highlighted these concerns in promulgating an interim final rule on September 29, 2025, with immediate effect. 90 Fed. Reg. at 46,509. Previously, any alien domiciled outside the United States who possessed an unexpired employment authorization document issued by

United States Citizenship and Immigration Services was eligible to obtain a CDL, despite the States' inability to obtain that individual's foreign driving history. 49 C.F.R. § 383.71(f)(2)(i) (2021). The Rule here explains that this requirement (among others) did "not provide a sufficient margin of safety to protect the traveling public." 90 Fed. Reg. at 46,514. In particular, the agency emphasized that the absence of driving history information creates "a serious risk that unsafe or high-risk drivers—who may have prior violations, suspensions, or a history of crashes in foreign jurisdictions—could … operate large trucks and buses on U.S. roadways." *Id.*

As relevant here, to address this concern, the Rule limits eligibility for a non-domiciled CDL to individuals maintaining lawful immigration status in H-2A, H-2B, and E-2 employment-based nonimmigrant categories. 49 C.F.R. §§ 383.71(f)(3)(i)(B), 383.5. The Rule explains that aliens who receive visas premised on their employment in the United States generally undergo an employer vetting process that ameliorates concerns about the lack of access to their foreign driving history, including a check for a "U.S. CDL or foreign CDL equivalent, related work experience (12 months to two years), clean driving record, pass[ed] drug or medical testing, and knowledge or proficiency in English." 90 Fed. Reg. at 46,516. Additionally, because it can

be time-consuming to sponsor a new individual to replace an H-2A or H-2B visa holder who is no longer able to work—amounting to 75 days or more—employers have strong incentives to exercise diligence in screening individuals sponsored for those visas. *Id.* at 46,516 & n.25.

The Administrator further found that the risks identified supplied good cause to forgo notice and comment. Failure to act immediately would not only place human life at risk, as the Rule details, 90 Fed. Reg. at 46,513-15, but prior notice of the agency's intentions could lead to a "concentrated surge" of applications for new or renewed licenses to escape the effect of the Rule, undermining its safety effects, *id.* at 46,514. Indeed, the agency observed a similar spike before the effective date of new CDL training requirements in 2022. *Id.* at 46,514-15. In addition, because non-domiciliaries can apply for a license in any U.S. jurisdiction, they are "uniquely mobile and can strategically apply" to the jurisdictions the Rule identifies as having "systemic weaknesses and high error rates," exacerbating the administrative difficulties States already experience. *Id.* at 46,515.

The agency will accept comments on the Rule until November 28, 2025. 90 Fed. Reg. at 46,509.

4. These stay motions arise from two consolidated petitions for review. Petitioners in *Lujan* are two non-domiciled CDL holders and two unions representing other drivers. *See Lujan* Mot. 8-9. Petitioner in *King County* is the named Washington county alone. *See King County* Mot. i. The petitions were filed the week of October 20, three weeks after the Rule was published and took effect. Later that week, petitioners requested that the agency stay the Rule's effect. The agency denied those requests on October 24. That same day, petitioners separately moved this Court for a stay of the Rule pending review. This Court has ordered a joint response to those motions.

## ARGUMENT

To obtain interim relief, petitioners must show a likelihood of success on the merits, irreparable harm, and that the harm to third parties and the public interest support interim relief. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Petitioners have failed to meet that burden here.

### A.     Petitioners Are Not Likely to Succeed on the Merits

1. a. Petitioners in both cases primarily contend that the Rule is arbitrary and capricious. Those arguments fail.

Review under the Administrative Procedure Act for arbitrary and capricious agency action is "deferential," asking "only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1511 (2025) (citations omitted).

The agency's decision to limit non-domiciled CDL eligibility to three categories of nonimmigrant visas meets that standard. The agency explained that it is impossible for States to review the driving histories of many non-domiciled CDL applicants, as their "driving history exists predominantly or solely within a foreign jurisdiction." 90 Fed. Reg. at 46,514. "Without a verified driving record, there is a serious risk that unsafe or high-risk drivers—who may have prior violations, suspensions, or a history of crashes in foreign jurisdictions—could be granted nondomiciled [commercial learner's permits] and CDLs and operate large trucks and buses on U.S. roadways." *Id.* Thus, limiting the eligibility of classes of potential applicants whose driving history cannot be ascertained "will increase safety by appreciably reducing the number of non-domiciled CLP and CDL drivers with unknown driver safety records on the Nation's roadways." *Id.* For some classes of non-domiciled visa holders, however, the agency determined

that the employer vetting process for that visa that includes a check for a "U.S. CDL or foreign CDL equivalent, related work experience (12 months to two years), clean driving record, pass[ed] drug or medical testing, and knowledge or proficiency in English" would sufficiently ameliorate these concerns, particularly given the incentives for employers sponsoring such visa holders to diligently screen such individuals. *Id.* at 46,516 & n.25.

Petitioners' contrary arguments rest primarily on a misunderstanding of the Rule's rationale. The Rule does not assert that there is a direct "link between immigration status and a driver's ability to safely operate a commercial motor vehicle." *Lujan* Mot. 10 (emphasis omitted); *see id.* 11-12 (suggesting that domiciliary CDL holders are more dangerous drivers); *King County* Mot. 17 (alleging an "inference that certain drivers are less safe than others"); *id.* 20 (similar). Indeed, as petitioners note, the Rule includes in its discussion of benefits an acknowledgment that reliable data on a "measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States" does not exist. 90 Fed. Reg. at 46,520. Instead, the salient point is that State licensing authorities do not (and cannot) assess with the same degree of confidence a non-domiciled applicant's safety because individuals domiciled outside a given State but

seeking a CDL—a category almost entirely comprised of non-domiciled aliens—tend to have driving histories outside the reach of U.S. State-level agencies. It is well within the agency's regulatory ambit to decide that credentialing individuals whose driving history is largely or entirely unknown does not provide an appropriate margin of safety, at least absent alternative vetting measures like those available to non-domiciliaries who remain eligible for CDLs. That is all the more true where many State-level agencies are demonstrably incapable of operating the non-domiciled CDL program effectively. *Lujan* Mot. 12-13. Indeed, the agency's review shows that the systemic deficiencies in States' implementation of the CDL program have resulted in numerous non-domiciliaries with unknown foreign driving records holding non-domiciled CDLs with non-compliant expiration dates or for which the driver was ineligible at issuance or renewal. 90 Fed. Reg. at 46,512.

Nor do the petitioners' allegations of underinclusiveness render the Rule arbitrary. *Contra* the *Lujan* petitioners, those non-domiciliaries who remain eligible for a CDL by virtue of their work visas are not similarly situated to those excluded from eligibility in all material respects. *Lujan* Mot. 13-14. Even if those excluded from eligibility have work authorization

and jobs requiring a CDL, they are not guaranteed to undergo the same degree of vetting the agency has reasonably concluded that employer-sponsors will conduct. 90 Fed. Reg. at 46,516. Notably, amid a critique of that vetting process's utility, King County does not mention the very thing missing from a non-domiciliary CDL applicant's background check: assurance of a "clean driving record." *King County* Mot. 19; *see* 90 Fed. Reg. at 46,516. And even if some non-domiciliaries' employers are incentivized to vet with similar rigor to work visa sponsors, *Lujan* Mot. 14; *King County* Mot. 19-20, it was reasonable for the agency to conclude that *as a class*, non-domiciliaries with work visas are more likely to be subject to rigorous screening and thus more likely to meet safety requirements. *See Magnetsafety.org v. CPSC*, 129 F.4th 1253, 1264-65 (10th Cir. 2025) (upholding a rule as reasonable for distinguishing among categories based on likely characteristics). In fact, the two named petitioners in *Lujan* are owner-operators of their own businesses, and thus unlikely to face any vetting whatsoever. Lujan Decl. ¶ 1; Semenovskii Decl. ¶ 1.

The *Lujan* petitioners impermissibly seek to substitute their own judgment for that of the agency in suggesting that because "all individuals" who apply for a CDL must complete safety testing, differences in the

availability of driving history are immaterial. *Lujan* Mot. 14; *see also King County* Mot. 19 (suggesting that work visa sponsor vetting adds little). But that argument would suggest that there is no safety-related reason to obtain *any* applicant's driving history, whether domiciled or not. That was not the view of Congress, which mandated that a State consult driving history from other States before issuing a CDL. 100 Stat. at 3207–180. Just as driving history is relevant to whether an individual should receive a CDL, it is equally reasonable for the agency to determine that the absence of such history or any substitute process makes issuance of a CDL inappropriate. And the *Lujan* petitioners are likewise wrong to assert that the agency failed to consider the interests of current non-domiciled CDL holders who would be unable to renew their CDLs under the Rule (*Lujan* Mot. 15-16): the agency explained that although "in some cases [they would] no longer be eligible for a non-domiciled CDL," 90 Fed. Reg. at 46,518, they would nevertheless "be able to find similar employment in other sectors," *id.* at 46,520, and would be able to make such a transition with "some de minimis costs," *id.*

Alternatively, King County claims, the Rule is unreasoned because the agency might have overcome the States' inability to obtain foreign driving records simply by requiring drivers to provide their records. *King County*

Mot. 20.  That suggestion is not at all "significant," "viable," or "obvious." *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015). State licensing agencies are ill-equipped to evaluate the completeness and veracity of foreign records submitted by an applicant—particularly so given their acute, systemic non-compliance with CDL standards.  Private employers, on the other hand, have not only greater resources to verify an applicant's submissions and to ensure overall safety, but also—as the Rule points out, 90 Fed. Reg. at 46,516—a strong incentive to do so.

b.  King County presses two additional arguments not advanced by the *Lujan* petitioners.  These are likewise meritless.

First, the County contends that the Rule exceeds the agency's statutory authority.  *King County* Mot. 13-16.  The Rule relies on two provisions of the Act:  the Administrator's obligation to prescribe uniform "minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle," 49 U.S.C. § 31305(a), as well as authority to set the conditions under which a non-domiciliary may hold a CDL, *id.* § 31311(a)(12)(B)(ii).  *See* 90 Fed. Reg. at 46,511.  And as explained, the Rule here relates to "the fitness" of individuals operating commercial motor vehicles insofar as driving history is a significant consideration.

The County suggests that § 31305(a) is limited to certain "regulatory tasks" related to "testing driver safety." *King County* Mot. 14. But § 31305(a) itself refers to both "standards for testing *and* ensuring the fitness" of a CDL applicant. And King County apparently does not dispute that the agency may properly invoke its statutory authority to require States to review an applicant's driving history, even though such a requirement does not expressly appear in the list of "regulatory tasks" related to "testing driver safety" the County identifies. *Id.* Given the County's apparent recognition that a driver's prior record is a significant safety consideration, it is difficult to see why the Rule's exclusion from eligibility of classes of individuals whose foreign driving record *cannot* be ascertained would be any less within the agency's authority.

The County waves away these concerns by asserting that the Rule "fundamentally concerns immigration status" rather than safety. *King County* Mot. 14. But as discussed, immigration status is relevant here only insofar as it relates to the accessibility of driving records by licensing agencies within the United States and the availability of alternative vetting mechanisms. 90 Fed. Reg. at 46,514. And the County's assertion (at 15-16) of conflict with the Immigration and Nationality Act is meritless. Employers

may be obligated to verify prospective employees' employment status, *id.*, but generic work authorization does not mean suitability for any and every job.

Second, King County's allegations of pretext are insufficient to disturb the conclusion that the Rule is reasonable under the APA. There exists a strong "presumption that public officials 'have properly discharged their official duties,'" *Hight v. DHS*, 135 F.4th 996, 1008 (D.C. Cir. 2025) (quoting *United States v. Chemical Found.*, 272 U.S. 1, 14-15 (1926)), and, as King County concedes, any review (including for pretext) "is ordinarily limited to … the existing administrative record," *King County* Mot. 21 (quoting *Department of Com. v. New York*, 588 U.S. 752, 785 (2019)).

Apart from a passing reference to "nonexistent safety concerns," *King County* Mot. 24, the County does not seriously dispute that driving history is relevant to safety, nor that State agencies cannot obtain foreign histories directly, undercutting the thoroughness of their vetting of non-domiciliaries. And so the "evidence" of the problem the agency identified indeed "match[es]" precisely the Rule's intervention. *Id.* 22 (quoting *Department of Com.*, 588 U.S. at 784). The rationality of that explanation is the beginning and end of the inquiry, even crediting King County's speculative assertions

that the agency was motivated by other reasons in promulgating the Rule. *Department of Com.*, 588 U.S. at 781 ("[A] court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." (citation omitted)).  And that rationale is not undercut by the Rule's isolated observation that there are national security implications to the issuance of CDLs to noncitizens. *King County* Mot. 22-23; *see* 90 Fed. Reg. at 46,514.

Furthermore, King County cannot justify looking beyond the administrative record to extra-record statements or other actions taken by the agency. *King County* Mot. 23-24.  Indeed, the County cites no binding authority that would suggest such a step is proper; the only decision on which it relies is an out-of-circuit decision in which, unlike here, the extra-record statements were directly opposed to the policy adopted in the rule under review. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021); *King County* Mot. 21-22.

2.  The Rule is also procedurally proper.

a.  The agency's decision to proceed via interim final rule was justified because "good cause" established that notice and comment would be "impracticable" and "contrary to the public interest."  5 U.S.C. § 553(b)(B).

The Supreme Court recently held that the Secretary of Health and Human Services properly invoked the good cause exception in support of a rule designed to "significantly reduce COVID–19 infections, hospitalizations, and deaths." *Biden v. Missouri*, 595 U.S. 87, 96 (2022); *see also Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014). Here, the threat to human life from potentially unsafe CDL holders is likewise immediate. 90 Fed. Reg. at 46,512-14. FMCSA also reasonably concluded, on the basis of a prior surge, that notice and comment could exacerbate those risks by encouraging applicants (including those with unsafe driving records) to obtain or renew CDLs immediately, before the Rule took effect.[2] *Id.* at 46,514-15; *see Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that good cause is "appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, 'announcement of a proposed rule would

---

[2] King County's insistence that a rush of applications for CDLs before the entry into effect of additional restrictions is "likely often, or even always true," *King County* Mot. 11 (quotation omitted), does nothing to undercut the urgency of proceeding by interim final rule where such a surge could lead to precisely the safety-related problems the Rule is designed to address. Further, that the data on which FMCSA relied in predicting such a surge may have been imperfect, *Lujan* Mot. 21-22, does not render the agency's reliance on it unreasonable. *District Hosp. Partners*, 786 F.3d at 61-62 (collecting cases).

enable the sort of financial manipulation the rule sought to prevent'" (quotation omitted)).

Petitioners acknowledge that an imminent threat to life generally suffices to invoke good cause, *Lujan* Mot. 17 (citing *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)); *King County* Mot. 9-10 (same), but nevertheless insist that the five fatal collisions documented in the Rule, in which 12 lives were lost, are too few to merit an interim final rule, *Lujan* Mot. 18 ("[T]hose crashes are a tiny fraction of a percentage of the total number of commercial motor vehicle crashes in a year."); *King County* Mot. 10 ("[S]ome fatal car crashes are the cost of doing business in a car and truck-reliant society."). But this Court's cases have never required a particular quantitative threshold for a threat to life to qualify for good cause. *E.g.*, *Jifry*, 370 F.3d at 1179-80.

The *Lujan* petitioners further err in focusing myopically on one aspect of the problem the Rule identifies: it is not that the systemic breakdown in State administration of commercial motor vehicle safety standards standing alone justifies an interim final rule, *but see Lujan* Mot. 19-20, but rather that such a breakdown heightens the need to ensure that CDL holders are safe operators.

b. FMCSA did not err by declining to consult with the States before promulgating the Rule. *King County* Mot. 12-13; *cf. Lujan* Mot. 20 (adverting to a similar argument in passing). The consultation language petitioners cite appears in 49 U.S.C. § 31308, which governs regulations on State issuance of CDLs, not § 31305(a) or § 31311(a)(12)(B)(ii), the authorities to prescribe fitness standards on which the agency relied here.

## B. The Balance of Harms and Public Interest Also Preclude a Stay

A stay of the Rule pending review would work significant harm to the government and the public. As a baseline matter, an order prohibiting the government from complying with its statutory mandate to ensure safe operation of commercial motor vehicles inflicts per se irreparable harm. *Trump v. CASA, Inc.*, 606 U.S. 831, 860-61 (2025) (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Furthermore, the Rule is designed to protect non-CDL holders who use the highways. Depriving them of the Rule's indirect protections also inflicts irreparable harm and disserves the public interest—not least because a stay might encourage the same surge in applications the agency sought to avoid by promulgating an interim final rule. *Noem v. Vasquez Perdomo*, --- S. Ct. ----, 2025 WL 2585637, at *4 (Sept. 8, 2025) (Kavanaugh, J., concurring) ("[A]

court must balance the harms to the regulated and negatively affected parties not only against the harms to the Government as an institution, but also against the harms to the third parties who otherwise would *benefit* from the challenged government action." (emphasis in original) (citation omitted)).

The broad-based and urgent harms posed by a stay outweigh the harms petitioners have identified. To be sure, the Rule will affect CDL holders who lose their eligibility in the near term, like the named *Lujan* petitioners and the small handful of additional drivers the union petitioners identify. But these harms pale in comparison to those the government has identified, particularly because the drivers might obtain other work to mitigate their harms while the petitions are pending.

Petitioners also invoke harms that are too speculative or remote to justify a stay, much less to outweigh the public interest. King County, for example, surmises that it might lose the investment it made in training the roughly 50 CDL holders it employs. *King County* Mot. 25-26. It is not evident why that is so; after all, the Rule does not revoke existing CDLs, and King County offers no evidence that all of its non-domiciled drivers are facing imminent expiration of their licenses, much less that whatever portion of those drivers are unable to renew during the pendency of this litigation

would be unable to continue employment with the County and obtain a license if the County ultimately prevails. For their part, the *Lujan* petitioners hypothesize various follow-on effects from a reduction in the number of CDL holders. *Lujan* Mot. 27-28. But the Supreme Court has repeatedly reaffirmed that speculation about third-party decisionmaking (here, the decisions of "states, localities, and school districts," *Lujan* Mot. 27) about how to adjust to governmental action does not suffice even for standing. *E.g.*, *Murthy v. Missouri*, 603 U.S. 43, 72 (2024). The speculative nature of those claims is underscored by the fact that non-domiciliaries account for only a small fraction of the nearly six million CDL holders nationwide. *Compare* 90 Fed. Reg. at 46,518-19 (estimating that 194,000 non-domiciliaries would be unable to renew a CDL), *with* FMCSA, 2024 Pocket Guide to Large Truck and Bus Statistics, at 7 (July 2025), https://perma.cc/MQ5P-8TJL. By extension, then, such allegations cannot carry the burden of showing "certain and great" injury. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

## C.   Any Relief Should Be Party- and Injury-Specific

If the Court finds petitioners likely to succeed on the merits of their claims and equitably entitled to interim relief, it should limit that relief in two

respects: first, to any parties who have shown irreparable injury outweighing the government's injury and the public interest in the status quo, and second, to any provisions of the Rule that are preliminarily deemed deficient with respect to those parties.[3] That conclusion is required by two related limitations on the judicial power. First, equitable relief has traditionally been limited to remedying the injuries of the complaining party before the court. *CASA*, 606 U.S. at 841-42. Similarly, equitable relief must be tailored "to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). And here, petitioners do not challenge many aspects of the Rule—including, for example, requirements about the expiration dates for non-domiciled CDLs and requirements related to renewal. *See* 90 Fed. Reg. at 46,510-11 (outlining changes from the Rule).

That petitioners style their request as seeking a "stay" of the "effective date" of the Rule does not matter. To start, petitioners' motions cannot fairly be characterized as a request to "stay" the "effective date" of a Rule that has been in effect for over a month. Properly understood, petitioners seek to

---

[3] For example, should the Court conclude that the Rule is over- or underinclusive with respect to one class of non-domiciliary, the same conclusion should not automatically hold true for all non-domiciliaries.

preclude the Rule's application to them and their licenses (or the licenses of their employees) pending this Court's review of their petitions. The point is underscored by the fact that this Court's jurisdiction over these petitions rests on the Hobbs Act, 28 U.S.C. § 2342(3)(A). That statute provides that interim relief is an equitable determination, granting the Court "discretion" to "restrain or suspend, in whole or in part, the operation of the order pending the final hearing and determination of the petition." *Id.* § 2349(b).[4] That interim equitable remedy is no less subject to traditional equitable principles—like the need to tailor relief to parties that have shown irreparable injury—than an injunction pending appeal or a preliminary injunction in a case arising from a district court.

## CONCLUSION

For the foregoing reasons, the Court should deny the motions for stay pending review.

---

[4] Petitioners' references to 28 U.S.C. § 2112(a)(4), *Lujan* Mot. 9; *King County* Mot. 9, are beside the point: that statute provides that a court of appeals may "stay the effective date" of a challenged agency order, but only "to the extent authorized by law." Section 2112(a)(4) thus provides no independent authority.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD

 */s/ Simon G. Jerome*
SIMON G. JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-1673*
  *simon.g.jerome @usdoj.gov*

OCTOBER 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing response complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the response contains 5,193 words. The response complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point CenturyExpd BT typeface.

*/s/ Simon G. Jerome*
SIMON G. JEROME