# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 25-1215                                        September Term, 2025

FMCS-2025-0622
FMCS-90FR46509

**Filed On:** November 13, 2025

Jorge Rivera Lujan, et al.,

       Petitioners

    v.

Federal Motor Carrier Safety Administration,
et al.,

       Respondents

------------------------------

Consolidated with 25-1224

**BEFORE:**   Henderson[*], Wilkins, and Pan, Circuit Judges

## O R D E R

Upon consideration of the emergency motions for stay pending review, the joint opposition to those motions, and the replies; the amicus briefs in support of the stay motions, which the court construes to include unopposed motions for leave to participate as amici; the consent motion to participate as amicus and the lodged amicus brief in opposition to the stay motions; and the administrative stay entered on November 10, 2025, it is

**ORDERED** that the motions for leave to participate as amici be granted. The Clerk is directed to file the lodged amicus brief. It is

**FURTHER ORDERED** that the administrative stay be dissolved. It is

**FURTHER ORDERED** that the emergency motions for stay be granted. Petitioners have satisfied the stringent requirements for a stay pending court review.

_____

[*] A dissenting statement from Circuit Judge Henderson is attached.

See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2025).

To start, for purposes of the stay motions, petitioners have demonstrated that they are likely to succeed in at least three of their challenges to respondents' interim final rule. That rule narrowed the circumstances in which states may grant or renew non-domiciled commercial driver's licenses ("CDLs"). See 90 Fed. Reg. 46,509, 46,510 (Sept. 29, 2025).

First, petitioners will likely succeed on their claim that the Federal Motor Carrier Safety Administration ("FMCSA") improperly issued the rule without prior "consultation with the States." 49 U.S.C. § 31308. The FMCSA's rulemaking explained that the rule was "based on the broad authority of the Commercial Motor Vehicle Safety Act of 1986," which "requires the Secretary of Transportation (Secretary), after consultation with the States, to prescribe uniform minimum standards 'for testing and ensuring the fitness of an individual operating a commercial motor vehicle.'" 90 Fed. Reg. at 46,511 (quoting 49 U.S.C. § 31305(a)) (emphasis added). The FMCSA further explained that it was forgoing state consultation because "the total cost to States of complying with these new regulations is not expected to be substantial" and because state consultation was "not practicable." Id. at 46,522–23. That rationale is plainly flawed because § 31308 contains no exceptions for insubstantial costs or impracticability. Our dissenting colleague does not argue that the agency complied with the statute and instead suggests, without elaboration, that its authority was "unclear." Dissenting Statement 6. Such an analysis does not explain why petitioners are unlikely to succeed on the merits under Nken. Even the FMCSA does not defend its prior rationale. It instead adopts a new argument that "[t]he consultation language . . . appears in 49 U.S.C. § 31308, which governs regulations on State issuance of CDLs, not § 31305(a) or § 31311(a)(12)(B)(ii), the authorities to prescribe fitness standards on which the agency relied." But we cannot rely on that misstatement of the rulemaking's basis and that rewriting of the agency's rationale, as our dissenting colleague acknowledges. See SEC v. Chenery Corp., 318 U.S. 80, 95 (1943); Dissenting Statement 6–7. In fact, the FMCSA conceded in the rulemaking that the Commercial Motor Vehicle Safety Act subjects this rule to the state-consultation requirement. See 90 Fed. Reg. at 46,511.

Second, petitioners are likely to prevail on their argument that the FMCSA has not satisfied the narrow good-cause exception to issue the rule without notice and comment. See 5 U.S.C. § 553(b)(B); Sorenson Commc'ns Inc. v. FCC, 755 F.3d 702, 706 (D.C. Cir. 2014). The FMCSA attempted to justify the good-cause exception based

on public safety.  See 90 Fed. Reg. at 46,513–14.  However, it conceded that "[t]here is not sufficient evidence, derived from well-designed, rigorous, quantitative analyses, to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL driver and safety outcomes in the United States."  Id. at 46,520.  Furthermore, according to the FMCSA's own data, non-domiciled CDL holders account for approximately 5 percent of all CDL holders but only about 0.2 percent of fatal crashes.  See id. at 46,512, 46,520 (documenting five fatal crashes involving non-domiciled CDL holders in 2025); FMCSA, Summary Report: CY 2025 Fatal Crashes, U.S. Dep't of Transp. (Sept. 26, 2025), https://perma.cc/KQ2S-YN23 (estimating a total of 2,399 fatal crashes involving large trucks and buses as of September 26, 2025).  Given the FMCSA's anticipation that less-experienced drivers would replace the non-domiciled ones forced out of the market, it does not appear to have shown that the rule would produce any net safety benefit.  See 90 Fed. Reg. at 46,520.

        Third, petitioners are likely to succeed on their claim that the FMCSA acted arbitrarily and capriciously in issuing the rule.  As discussed above, the FMCSA's own data appears to indicate that the CDL holders excluded by the rule are involved in fatal crashes at a lower rate than CDL holders who are not excluded.  Accordingly, the FMCSA does not appear to have "articulate[d] a satisfactory explanation" for how the rule would promote safety.  FDA v. Wages & White Lion Invs., LLC, 604 U.S. 542, 567 (2025) (alteration in original) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  Moreover, the FMCSA seems to have failed to adequately consider the "serious reliance interests" of those currently holding non-domiciled CDLs.  DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 30 (2020) (quoting Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221–22 (2016)).  Although the FMCSA "anticipate[d] that drivers who will no longer be eligible for a non-domiciled CDL will be able to find similar employment in other sectors" with only "some de minimis costs," it cited no support for that assertion.  90 Fed. Reg. at 46,520.  And its characterization of any transition costs as "de minimis" appears to conflict with its description elsewhere in the rule of a non-domiciled CDL as "a high-value economic credential."  Id. at 46,514, 46,520.

        The other stay factors also favor such relief.  Petitioners have shown that they face irreparable harm because the rule threatens destruction of the individual petitioners' businesses, similar harm for members of the union petitioners, and potential injury or death for residents of the county petitioner.  See Alpine Sec. Corp. v. FINRA, 121 F.4th 1314, 1329 (D.C. Cir. 2024); Mozilla Corp. v. FCC, 940 F.3d 1, 62 (D.C. Cir. 2019) (per curiam).  As to the harm to respondents and the public interest, "[t]here is

generally no public interest in the perpetuation of unlawful agency action," and "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)). Furthermore, there is an "important public interest in safety on the roads and highways." Dixon v. Love, 431 U.S. 105, 114 (1977). Whereas the FMCSA does not appear to have demonstrated any safety benefit from the rule, the county petitioner has furnished evidence that the rule would harm public safety by forcing it to replace safer experienced drivers with less-safe new drivers.

Finally, although respondents ask us to narrow any stay, we conclude that the circumstances warrant exercising our discretion to restrain the rule "in whole." 28 U.S.C. § 2349(b).

<u>**Per Curiam**</u>

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:   /s/
Selena R. Gancasz
Deputy Clerk

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting statement:

I have previously raised an alarm over the increasing trend of litigants asking us to decide complex, novel and controversial questions via emergency stay motions when "[w]e can produce a more carefully reasoned but still timely result using the expedited appeals process." *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *14 (D.C. Cir. Sept. 25, 2025) (Henderson, J., dissenting statement). But granting the extraordinary remedy of a stay—rather than expediting our review of the merits—is particularly inappropriate here.

Under the Commercial Motor Vehicle Safety Act of 1986, "[n]o individual shall operate a commercial motor vehicle without a valid commercial driver's license" (CDL). 49 U.S.C. § 31302. The Act authorizes the States to issue CDLs as a condition for receiving federal highway funds, *see* 49 U.S.C. § 31311(a), and requires the Secretary of Transportation to "prescribe regulations on minimum uniform standards for the issuance" of such CDLs "[a]fter consultation with the States," 49 U.S.C. § 31308. The Secretary has delegated this responsibility to the Federal Motor Carrier Safety Administration (FMCSA). 49 C.F.R. § 1.87(e)(1).

On September 29, 2025, the FMCSA promulgated the challenged interim final rule, which, among other things, narrows the circumstances under which the States may issue CDLs to drivers who are domiciled in a foreign jurisdiction but live in the United States. *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses*, 90 Fed. Reg. 46,509 (Sept. 29, 2025). Under the FMCSA's previous rules, the States could issue a CDL to such an individual provided he had "an unexpired employment authorization document (EAD)"

*or* "an unexpired foreign passport accompanied by an approved I-94 form documenting the [individual's] most recent admittance into the United States." 49 C.F.R. § 383.71(f)(2)(i) (2021). Under the new rule, the States may not issue a CDL to a foreign-domiciled individual *unless* he has "[a]n unexpired foreign passport[] and an unexpired Form I-94/94A" that also "indiciat[es] one of the following classifications: H-2A—Temporary Agricultural Workers, H-2B–Temporary Non-Agricultural Workers, or E-2–Treaty Investors." 49 C.F.R. §§ 383.71(f)(3)(i), 383.5 (2025); *see* 90 Fed. Reg. at 46,523.

To warrant a stay pending appeal, the movant must make a "strong showing" that he is likely to succeed on the merits, that he will be irreparably harmed absent a stay, that the balance of equities favors relief and that a stay is in the "public interest." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The petitioners have failed to satisfy the first stay factor. For that reason alone, I believe we should deny the stay.

To begin, the petitioners are unlikely to succeed on their claim that the FMCSA lacked good cause to issue its rule without notice and comment. The APA permits agencies to bypass ordinary notice and comment procedures if "the agency for good cause finds" such procedures "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). We have repeatedly recognized that good cause exists "when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare," *Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006), or otherwise "defeat the purpose" of the rule, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012).

Here, the FMCSA invoked the good-cause exception based on its determination that advanced notice and comment would cause a "concentrated surge" of CDL applications in which large numbers of drivers ineligible under the new rule would apply for, and obtain, CDL licenses before the rule went into effect—which action would both "actively subvert the rule's purpose" and endanger our Nation's roadways. 90 Fed. Reg. at 46,514. Because that is precisely "the type of exigent circumstance" that we have held "comes within the narrow 'good cause' exception of section 553(b)(B)," *Chamber of Commerce of U.S.*, 443 F.3d at 908 (citing *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983)), our only task then is to determine whether the FMCSA presented sufficient evidence in support of its good-cause determination, *see Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1145 (D.C. Cir. 1992). And in making that determination, we must be "hesitant to discount" the agency's prediction of how affected parties will react to its proposed rule because that "necessarily involve[s] deductions based on expert knowledge of the Agency." *Id*.

In my view, the FMCSA produced more than sufficient evidence that advanced notice of its rule would lead to a surge in disqualified drivers obtaining CDL licenses before its rule went into effect. Most importantly, the agency found that a similar surge had happened before. 90 Fed. Reg. 46,514–46,515. In June 2021, after announcing that it would implement new entry-level training requirements for obtaining CDL licenses by February 2022, *Extension of Compliance Date for Entry-Level Driver Training*, 86 Fed. Reg. 34,631 (June 30, 2021), the FMCSA saw the number of CDL issuances steadily increase following its announcement and nearly

double in the month before the February 2022 deadline, 90 Fed. Reg. 46,514–515. The petitioners second-guess the agency's interpretation of these facts, disputing, for example, whether the February 2022 deadline in fact caused a surge. But we must defer to the FMCSA's factual findings unless they are arbitrary and capricious. *Tri-County Telephone Ass'n, Inc. v. FCC*, 999 F.3d 714, 719 (D.C. Cir. 2021).

Nor are the petitioners likely to succeed in demonstrating that the FMCSA's rule is arbitrary and capricious. The FMCSA articulated two independent justifications for its rule—both of which bear "a rational connection between the facts found and the choice made." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014).

First, the agency explained that its rule straitened a loophole in its regulations implementing the Commercial Motor Vehicle Safety Act. 90 Fed. Reg. at 46,514; *see Associated Dog Clubs of N.Y. State v. Vilsak*, 75 F. Supp. 3d 83, 91–92 (D.D.C. 2014) ("An agency can change its prior position to address a loophole, even a longstanding one, and can decide that a growing problem warrants more oversight than was previously necessary.") (citing *Ctr. for Sci in the Pub. Interest v. U.S. Dep't of Treasury*, 797 F.2d 995, 998–99 (D.C. Cir. 1986)). The FMCSA's implementing regulations require the States to complete a check of an applicant's driving record before issuing him a CDL. 49 C.F.R. § 383.73(b)(3)(iv). As the agency explained, however, the States have been "unable to carry out this requirement" with respect to foreign-domiciled CDL-applicants because their "driving histor[ies] exist[] predominantly or entirely within a foreign jurisdiction," 90 Fed. Reg. at 46,514. To close that critical public safety

gap, the FMCSA determined that foreign-domiciled drivers may now be largely ineligible to obtain CDLs. The petitioners may disagree with that decision but under our deferential standard of review we cannot "substitute [our] own policy judgment for that of the agency." *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 937 (D.C. Cir. 2017).

Second, the FMCSA reasonably concluded that by "reducing the number of non-domiciled . . . CDL drivers with unknown driver safety records on the Nation's roadways," its rule would increase driver safety. 90 Fed. 46,516. It should go without saying that our Nation's roadways are safer the fewer people there are operating eighteen-wheelers, buses and delivery trucks with unchecked driving histories: "Without a verified driving record, there is a serious risk that unsafe or high-risk drivers—who may have prior violations, suspensions, or a history of crashes in foreign jurisdictions—could be" issued a CDL. *Id.* at 46,514. But the FMCSA also backed that common-sense proposition with facts, citing five recent fatal crashes caused by foreign-domiciled CDL-licensed drivers—three of whom had previously received citations for speeding or failing to obey traffic signals and another who had failed his initial CDL-skills test for similar offenses. *See id.* at 46,512–513 An audit of these drivers' foreign driving records could have revealed similar or more severe violations, which could have disqualified them from obtaining their CDLs.

My colleagues disagree. In their view, the FMCSA's rule will not "produce any net safety benefit" and will in fact "*harm* public safety" because, according to them, the five fatal crashes demonstrate that foreign-domiciled CDL-drivers account for "only about 0.2%" of fatal-

crashes involving commercial vehicles in 2025. To begin, the FMCSA never stated that these five examples were exhaustive; that is a finding of fact my colleagues make on the petitioners' behalf. 90 Fed. Reg. at 46,512 (identifying "at least" five fatal crashes). These examples merely bolstered the FMCSA's already reasonable determination that allowing CDL-holders with unverified driving histories on our roadways is unsafe. And in any event, it was well within the agency's policy judgment to determine that five fatal crashes (which claimed the lives of 12 individuals—two of whom were children) were five crashes too many.[1]

That leaves us with MLK County's claim that the FMCSA exceeded its statutory authority by issuing its rule without the statutorily-required consultation with the States. *See* 49 U.S.C. § 31308. The County has made plausible arguments in support of its challenge. First, the FMCSA relied exclusively on Executive Order (E.O.) 13132 to conclude that state consultation was "not practicable" and, in any event, "not required" because its rule would not "impose[] substantial direct compliance costs on State[s]." 90 Fed. Reg. at 46,522–23. But whether the FMCSA's interpretation of the E.O. 13132's provision for state-consultation—and the agency's dispensing of it—complies with § 31308 is unclear. Second, the FMCSA now argues for the first time that § 31308's state-consultation requirement is not implicated here because the agency promulgated the rule pursuant to its authority to "prescribe regulations on minimum standards for testing and . . . fitness" of CDL drivers under

---

[1] Notwithstanding I do not press the irreparable harm factor, I note the imbalance between the economic harm to the disqualified CDL applicants and lives lost.

49 U.S.C. § 31305(a), which does not contain a state-consultation requirement. That argument, however, raises a clear problem under *SEC v. Chenery Corp*, 318 U.S. 80 (1943). And a strong argument can be made that the FMCSA misreads its own rule as a "fitness" standard under § 31305(a) rather than a CDL-licensing standard under § 31308.

Nonetheless, the serious public safety considerations, the opportunity for public comment until November 28, 2025, provided in the rule, 90 Fed. Reg. at 46,515, the FMCSA's stated commitment in the rule to receive and consider "input from States" while the rule remains in effect, *id.* at 46,523, and the novelty and complexity of the issues all weigh against granting a stay. We should instead resolve these issues on an expedited merits review.[2]

\* \* \*

For the foregoing reasons, I respectfully dissent.

---

[2] The FMCSA stated as a reason for finding consultation with the 50 States "[im]practicable" the agency's "immediate need to address" the States' demonstrated failure to issue CDL licenses in compliance with the agency's own safety standards, thus perpetuating the dangers to the driving public. 90 Fed. Reg. at 46,523; *see id.* at 46,512. One does not ordinarily consult the fox to ensure the hens' safety.